**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| JOHN C. DUVALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 23-4160 |
| | ) | |
| CENTURION OF MISSOURI, LLC, | ) | |
| | ) | |
| ERNEST JACKSON, | ) | |
| | ) | |
| BRYAN POPE, | ) | |
| | ) | **CLASS ACTION COMPLAINT FOR** |
| JEFFREY PASKAR, | ) | **INJUNCTIVE AND DECLARATORY** |
| | ) | **RELIEF** |
| MAHDOKHT FARAHANI | ) | |
| | ) | |
| EARL D. SCOTT, | ) | |
| | ) | |
| KEITH SEGALL, | ) | |
| | ) | |
| KELLY MORRISS, | ) | |
| | ) | |
| TREVOR FOLEY, and | ) | |
| | ) | |
| KAREN S. BOEGER, | ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT**

# INTRODUCTION

1.      The United States Constitution and state law protects prisoners' access to basic medical and dental care. It also protects their ability to enforce these rights without fearing retaliation. Defendants have deprived Plaintiff John C. Duvall of these Constitutional rights.

2.      Plaintiff suffered for over a year with an uncapped tooth that the Dental Compensatory Defendants[1] refused to timely fix. He finally asked to have the tooth removed because fixing the tooth would require even more waiting, amount to months—with no end in sight—to his pain and suffering.

3.      Plaintiff's situation is not unique. Inmates in Missouri state prisons regularly wait years for simple fillings. Some, like Plaintiff, wait so long that the tooth becomes unrestorable. Those inmates then must wait to have the broken tooth removed. This cycle is ongoing. The Dental Injunction Defendants[2] have the power to stop this cycle.

4.      Plaintiff and the Dental Injunctive Relief Class are entirely dependent on Dental Defendants for their basic dental care—whether preventative, urgent, or emergency. However, the system provided by Dental Injunction Defendants is grossly inadequate and subjects all prisoners to a substantial risk of serious harm, including unnecessary pain and suffering, preventable tooth loss, and chronic conditions.

---

[1] The "Dental Compensatory Defendants" are Centurion of Missouri, LLC; Dr. Paskar; Dr. Jackson; Dr. Pope; and Dr. Farahani.

[2] The "Dental Injunction Defendants" are Centurion, Dr. Farahani, Trevor Foley, and Karen Boeger. Collectively, Dental Injunction Defendants and Dental Compensatory Defendants are referred to as "Dental Defendants."

5.    Plaintiff seeks injunctive relief to compel Dental Injunction Defendants to immediately provide Plaintiff and the Dental Injunctive Relief Class he represents with constitutionally adequate dental care.

6.    Plaintiff also requires naproxen to manage his pain from degenerative disc disease, injuries sustained from attacks in prison, and various other ailments. The Medical Defendants[3] added a note to his medical file that he was allergic to naproxen. This fabrication caused Plaintiff to be denied his naproxen for over eight months.

7.    When Plaintiff filed this case to hold the Dental and Medical Defendants accountable for their misconduct, they caused Defendant Kelly Morriss to transfer Plaintiff to a more dangerous unit.

8.    These violations warrant awarding Plaintiff compensatory damages, punitive damages, and all costs and attorneys' fees allowed by law. Defendants' conduct also calls for an injunction requiring them to adhere to their legal mandates.

## JURISDICTION

9.    This Court has jurisdiction over this case under 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202. This Court has Supplemental Jurisdiction to hear all state law claims pursuant to 28 U.S.C. § 1367.

10.    This Court has personal jurisdiction over all Defendants. All Defendants have continuous and systemic connections to Missouri such that they are rendered "at home" here. Further, all activities complained of in this Complaint happened in Missouri thus allowing this Court to exercise personal jurisdiction over all Defendants.

---

[3] The "Medical Defendants" are Centurion, Dr. Scott, and Dr. Segall.

11.     Venue is appropriate in this the Western District of Missouri under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this Complaint occurred in this judicial district—namely, the provision of inadequate medical and dental care to Plaintiff as well as his transfer to Unit 3.

## PARTIES

### I.     Parties to all Claims

12.     Plaintiff John C. Duvall is in the custody of the Director of the Missouri Department of Corrections. He is currently confined at the Jefferson City Correctional Center ("JCCC") and has been at all relevant times.

13.     Defendant Centurion of Missouri, LLC ("Centurion") has contracted with the State of Missouri to provide prisoners confined in the JCCC and other facilities operated by the Missouri Department of Corrections ("MDOC") with medical and dental care and treatment. In providing medical and dental care treatment to prisoners confined by MDOC, it acted under color of state law. It is being sued for its official and unofficial policies that have violated Plaintiff's constitutional rights, and it is being sued for the wrongful acts and omissions of its employees that have injured Plaintiff pursuant to Mo. Rev. Stat. § 347.075. It is being sued for all damages allowed under state and federal law.

### II.     Parties to Dental and Retaliation Claims

14.     Defendant Ernest Jackson was a sub-contractor for Defendant Centurion serving as the Missouri Director of Dental Services from November 2021 through September 2023. In that role, he was responsible for providing and ensuring that all prisoners confined by MDOC receive adequate and timely dental care. Dr. Jackson served as the "responsible chief dentist" charged with "monitoring the appropriateness, timeliness, and responsiveness of dental care and treatment." During all times mentioned herein, Dr. Jackson also provided dental care and

4

evaluation of patient needs at JCCC. In his capacity providing and monitoring dental care for prisoners confined by MDOC, he was acting under color of state law. He is being sued for all damages allowed under the law.

15. Defendant Mahdokht Farahani is the Missouri Director of Dental Services for Defendant Centurion. She started this position in September 2023. She is responsible for providing and ensuring that all prisoners confined by MDOC receive adequate and timely dental care. In her capacity providing and monitoring dental care for prisoners confined by MDOC, she was acting under color of state law. She is being sued for all damages allowed under the law.

16. Defendant Jeffrey Paskar was at all times mentioned herein employed by Defendant Centurion and Dr. Jackson as a dentist who was charged with providing dental care to inmates confined in the JCCC and other facilities operated by MDOC. In his capacity as a dentist for Centurion, he was acting under color of state law. He is being sued for all damages allowed under the law.

17. Defendant Bryan Pope was at all times mentioned herein employed by Defendant Centurion as a dentist who was charged with providing dental care to inmates confined to JCCC and other facilities operated by MDOC. In his capacity as a dentist for Centurion, he was acting under color of state law. He is being sued for all damages allowed under the law.

III.    **Parties to Medical and Retaliation Claims**

18. Defendant Earl D. Scott was at all times mentioned herein employed by Centurion as a doctor who was charged with providing medical care and treatment to inmates confined in the JCCC and other facilities operated by MDOC. In his capacity as a doctor for Centurion, he was acting under color of state law. He is being sued for all damages allowed under the law.

19. Defendant Keith Segall was at all times mentioned herein, employed by Defendant Centurion as a doctor who was charged with providing medical care and treatment to

inmates confined in the JCCC and other facilities operated by MDOC. In his capacity as a doctor for Centurion, he was acting under color of state law. He is being sued for all damages allowed under the law.

## IV. Party to Retaliation Claim Only

20. Defendant Kelly Morriss is the warden of JCCC and at all times relevant hereto was acting under color of state law in operating JCCC. She is being sued in her official capacity for injunctive relief and in her individual capacity for all damages allowed under the law.

## V. Parties to Dental Injunctive Relief Claims Only

21. Defendant Trevor Foley is the Acting Director of MDOC ("MDOC Director"). As the MDOC Director, he has authority to procure all contractual services for MDOC "through the division of purchasing or by other means authorized by law…." Mo. Rev. Stat. § 217.035. Defendant Foley is responsible for ensuring that all incarcerated individuals receive dental care that does not subject Plaintiff, or the proposed class, to violations of the Eighth Amendment. He is being sued in his individual and official capacity for injunctive relief.

22. Defendant Karen Boeger is the Director of the Division of Purchasing. The Division of Purchasing has authority to accept and authorize the state of Missouri to enter into contracts. She is being sued in her individual and official capacity for injunctive relief.

## FACTUAL ALLEGATIONS

## I. Dental Care

### A. Missouri Correctional Facilities Provide Substandard and Unconstitutional Dental Care.

23. Dental health needs are serious medical necessities, because dental care is one of the most important needs of inmates to preserve and maintain general health, including the

ability to eat and chew food, engage in normal activities, and maintain physical and dental health.

24. Dental Defendants have a policy and practice of failing to provide medically necessary dental services and are deliberately indifferent to the fact that the systemic failure to do so results in injury and a substantial risk of serious harm to prisoners.

25. Those incarcerated at Missouri correctional facilities can wait years for basic dental treatment and suffer significant pain and other harm as a result.

26. The care provided at Missouri correctional facilities amounts to dental neglect far below the standards of care set by the ADA and MDOC's own Procedure Manual.

27. Every dental professional is held to a standard of ethics both through their governing body and the American Dental Association ("ADA"). The ADA's Principle of Ethics and Code of Conduct is considered the professional guide to ethical practice.

28. One of the ADA's Principles is the Principle on Beneficence ("do good"). It provides: "This principle expresses the concept that professionals have a duty to act for the benefit of others. Under this principle, the dentist's primary obligation is service to the patient and the public-at-large. The most important aspect of this obligation is the competent and timely delivery of dental care within the bounds of clinical circumstances presented by the patient, with due consideration being given to the needs, desires and values of the patient. The same ethical considerations apply whether the dentist engages in fee-for-service, managed care or some other practice arrangement. Dentists may choose to enter into contracts governing the provision of care to a group of patients; however, contract obligations do not excuse dentists from their ethical duty to put the patient's welfare first."

29.     These ethical guidelines also provide a standard related to discontinuation of care: "Once a dentist has undertaken a course of treatment, the dentist should not discontinue that treatment without giving the patient adequate notice and the opportunity to obtain the services of another dentist. Care should be taken that the patient's oral health is not jeopardized in the process."

30.     The Missouri Department of Corrections has also published a Procedure Manual on Dental and Oral Care dated August 16, 2020. The purpose of the manual is "to ensure dental and oral care under the direction and supervision of a licensed dentist is provided to each offender in a timely manner and to provide continuity of care to offenders throughout the offender's incarceration."

31.     The MDOC Procedure Manual provides that every person incarcerated at MDOC facilities should receive an oral examination "performed by the dentist within 30 calendar days of admission to a reception and diagnostic facility." But these examinations have not occurred over at least the last four years.

32.     The MDOC Procedure Manual defines a "Dental Emergency" as "A dental problem requiring immediate dental treatment for relief of acute oral and/or maxillofacial condition characterized by trauma, infection, severe pain, swelling or bleeding, which are likely to remain acute or worsen without intervention." MDOC directs that "Dental emergencies will be responded to immediately."

33.     For non-emergency care, "Offenders submitting a request for dental treatment shall be triaged by a dental or health services staff member and referred to a dental staff member for scheduling and treatment." But MDOC facilities do not have an adequate system to ensure a fair and timely evaluation of dental requests. While medical nurses are often the ones responsible

8

for collecting, evaluating, and scheduling dental Health Service Requests (HSRs), they have not been provided the training necessary to actually evaluate or prioritize dental needs. Additionally, medical staff at MDOC correctional facilities have refused to accept requests for dental treatment submitted on HSRs including when there is no dentist staffed at a facility. Accordingly, those incarcerated at Missouri correctional facilities unnecessarily suffer pain and complications because of this lack of an adequate procedure for providing and requesting care.

34.    For non-emergency care, the MDOC Procedure Manual also confirms that oral treatment, not limited to extractions, should be "provided according to a treatment plan based on a system of established priorities for care when, in the dentist's judgment, the offender's health would otherwise be adversely affected." This includes provision of teeth cleaning. But neither MDOC nor Centurion have provided a "system of established priorities for care."

35.    According to the Procedural Manual, MDOC defines the "Responsible Dentist" as the dentist who "[s]upervises clinical judgements regarding the dental care provided to offenders. This includes establishing and implementing procedures for clinical aspects of the program, monitoring the appropriateness, timeliness and responsiveness of dental care and treatment; and reviewing the recommendations for treatment of offenders made by healthcare providers in the community."

36.    Neither Centurion nor Dr. Jackson (as Dental Director) provided the MDOC Procedure Manual to new dentists hired at MDOC correctional facilities. It is not readily accessible through a public internet search if a dentist wants to find it.

37.    The MDOC cites the National Commission on Correctional Health Care ("NCHCC") as a source of information on dental and oral care.

38. The NCCHC publishes on its website, "Guidelines for a Correctional Dental Health Care System."

39. That document "describes the necessary elements for a correctional dental health care system."[4] The NCCHC stresses the importance of correctional dental health care: "It is important that correctional institutions provide basic on-site dental services including extractions, surface restorations, prostheses, prophylaxis, and other preventative measures. Because there is a significant correlation between poor oral health and systemic health problems such as heart disease and diabetes, it is important that dental services are commensurate to the medical services system."

40. One of the key elements is "policies and procedures" to address issues "such as access to care, intake screening, oral examination, dental sick call, supplies and equipment, staffing levels, and quality improvement. The goals for a correctional dental program include pain relief, elimination of infection and disease, restoration of function, and patient education and prevention."

41. Critical to this goal is having "adequate dental care resources to avoid unnecessary delays in the delivery of oral health care." But Dental Defendants have not provided the necessary staff or resources (including working equipment) to avoid unnecessary delays in the delivery of oral health care. There are simply insufficient dentists on staff to meet the significant dental care needs of the over 20,000 incarcerated individuals in MDOC custody.

42. The NCCHC Guidelines repeatedly stress the need for periodontal care and screening because "[i]ncarcerated individuals tend to have oral soft tissue pathology that is more prevalent and varied than is seen in the noninstitutionalized population," which "leads to

---

[4] https://www.ncchc.org/wp-content/uploads/Dental-Health-Care-2014.pdf.

inflamed and significant periodontal disease, which could be very serious." Periodontal disease is a risk factor for atherosclerotic cardiovascular disease and chronic kidney disease. To account for this risk, the NCCHC states that the intake oral screening should include periodontal disease screening. Additionally, periodontal screening and recording should be done at treatment planning appointments. Correctional dental systems should have designated forms for recording periodontal screening results. Dental Defendants do not conduct periodontal screening; indeed, they do not even have an established form or method for recording.

43.    The NCCHC guidelines and standards require that only a licensed dentist perform a comprehensive oral examination. These examinations "should include review of the inmate's medical history; current complaints (if any); extraoral head and neck examination; charting of existing, missing, and decayed teeth; periodontal screening; and examination of intraoral soft tissue. When deemed appropriate, radiographs should be taken and a dental treatment plan should be developed. The examination findings should be documented. In addition, significant medical history findings regarding medication allergies, systemic diseases, and necessary precautions to be taken in treating the inmate should be noted." The NCCHC standards require such an oral examination be performed within 30 days of an inmate's admission to a prison. "Quality management assessments should monitor patient care to verify the timeliness of the examination."

44.    Another important facet of a correctional dental system according to the NCCHC is a "mechanism by which each inmate may communicate his or her dental needs to health care staff on a daily basis. This mechanism includes a process to access dental care, timely disposition of requests of requests, and priority-of-needs referral system." Dentists—not correctional staff— should be setting the priority-of-needs. And if non-dental staff are involved in aspects of

accessing correctional dental care, those non-dental health professionals "should be trained to identify and manage urgent dental needs to avoid unnecessary delay of care." While Dr. Farahani has acknowledge that this training is critical, neither Dr. Farahani nor Centurion have done this training yet.

45.     In cases of dental emergencies like maxillofacial trauma, acute oral infections involving orofacial spaces, and uncontrolled bleeding following dental extractions, the NCCHC guidelines state that care should be provided immediately. And for urgent dental needs—such as toothaches, pain after dental extraction, and abscess not involving orofacial spaces—these can be painful and should be evaluated within 72 hours of receiving an inmate's complaint.

46.     But a correctional dental care system should not be limited to simply responding to emergencies and urgent care needs. It should include "preventive, oral surgery, restorative (operative), endodontic, periodontic, prosthetics, and orthodontic dentistry."

47.     Preventive dentistry has "the goal of preventing and eliminating dental caries, periodontal diseases, oral disease, and systemic complications due to poor oral health." According to the NCCHC, preventive dentistry is important because "most gingivitis, periodontal disease, and tooth loss could be prevented since they are caused by local factors that are accessible, correctable, and controllable." A correctional dental system should establish policies on "preventive dentistry and the frequency of routine dental prophylaxis." During the relevant time period, Dental Defendants have had no such policies and have no system to ensure preventive care beyond inmate-initiated Health Service Requests. Indeed, Centurion's employees have provided no routine cleanings at JCCC since they took over dental care at the facility on November 15, 2021.

48. When it comes to dealing with restorative care, correctional dental systems should give this "significant importance" in providing care—even if the restorative care is "routine"—because "[d]elaying or deferring restorative care in a correctional setting simply leads to an increase of oral pain, infection, or tooth loss. As a result, dental services become inundated with emergency dental sick-call requests and more procedures to replace lost teeth with removable prosthetics."

49. All of these should be more than aspirational goals. The NCCHC states that these (and other) goals should be monitored, evaluated, and measured including: (1) Percentage of inmates receiving oral examinations within the specified time limit; (2) Percentage of inmates receiving oral screenings within the specified time limit; (3) Percentage of inmates whose dental health records contain notification of risk factors for periodontal disease.

50. But Dental Defendants have chosen to save money on staffing and supplies rather than meet these basic needs.

51. Despite having established MDOC Dental and Oral Care procedures, Defendants Foley and Boeger have not enforced and ensured compliance with these procedures or standards of care set by the ADA or the National Commission on Correctional Health Care.

52. A recently resigned dentist at South Central Correctional Center, Dr. James Fairbanks, has outlined the "dental neglect, specifically for failing to provide adequate dental care to incarcerated individuals in Missouri Correctional Centers" in a whistleblower letters to the U.S. Department of Justice, Civil Rights Division. (Ex. 1: May 2, 2024 Fairbanks DOJ Letter; Ex. 2: August 30, 2024 Fairbanks DOJ Letter.) In his words, "The sad reality is that standards of care regarding diagnosis, treatment planning, and periodontal maintenance are being ignored." As he highlights:

- Dental Defendants did not provide official guidelines or guidance from NCCHC to practicing dentists.

- There is inadequate staffing to meet the needs of incarcerated individuals at MDOC facilities.

- The "antiquity of some of the dental equipment" prevents proper dental examination and care.

- "Nearly all of the inmates do not have dental exams that are current. Some incarcerated individuals have not had an exam with radiographs for more than ten years." Dental Defendants' dental charting system does not even have a place to record comprehensive or periodic oral evaluations.

- There is "no place to chart periodontal probing depths, such as dental clinics or private practices would use." Dr. Fairbanks was told by Dental Defendants "not to prioritize periodontal treatment as that type of service was not part of the contract Centurion had with the state of Missouri."

- Dental Defendants have cut dental prophylaxis. "Comprehensive dental care, including diagnosis and periodontal treatment are not included" in the dental care performed by dentists at state correctional centers in Missouri. Instead, "[e]ssentially, most dental care" is "dental emergenc[y] 'triages.'" Funding for dental hygienists has been cut.

- "Requiring an HSR in order to be seen requires that a patient must identify a specific need or request for treatment. This also means even if a patient requests a Comprehensive Oral Evaluation, he/she must submit a new form to be seen each time for treatment. HSR's are typically treated as 'triage' appointments, or Limited exam focused appointments, where the dentist diagnoses a specific tooth or area. This is not the

14

standard of care for dentistry!" Defendant Centurion and Farahani told dentists that "call-back" lists should not used to ensure follow-up care. Rather, an incarcerated individual would have to continue submitting HSRs in order to have those procedures scheduled.

53.    Dr. Fairbanks has recently testified under oath that he also shared these concerns with Centurion's dental director, Dr. Farahani, by letter and through conversations. While Dr. Farahani has acknowledged many of these concerns, she has done little if anything to tackle the problems. Of particular note, Dr. Fairbanks requested an additional dentist to help care for the 1600 inmates at SCCC and catch up on the back-log from the two years without a dentist. But Dr. Farahani would not agree to that request.

54.    Because Dental Defendants do not in practice come close to meeting these basic standards, those incarcerated in Missouri correctional facilities face the resulting health consequences including suffering pain, discomfort, bleeding gums, the loss of teeth, and the heightened risk of systemic health problems such as heart disease and diabetes.

55.    Despite all the guidance pointing to the need for preventative and restorative care, the primary dental service provided by Dental Defendants is tooth extraction, even if a much less invasive procedure such as a filling is medically appropriate and necessary. Those incarcerated in Missouri correctional facilities regularly face the horrible dilemma of whether to wait to receive treatment to save a tooth (and suffering pain in the interim), or ending the pain and losing a tooth that could otherwise save. The latter can also result medical complications, dental instability, and hardships with normal functions like eating.

56.    These are not just a theoretical concern. As highlighted below, this is the very experience of Plaintiff and others. As Dr. Fairbanks explains, "I have seen patients requiring extractions on teeth that were diagnosed, in some cases years earlier, for restorative treatment

never performed." (Ex. 1.) The only thing Dental Defendants' policies accomplish is to obscure the extent of the problems by preventing any assessment and record of the problems through comprehensive and periodic oral evaluations. For example, on the wait-list Dr. Fairbanks kept, he had notes on over 500 individuals incarcerated at SCCC that needed follow-up treatment. But because these were not on HSRs, Centurion and Dr. Farahani only acknowledged a fraction of this amount. And Dr. Farahani and Centurion have instructed dentists not to use waitlists to schedule treatment.

57.     The same is true for the impact of the lack of periodontal care. As Dr. Fairbanks highlights, "the result of little to no periodontal maintenance and continuity of care has resulted in MOST of the incarcerated people I treat requiring periodontal treatment beyond just simple 'cleaning' or dental prophylaxis. In fact, most inmates I treat now require root planning procedures due to periodontal disease which may have been prevented had they received routine periodontal care."

58.     The Dental Defendants have willfully or recklessly delayed treatment to Plaintiff and others. Dental Defendants actions, omissions, policies, and practices means that practicing dentists are frustrated "in both recognizing the impossibilities and ambivalence by corporate Centurion to treat these incarcerated individuals with the same standard of care that one would receive outside a correctional institution."

59.     Despite these systemic and long-standing problems, Defendants Foley and Boeger recently entered into a new contract with Centurion for the provision of dental care at MDOC correctional facilities for another four years through June 30, 2028. Defendants Foley and Boeger are well aware of these problems and conduct tacking through the electronic medical record system to understand the dental care provided by Centurion. The new Contract has a

requirement for Centurion to provide "a comprehensive report" by August 1, 2024 "detailing the backlog of all offenders awaiting extractions and/or restorations." Defendants Foley and Boeger also receive a staffing plan as part of their review of the Centurion contract.

**B.** **This Dental Neglect Affected Plaintiff and Additional Individuals Incarcerated at Missouri Correctional Facilities.**

60. On September 9, 2002, the #4 molar in Plaintiff's mouth broke. It was fixed by placing a cap over it.

61. In June of 2019, Plaintiff received a dental examination conducted by Dr. Paskar. There is no indication in the chart that any periodontal screening occurred, and no panoramic X-ray was taken. There were no follow up visits scheduled and Mr. Duvall has not had a routine dental examination since this date. Mr. Duvall's chart simply notes that he was "instructed . . . to fill out HSR if problems occur."

62. In February 2022, the covering on Plaintiff's #4 molar—one of the last two of his remaining molars—was damaged.

63. On or about March 4, 2022, Dr. Pope saw Plaintiff about the lost filling covering his #4 molar.

64. Dr. Pope told Plaintiff that it was fixable, and that Plaintiff would be placed on a waiting list to have the tooth repaired.

65. On June 22, 2022, Plaintiff filed an informal resolution request about Dental Defendants' slow response which at that time had resulted to over four months of pain and suffering. On August 24, 2022, he escalated this request in a grievance submitted on the same day. He appealed that grievance on October 25, 2022.

66.     Dr. Jackson finally received Plaintiff's grievance on or about November 8, 2022. But he didn't respond until February 20, 2023—around a year after the repair to Plaintiff's tooth failed. In his response, Dr. Jackson stated that he would see if he could restore the #4 molar.

67.     On or about March 22, 2023, Dr. Paskar saw Plaintiff about his tooth. The medical record states that the #4 molar only had a root left and that Dr. Paskar would schedule a tooth extraction.

68.     Finally, on May 18, 2023—over a year after the filling fell out—Plaintiff saw Dr. Paskar to remove the #4 molar. During the procedure, Dr. Paskar told Plaintiff that the tooth would have been repairable outside of prison. The medical record also states that the tooth was restorable.

69.     Dr. Paskar continued by telling Plaintiff that he only did extractions at the JCCC. When Plaintiff asked to have the tooth fixed, Dr. Paskar replied that he would place Plaintiff on the filling dentist list. At that point, a dental technician informed Dr. Paskar and Plaintiff that 178 inmates were ahead of Plaintiff on that list. Dr. Paskar estimated that Plaintiff would have to wait at least six additional months to a year to have the tooth repaired.

70.     Given that Plaintiff would have to wait six more months to have his tooth fixed—on top of the 14-month wait he already had endured—he decided to have the tooth extracted.

71.     Through this year-long affair, Plaintiff suffered excruciating pain and hot/cold sensitivity from his uncapped tooth. Further, he cannot properly chew any food after his tooth lost its repair work, which aggravated his preexisting chronic diverticulitis and internal and external hemorrhoids. He has also developed blood blisters, which have developed into a permanent scar, because he cannot properly chew. Sometimes, these blood blisters burst, causing him to cough up blood. Since May 2022, he has suffered from jaw popping and pain.

72.     In addition, while Plaintiff was waiting for his tooth to be repaired, the tooth split apart, making his pain and prognosis worse.

73.     Plaintiff's situation of needlessly waiting for appropriate dental care is not an isolated incident:

      a.     Inmate Everett Ulshafer #1000338 lost a filling two years ago and put in a health service request to have it fixed. It is still not fixed.

      b.     Inmate Scott Johnson #1349721 has had a tooth infection for nearly a year.

      c.     Inmate Anthony Genovese #500255, despite being in pain from a cavity for months, has received no dental care.

      d.     In August 2022, Inmate Dean Havens #272145 was received at a reception center and seen by a Dentist who noted his cavity. More than a year later, Mr. Havens tooth still has not been fixed.

74.     The average wait time to get a tooth repaired at JCCC is more than 10 months no matter how much pain an inmate is experiencing.

75.     Inmates at other Missouri correctional centers have endured similar experiences. At the South Central Correctional Center ("SCCC"), James Thompson waited over 2 years to receive a filling while in the custody of the Missouri Department of Corrections. Mr. Thompson repeatedly told prison medical staff that his tooth was painful—indeed, it was so painful to eat that he lost 50 pounds. Mr. Thompson had to file a lawsuit before he was seen by any dentist. *See* Doc. 71, Jackson Summary J. Order, *Thompson v. Buckner*, Case No. 23-3002 (W.D. Mo. Mar. 20, 2024). For most of this period, Defendants Centurion and Jackson did not have any dental staff at SCCC. In fact, the facility did not have a dentist for around two years. A nurse told Mr.

Thompson that after SCCC's dentist had retired, Defendants were "too cheap to hire another one."

76. At SCCC, dentists also lacked the necessary equipment and supplies to timely and properly provide dental care.

## II. Medical Care

77. Plaintiff incorporates by reference all the allegation above as if they are set forth herein.

78. Among other conditions that require consistent treatment, Plaintiff suffers from degenerative disc and joint disease, among other conditions that cause him excruciating pain.

79. For years, Plaintiff has managed his pain with naproxen. Indeed, Plaintiff's medical chart has prescriptions for naproxen as far back as 2002.

80. Throughout this time, Plaintiff has never had an allergic reaction to naproxen.

81. Relevant for this case, on or about April 6, 2022, Defendant Segall prescribed Plaintiff naproxen for his pain and suffering caused from his injured shoulder and his degenerative disc and joint disease.

82. The medical note from April 6, 2022 states that the plan for Plaintiff was for him to refill his naproxen.

83. Then, without any reason given, the medical record has an entry time-stamped April 13, 2022, that says "discontinue naproxen due to possible allergies."

84. Plaintiff went to pick up his naproxen after that visit but was not allowed to receive it.

85. Drs. Segall and Scott conspired to change Plaintiff's medical file to falsely list him as being allergic to naproxen. Plaintiff is not allergic to naproxen and has never told anyone

that he is allergic to naproxen. Both doctors knew that Plaintiff was not allergic to naproxen and that he needed that medicine to manage his pain.

86.     Plaintiff did not discover this inaccuracy in his medical record until on or about May 24, 2022, when he spoke with a nurse about why he was not receiving his naproxen. The nurse informed Plaintiff that the medical record would be corrected and that he would receive his naproxen.

87.     On May 27, 2022, Dr. Segall told Plaintiff that Dr. Scott had ordered Dr. Segall to list Plaintiff as being allergic to naproxen even though Plaintiff had never had an allergic reaction to naproxen.

88.     Despite admitting to Plaintiff that his record was erroneously changed to state that he was allergic to naproxen, the Medical Defendants continued to deny naproxen to Plaintiff until December 20, 2022.

89.     The Medical Defendants willfully, wantonly, recklessly, and maliciously delayed giving Plaintiff access to naproxen knowing he needed that medication to manage his pain.

III.    **Retaliation**

90.     On May 31, 2023, Plaintiff filed this action in Cole County Circuit Court. *See* Doc. 1-1 at 1.

91.     At that time, Plaintiff was housed in Unit 4D.

92.     On September 21, 2023, Plaintiff was moved to Unit 3. Unit 3 is a lock-down unit and inmates in that unit have a more difficult time accessing the law library.

93.     Before this transfer, his caseworker told Plaintiff that she would have Plaintiff moved to Unit 1, which is a semi-medical unit.

## CLASS ACTION ALLEGATIONS

94.     Plaintiff Duvall seeks certification on behalf of a Dental Injunctive Relief Class defined as follows: All individuals who are incarcerated now, or will be in the future, in Missouri adult correctional facilities subjected to the dental care policies and practices of the Dental Defendants.

95.     Plaintiff reserves the right to modify or refine the definitions of the Dental Injunctive Relief Class based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

96.     Excluded from the Dental Injunctive Relief Class are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants' and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which Defendants or their parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

97.     **Numerosity (Rule 23(a)(1)).** The Dental Injunctive Relief Class is so numerous that joinder of individual members herein is impracticable. The exact number of members of the Class, as herein identified and described, is not known, but upon information and belief, there are tens of thousands of individuals incarcerated in Missouri correctional facilities subjected to the dental care policies and practices of the Dental Defendants.

98. **Commonality (Rule 23 (a)(2)).** Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Dental Injunctive Relief Class members, including the following:

- Whether Dental Injunction Defendants failure to operate a dental care system providing minimally adequate dental care violates the Cruel and Unusual Punishment Clause of the Eighth Amendment?

- Whether Dental Injunction Defendants have been deliberately indifferent to the serious needs of class members?

99. **Typicality (Rule 23(a)(3)).** Plaintiff's injunctive relief claims are typical of the claims of the other members of the proposed Dental Injunctive Relief Class. Plaintiff and members of the Dental Injunctive Relief Class suffered injuries as a result of Defendants' wrongful conduct that is uniform across the Dental Injunctive Relief Class.

100. **Adequacy (Rule 23(a)(4)).** Plaintiff's interests are aligned with the Class they seek to represent. Plaintiff has and will continue to fairly and adequately represent and protect the interest of the Dental Injunctive Relief Class. Plaintiff has retained competent counsel highly experienced in complex litigation and class actions and the types of claims at issue in this litigation, with the necessary resources committed to protecting the interest of the Dental Injunctive Relief Class. Plaintiff has no interest that is antagonistic to those of the Dental Injunctive Relief Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and counsel are committed to vigorously prosecuting this action on behalf of the members of the Dental Injunctive Relief Class. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to those of the other members of the Dental Injunctive Relief Class.

101.   This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because there are tens of thousands of class members and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Dental Injunction Defendants. Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

102.   This action is also maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Dental Injunction Defendants' policies, practices, actions, and omissions that form the basis of this complaint are common to and apply generally to all members of the class, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the class. All state-wide dental care policies are centrally promulgated, disseminated, and enforced. The injunctive and declaratory relief sought is appropriate and will apply to all members of the Dental Injunctive Relief Class.

## CLAIMS FOR RELIEF

### COUNT I - § 1983 DELIBERATE INDIFFERENCE TO DENTAL CARE

### Individually against Defendants Centurion, Farahani, Jackson, Paskar, and Pope

103.   Plaintiff incorporates by reference the allegations above as if set forth herein.

104.   The Dental Defendants all acted under the color of state law when they were providing dental care to inmates at JCCC, including Plaintiff.

105.   Drs. Pope, Jackson, and Paskar were all deliberately indifferent to Plaintiff's objectively serious dental needs because they knowingly failed to timely fix Plaintiff's #4 molar even though they knew that the unfilled tooth was causing Plaintiff extreme pain.

106.    Centurion is also liable for the failure to timely fix Plaintiff's #4 molar because there was a policy, custom, or action by those who represent Centurion's official policy that caused the untimely care.

107.    Because of the Dental Defendants' failure to provide him timely dental care, Plaintiff has suffered damages.

**COUNT II - § 1983 DELIBERATE INDIFFERENCE TO DENTAL CARE (INJUNCTIVE RELIEF)**

**Individually and on behalf of the Dental Injunctive Relief Class against Defendants Centurion, Farahani, Foley, and Boeger**

108.    Plaintiff incorporates by reference the allegations above as if set forth herein.

109.    The Dental Injunction Defendants all acted under the color of state law when they were providing dental care to inmates at JCCC, including Plaintiff.

110.    By their policies and practices described herein, Dental Injunction Defendants subject Plaintiff and all members of the Dental Injunctive Relief Class to a substantial risk of serious harm and injury from inadequate dental care. These policies and practices have been and continue to be implemented by Dental Injunction Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their individual and official capacities, and are the proximate cause of Plaintiff's and the Dental Injunctive Relief Class's ongoing deprivation of rights secured by the U.S. Constitution under the Eighth Amendment.

111.    Dental Injunction Defendants have been and are aware of all of the deprivations complained of herein and have condoned or been deliberately indifferent to such conduct.

112.    Plaintiff and the Dental Injunctive Relief Class have no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint. Plaintiff has suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of

Dental Injunction Defendants, as alleged herein, unless Plaintiff and the Dental Injunctive Relief Class are granted the equitable relief they request.

## COUNT III – STATE LAW DENTAL MALPRACTICE

### Individually against Defendants Centurion, Farahani, Jackson, Paskar, and Pope

113.    Plaintiff incorporates by reference all the allegations above as if they are set forth herein.

114.    Plaintiff and Drs. Pope, Jackson, and Paskar had a physician-patient relationship to provide dental care to Plaintiff. Because Centurion employed Drs. Pope, Jackson, and Paskar, it is liable for their actions.

115.    The Dental Defendants failed to exercise the requisite degree of care and skill by failing to timely fix Plaintiff's #4 molar.

116.    This failure caused Plaintiff to suffer actual damages.

## COUNT IV - § 1983 DELIBERATE INDIFFERENCE TO MEDICAL CARE

### Individually against Defendants Scott and Segall

117.    Plaintiff incorporates by reference all the allegations above as if set forth herein.

118.    The Medical Defendants acted under color of state law when they provided medical care to inmates at JCCC, including Plaintiff.

119.    Drs. Segall and Scott were deliberately indifferent to Plaintiff's medical need when they conspired to change Plaintiff's medical record to falsely state that he was allergic to naproxen despite knowing that he never had an allergic reaction to naproxen in the nearly 20 years that he had been taking that medication. They also knew that Plaintiff needed the naproxen to manage his pain.

120.    Centurion has a policy that results in doctors refusing to dispense naproxen to inmates—including Plaintiff—for the purpose of saving money.

121. Because of the Medical Defendants' actions, Plaintiff has suffered harm.

## COUNT V – STATE LAW MEDICAL MALPRACTICE

### Individually against Defendants Scott and Segall

122. Plaintiff incorporates by reference all the allegations above as if set forth herein.

123. Plaintiff and Drs. Segall and Scott had a physician-patient relationship to provide medical care to Plaintiff. Because Centurion employed Drs. Segall and Scott, it is liable for their actions.

124. The Medical Defendants failed to exercise the requisite degree of care and skill by changing Plaintiff's medical record to state that he was allergic to naproxen despite no evidence supporting that assertion.

125. This failure caused Plaintiff to suffer actual damages.

## COUNT VI - § 1983 RETALIATORY TRANSFER

### Individually against Defendants Centurion, Farahani, Jackson, Paskar, Pope, Scott, Segall, and Morriss

126. Defendants conspired to move Plaintiff to Unit 3 because of this lawsuit and other activities Plaintiff has engaged in to exercise his constitutional rights.

127. If Plaintiff had not filed this lawsuit or otherwise exercised his constitutional rights, he would not have been transferred.

128. Plaintiff has suffered harm by Defendants' actions.

129. Plaintiff will also suffer irreparable harm if he remains in Unit 3. The balance of harms and the public interest favor transferring Plaintiff to Unit 1.

WHEREFORE, Plaintiff respectfully asks the Court for an order:

a. Certifying the Injunctive Relief Count on behalf of the Dental Injunctive Relief Class as requested herein as a Class Action, designating Plaintiff as the representative of the Dental Injunctive Relief Class, and appointing Plaintiff's counsel as Class Counsel for the Dental Injunctive Relief Class;

b. Awarding Plaintiff all compensatory damages to be determined at trial;

c. Awarding Plaintiff punitive damages to be determined at trial;

d. Awarding Plaintiff attorneys' fees, all costs, and pre-judgement and post-judgment interest allowed under the law;

e. Preliminarily and permanently enjoining Dental Injunction Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law from subjecting Plaintiff and the Dental Injunctive Relief Class to the illegal and unconstitutional conditions, acts, omissions, policies, and practices set forth above;

f. Declaring that:

    i. Dental Injunction Defendants' actions, omissions, policies, and practices are in violation of the rights of Plaintiff and the Dental Injunctive Relief Class a violation of the Eighth Amendment of the U.S. Constitution;

    ii. Defendants Centurion, Farahani, Jackson, Paskar, and Pope committed dental malpractice under state law;

    iii. Medical Defendants' actions constitute a violation of the Eighth Amendment of the U.S. Constitution and medical malpractice under state law;

    iv. Defendants actions amounted to a retaliatory transfer in violation of the Eighth Amendment of the U.S. Constitution.

g. Requiring Dental Injunction Defendants and their agents, employees, officials, and all persons acting in concert with them under color of state law, to develop and implement as soon as practical a plan to eliminate the substantial risk of serious harm to Plaintiff and members of the Dental Injunctive Relief Class suffer due to Dental Injunction Defendants' inadequate dental care. Dental Injunction Defendants' plan shall include at a minimum:

  i. Staffing sufficient to provide Plaintiff and Dental Injunctive Relief Class members with timely access to qualified and competent dental providers who can provide prophylactic, routine, urgent, emergent, and specialty dental care;

  ii. Policies and practice that provide timely access to dental care including training for non-dental correctional staff.

  iii. Policies and practices that reliably screen for dental conditions that need treatment.

  iv. Policies and practices that provide timely access to emergency and urgent dental care.

  v. Provision of adequate dental supplies and equipment to ensure timely and necessary dental care.

  vi. A regular quality assurance assessment of dental care staff, services, procedures, and activities designed to improve outcomes, identify and correct errors, and determine systemic deficiencies.

h. Issuing an injunction requiring Plaintiff to be transferred to Unit 1; and

i. Retaining jurisdiction of this case until Dental Injunction Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that

Dental Injunction Defendants will continue to comply in the future absent continuing jurisdiction; and

j.   Awarding any other relief that the Court deems just.


Dated:        November 14, 2024               Respectfully submitted,

                                              */s/ Ruth Anne French-Hodson*
                                              Ruth Anne French-Hodson    #65461
                                              Sarah T. Bradshaw          #66276
                                              Nathan A. Kakazu           #70157
                                              Sharp Law, LLP
                                              4820 W. 75th St.,
                                              Prairie Village, KS 66208
                                              Telephone: (913) 901-0505
                                              Facsimile: (913) 261-7564
                                              rafrenchhodson@midwest-law.com
                                              sbradshaw@midwest-law.com
                                              nkakazu@midwest-law.com

                                              *Attorneys for Plaintiff John C. Duvall*

## CERTIFICATE OF SERVICE

I hereby certify that on 14th day of November 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system:

SANDBERG PHOENIX & von GONTARD P.C.
Dennis S. Harms Katherine M. Grady
600 Washington Avenue - 15th Floor St. Louis, MO 63101-1313
314-231-3332; 314-241-7604 (Fax)
dharms@sandbergphoenix.com
kgrady@sandbergphoenix.com
*Attorneys for Defendants*
*Earl Scott, MD,*
*Keith Segall, MD,*
*Centurion of Missouri, LLC*
*Dr. Jeffery Paskar*

J. Thaddeus Eckenrode,
ECKENRODE-MAUPIN,
Attorneys at Law
11477 Olde Cabin Rd., Ste. 110
St. Louis, MO 63141
(314) 726-6670 (Telephone)
(888) 726-9086 (Toll-free)
(314) 726-2106 (Fax)
jte@eckenrode-law.com
*Attorney for Defendant Dr. Ernest Jackson*

*/s/Ruth Anne French-Hodson*
Attorney for Plaintiff John C. Duvall