Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

JOHN C. DUVALL vs. EARL D. SCOTT, ET AL.

Cause No. 23-04160-CV-SRB-P

(Deposition start time: 10:44 a.m.)

VIDEO DEPOSITION OF KEITH LUEKING
TAKEN ON BEHALF OF THE PLAINTIFF

JULY 1, 2026

Page 2

I N D E X

Direct Examination by Mr. Hodes Page 7
Cross Examination by Mr. Harms Page 124
Redirect Examination by Mr. Hodes Page 140

(Plaintiff's Exhibits 1-13 and Defendant's Exhibit A were retained by the reporter for attachment to all copies).

EXHIBITS

Plaintiff's Exhibit 1 Page 9
AmendedNotice of 30(b)(6) Deposition

Plaintiff's Exhibit 2 Page 32
Notice of Contract Amendment

Plaintiff's Exhibit 3 Page 36
Email Chain, 12/22/23

Plaintiff's Exhibit 4 Page 40
Email Chain, 2/12/24

Plaintiff's Exhibit 5 Page 48
Email Chain, 4/18/24

Plaintiff's Exhibit 6 Page 57
Organizational Chart, 3/9/23

Plaintiff's Exhibit 7 Page 62
Organizational Chart, August 2023

Plaintiff's Exhibit 8 Page 84
NCCHC Accreditation Report-Moberly
2/9/24

Plaintiff's Exhibit 9 Page 91
NCCHC Accreditation Report-Fulton
3/1/24

Page 3

Plaintiff's Exhibit 10 Page 93
MDOC Potosi Audit

Plaintiff's Exhibit 11 Page 98
MDOC Booneville Audit

Plaintiff's Exhibit 12 Page 111
Eastern REgion Backlog Report
6/16/23

Plaintiff's Exhibit 13 Page 117
MO Weekly Site Backlog Data
Dental-7/22/25

Defendant's Exhibit A Page 127
NCCHC Audit Report-Moberly
8/23/24

Page 4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

JOHN C. DUVALL, )
)
PLAINTIFF, )
)
VERSUS ) CAUSE NUMBER 23-04160-CV-SRB-P
)
EARL D. SCOTT, ET AL., )
)
DEFENDANTS. )

VIDEO DEPOSITION OF KEITH LUEKING, taken to be used in an action pending in the United States District Court, Western District of Missouri, Central Division, wherein John C. Duvall is Plaintiff and Earl D. Scott, et al. are Defendants, pursuant to agreement between counsel, under the provisions of Rule 26(a) of the Rules of Civil Procedure, taken on July 1, 2026, at the offices of Sandberg Phoenix, 701 Market Street, St. Louis, Missouri, 63101, before Linda A. Madel, a Certified Court Reporter, #535, and Notary Public within and for the State of Missouri; taken on behalf of the Plaintiff.

EXHIBIT
A

**to, yes.**
Q Now, is this the operative contract between Centurion of Missouri and MDOC?
**A No, this is an amendment to the original contract. It's Amendment Number 6.**
Q Okay. And in amending or I guess extending the pre-existing contract, who -- did MDOC or Centurion of Missouri come to the table to extend the contract?
**A We came to the table together. I mean it was -- it's a definitive active end date that had to be extended. So, yes, we --**
Q Together?
**A -- came to the table together.**
Q And for how long does this amendment run for?
**A I think it runs through June of 2028.**
Q Yeah, Page 2. Yeah, June 30th, 2028. Now, you mentioned Centurion and MDOC came to the table together because the previous extension was -- had a finite date. So who was involved in discussing or working together to extend the contract?
**A I believe the actual meeting was myself; David Shinn, who was the chief operating officer at the time; Julie Bueler, who was the vice-president -- the regional vice-president of operations. And then the Missouri Department of Correction staff that represented them.**



Q Now, what changed in the sixth amended -- or the sixth amended -- oh, my gosh -- sixth amendment to the contract from previous versions; let's say the fifth?
**A Termination date was extended naturally. The compensation schedules were updated to reflect, you know, increases in dollars, you know, dedicated to the contract. And then the basic contract was amended based on all of the different things you see here. For instance, we switched to a daily pill pack medication dosing system, different performance measures were updated or amended.**
Q Was there any discussion in, you know, coming to this sixth amended -- sixth amendment, was there any discussion of backlogs and how those would function or why those would be kept? Did anything change regarding backlogs?
**A No.**
Q Okay. You mentioned there was some pricing adjustments. Was there any discussion of staffing needs generally?
**A Not to my recollection.**
Q Not about hiring additional folks for specific roles or reducing specific folks for specific roles?
**A As part of this amendment the staffing tables did not change, no. None of the staffing matrixes changed.**
Q And then you mentioned there was, you know,



increases for pay and things like that. Was that the only thing for I guess what you would call make an increased budget or were there other discussions for increasing funding to Centurion or anything like that?
MR. HARMS: Object to the form. Go ahead.
**A The increase in funding is largely as you'd expect during this time period or any time period, it is the result of just inflationary pressures on the need for additional compensation based on hospital charge masters going up, the fee schedules with Medicare going up. Just normal inflation.**
Q Okay. And would COLA or cost of living adjustments be one of those things?
**A Yes.**
Q Was the fine for potentially not treating and/or certain performance measures, was that added in this contract amendment or was that a pre-existing measure?
**A The original contract had a set of performance measures. Some were added, removed or changed as a part of this amendment. Is that -- am I responsive to the question? I'm not sure I'm answering it.**
Q Does -- do any of those changes -- was one of them the fine for not getting a filling or extraction done within six months?
**A Yes, that was a -- that was a performance measure**



**that was added.**
Q Was anything discussed in these negotiations to change that did not become a part of the final contract or this amendment?
**A I'm not sure I understand the question. Can you rephrase it.**
Q Were there certain performance measures or different topics that were discussed and negotiated that did not end up being a part of the final sixth amendment?
**A Not that I can recall.**
Q Okay. You can set that to the side.
I'll mark this as Exhibit 3. This an email chain and the Bates label is Duvall, D-u-v-a-l-l, 0312389. Have you seen this email chain before?
**A No.**
Q So this is an email -- or I guess the original email, the second one in the chain, is an email from Julie Buehler, who you mentioned, from December 22nd, 2023, at 6:09 a.m. And it doesn't have who it was sent to necessarily. I would presume it's some of the folks mentioned at the top.
So it describes some possible performance measures and it seems like she's taking them from the Florida contract. So let's see. She says as discussed at the meeting regarding performance measures, I'm sharing a few of the options from one of our other contracts related to dental

Page 105

noncompliance with these performance measures addressed by Centurion?

A **We strive to be at 100 percent, so every day we would look at the provision of care and determine what can be improved. Sorry. It's a general question. I'm not sure how to answer.**

Q Would staffing additional folks be one way to address noncompliance?

A **If staffing is a solution to the issue, yes.**

Q I want to look at Page 6 now. You'll see C point -- C.11, fillings and extractions. Where it states here the contract shall ensure -- or sorry. The contractor shall ensure that restorations and extractions are completed within six months from the date the health service request, HSR, is triaged/referred by nursing to dental services.

Can you describe how Centurion would track this six month compliance threshold or measure that's included here in the contract?

A **It would be the date associated with the HSR to completion of the service.**

Q And they generate -- do they -- sorry. Do they generate reports reflecting that specific data that you mentioned?

A **Yes, that's how it's monitored.**

Q And that next sentence states nursing referral of

Page 106

HSR to dental services, dental provider triage indicating need for restoration or extraction specific to tooth number and procedure completion specific to type of procedure and tooth number shall be documented and linked to the same HSR number in the electronic medical record system as required by the state agency for tracking purposes.

Are HSRs submitted each given a specific HSR number?

A **I don't know that. It's a paper document.**

Q That you said the policy of was to enter into the electronic system, correct?

A **Yes.**

Q When they enter it into the electronic system, is every HSR then assigned an HSR number?

MR. HARMS: Object to the form; asked and answered. Go ahead.

A **I believe it is.**

Q (By Mr. Hodes) What -- from a specific HSR what information that's submitted on that paper form gets into the electronic system?

A **I don't have that information.**

Q Why is it important to have a system in place to track these HSRs?

MR. HARMS: Object to the form.

A **If we didn't have a system, we couldn't complete**

Page 107

**the monitoring.**

Q (By Mr. Hodes) To your understanding is an HSR automatically assigned a number or is that a manual process?

A **I do not know.**

Q Is this electronic system mentioned here what's called MOCIS, M-O-C-I-S?

A **I don't know if that's what the author of this document refers to or not. That would be a question for the Department of Corrections.**

Q What electronic system does Centurion use to track HSRs then?

A **If it's not the electronic medical record, it is a manual log.**

Q Does -- to your knowledge does MDOC monitor whether sites are assigning HSR numbers?

A **I don't know.**

Q Would it create a problem if there was no HSR number associated with a given HSR?

MR. HARMS: Object to the form. Go ahead if you know.

A **I'd be speculating. You're asking is there a problem if it's not an automatically generated document number?**

Q (By Mr. Hodes) Is it harder to track an HSR if it

Page 108

is not given a specific HSR number?

A **That seems like a logical conclusion, yes.**

Q Looking at the next sentence under C.11. Fillings and Extractions, the same subsection, if performance falls below 90 percent of this standard during the review period, the contractor shall issue a credit to the state agency in the amount of $263.98 times the number of offenders with fillings and extractions not completed as outlined in the above time frame.

Is that the financial penalty we briefly touched on earlier today?

A **Yes.**

Q And is the review period the six month time frame mentioned within this paragraph?

A **Yes, they have to be completed within six months.**

Q Who conducts the review of whether or not Centurion is at 90 percent compliance?

A **The Missouri Department of Corrections.**

Q Does Centurion internally monitor or review that data as well?

A **I believe we do, yes.**

Q Who would be responsible for reviewing that?

A **I don't know locally, but the ultimate responsibility lies with the vice-president of operations.**

Q How -- I'm sorry. Are you aware of what is called

notice of deposition handy. I'd like to just point you back to Topic Number 12. And that topic is number of FTE dentists from January 1, 2024, to present and vacancies at any facility during that period. Can you remind me of your definition of vacancy for a role?

A My -- the company's definition of a vacancy?

Q Yes.

A A vacancy would be not providing the FTEs specified in the staffing compliment.

Q So from January, 2024, to the present has Centurion had vacancies at given facilities?

A I'd have to refer to the document that was generated as part of discovery, but I believe so, yes.

Q Are you aware of individual sites that have had vacancy issues?

A Can you define an issue.

Q I guess -- sorry. Just a vacancy, not vacancy issue. That's my fault.

A Yeah, I mean any particular site may not fulfill the FTE requirement on any given day, month or week, but we're using additional staff to cover for those individuals or Dr. Farahani, for instance, is traveling to many sites to see patients.

Q From January, 2024, to the present are you aware of Algoa Correctional Center, ACC, having a vacancy for a



dentist role?

A Not off the top of my head. I'd have to look at the responsive documents.

Q Would that be the same for the other eighteen Missouri facilities?

A Yes.

Q Is there a contract penalty for not having a dentist at a facility?

A There is not a performance measure nor a credit as specified in the contract for a vacancy.

Q When does Centurion decide to look to hire an additional dentist?

A Whenever there's a clinical need.

Q So there could be a vacancy at I'll just use ACC, for example, but that vacancy I guess could be filled with other folks providing their own FTE hours?

A Yes.

Q Would -- if that was the case, would that then not be a vacancy because a provision of care is being provided?

MR. HARMS: Object to the form.

A There's a difference between a person and someone providing hours of coverage. Is that fair?

Q Fair to me.

A Okay.

Q And so if there is someone providing, you know,



hours, FTE hours, would Centurion immediately start looking for a new dentist?

A We would always recruit for a need if that's the question.

Q Are there -- are there specific metrics that Centurion would look at to determine whether to increase FTE hours or fully hire a new dentist?

A Many factors. Patients --

Q What might some of those be?

A Patients waiting to be seen would be one.

Q What are some of the other ones?

A It's largely backlog and, yeah, patient volume.

Q Do specific treatments factor in? For example, if the backlog for prosthetics was a certain number or would that kind of categorization not really change anything?

A I think the full scope of everything outstanding would play into the decision, yes.

Q Would -- have there been instances between January, 2024, and present where there's a vacancy at a given facility, but the FTE coverage is sufficient to handle backlogs or other things?

A It would take clinical judgment, but I would assume, yes, we've been able to cover clinical need with staff from other facilities or the statewide dental director.



Q You mentioned that there is a document or something that outlines some of these vacancies. What document is that?

A One of the documents I reviewed was a recruiting summary of where we're looking for positions.

Q So even if another Centurion provider was contributing FTE hours to help with a vacancy, would they still be on that -- would that vacancy be on that recruiting log to be --

A Likely, yes.

MR. HODES: Okay. That's all the questions I have.

MR. HARMS: I have some follow-ups.

CROSS EXAMINATION

BY MR. HARMS:

Q I'm going to try my best to go roughly in the order of the topics. So I'll ask you some questions about Topic Number 1, Centurion's information systems. You were asked some questions earlier about how HSRs are handled, right?

A Correct.

Q And it was your testimony that HSRs are somehow logged into the Missouri Department of Corrections electronic health record system; is that right? Yes?

A Yes.

Q Do you know whether or not the functionality of

let me start over.

The only compliance metric related to dental care that is in the contract between Missouri Department of Corrections and Centurion is the compliance metric that was added as a part of the sixth amendment to the contract, correct?

A That is correct.

Q And that compliance metric deals with performing fillings and extractions within six months of the date care is sought, correct?

A Correct.

Q And since that was added to the contract with the sixth amendment, that compliance has been tracked via various backlog reports, correct?

A By various compliance reports, yes.

Q Sure. And as a part of your preparation for this deposition you determined whether or not Centurion was or was not, in fact, in compliance with that compliance metric, true?

A True.

Q Since July of 2025 has Centurion been in compliance with that contract compliance metric?

A Based on my review of the documents we have maintained compliance since July, 2025, yes.

Q You were asked a bunch of questions earlier about



policies and who in Centurion of Missouri has authority to change policies, draft policies, all of those things; remember that testimony?

A Yes.

Q The clinical policies that are in use at all of Missouri Department of Corrections facilities, are those Centurion policies or Missouri Department of Corrections policies?

A All policies are Missouri Department of Correction policies. I may have misspoke in thinking the word procedure is synonymous with policy. So policies are dictated by the Missouri Department of Corrections. Our process is what we have the ability to change.

Q Is it true then that ultimately the decision maker on what policies are in place, the language of those policies, how the policies have been changed, all of those things are entirely within the purview of the Missouri Department of Corrections?

MR. HODES: Object to form.

A Yes.

Q (By Mr. Hodes) Centurion folks that we identified on the org chart can offer suggestions, can assist with policy amendments, but ultimately it's up to the Missouri Department of Corrections to decide what the policy language is, true?



A True.

Q You were asked some questions earlier about whether or not Centurion can hire dental hygienists even though it was not requested as a part of the Missouri Department of Corrections RFP; do you recall that testimony?

A I do.

Q Ultimatley the Missouri Department of Corrections gets to decide who comes into any one of its correctional facilities, right?

A Yes.

Q So if Centurion were going to on its own accord hire dental hygienists, it would still need the Missouri Department of Corrections' approval for those dental hygienists to come into the facility and provide care, right?

A Yes.

Q I want to establish a timeline here a little bit. Centurion took over the contract to provide medical, dental and mental health care in Missouri Department of Corrections' facilities starting in November of 2021, right?

A Yes.

Q And at that time Centurion subcontracted its dental services to a corporation owned by Dr. Ernest Jackson, true?

A That is true.



Q And as a part of that subcontract with Dr. Ernest Jackson he was the statewide dental director from the beginning of when Centurion started providing dental care in Missouri, correct?

A Yes.

Q In September of 2023 Centurion terminated its contract with Dr. Jackson's company, correct?

A That is correct.

Q And then after September of 2023 Centurion hired its own statewide dental director, true?

A That is correct.

Q And the statewide dental director that it hired was Dr. Farahani?

A Yes.

Q Can you grab those two organization charts. I think it's Exhibit 6 and 7.

A Yes.

Q So Exhibit 6 is the organization chart that was represented to be from March 9th of 2023. And the box kind of up at the top where it says service provider partners, do you see that?

A I do.

Q Jackson Dental is listed; do you see that?

A Yes.

Q So that even though the words statewide dental