Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

JOHN C. DUVALL, )
)
Plaintiff, )
)
vs. ) Case No. 23-04160-CV-SRB-P
)
EARL D. SCOTT, KEITH SEGALL, )
CENTURION OF MISSOURI, LLC, )
ERNEST JACKSON, JEFFREY )
PASKAR, MAHDOKHT FARAHANI, )
KELLY MORRISS, TREVOR FOLEY, )
KAREN S. BOEGER, and BRYAN )
POPE, )
)
Defendants. )

VIDEOTAPED DEPOSITION OF DR. MAHDOKHT FARAHANI
TAKEN ON BEHALF OF THE PLAINTIFF
AUGUST 14, 2026

Page 2

VIDEOTAPED DEPOSITION OF DR. MAHDOKHT FARAHANI, produced, sworn, and examined on the 14th day of August 2026, between the hours of 9:00 o'clock in the forenoon and 6:00 o'clock in the evening of that date at the law offices of Ruth Ann French of SHARP LAW, LLP, 4820 West 75th Street, Prairie Village, Kansas 66208, before KARA D. INCE, a Certified Court Reporter within and for the State of Kansas, in a certain cause now pending IN THE UNITED STATES DISTRICT COURT, FOR THE WESTERN DISTRICT OF MISSOURI, CENTRAL DIVISION, wherein JOHN C. DUVALL is the Plaintiff and EARL D. SCOTT, KEITH SEGALL, CENTURION OF MISSOURI, LLC, ERNEST JACKSON, JEFFREY PASKAR, MAHDOKHT FARAHANI, KELLY MORRISS, TREVOR FOLEY, KAREN S. BOEGER, and BRYAN POPE are the Defendants.

Page 3

TABLE OF CONTENTS

EXAMINATION
Questions by Ms. French 8
Questions by Mr. Felzien 261
Questions by Ms. French 264

EXHIBITS:

| | | |
|---|---|---|
| Exhibit No. 1 | Application for Employment | 11 |
| Exhibit No. 2 | Notice of Contract Amendment Contract No. CS210318001 | 62 |
| Exhibit No. 3 | Email Correspondence Duvall078415 | 104 |
| Exhibit No. 4 | Dental Performance Measures Dental HSR Creating an Appointment Processing Charting Guides Dental Treatment Guidelines | 114 |
| Exhibit No. 5 | Email Correspondence DUVALL0294847 | 126 |
| Exhibit No. 6 | HCPM05 - Fillings and Extractions | 131 |
| Exhibit No. 7 | Dental Compliance Tracking Report (June-July 2025) DUVALL0297163 | 148 |
| Exhibit No. 8 | Email Correspondence Duvall076677 | 155 |
| Exhibit No. 9 | Smartsheet DUVALL0317063 | 163 |
| Exhibit No. 10 | Archive Missouri Dental HSR Backlog DUVALL0317064 | 178 |
| Exhibit No. 11 | HSR Tracking Report DUVALL0317066 | 188 |

Page 4

TABLE OF CONTENTS(continued)

| | | |
|---|---|---|
| Exhibit No. 12 | MO Weekly Site Backlog Data - Dental 5.12.26 DUVALL0315638 | 197 |
| Exhibit No. 13 | MO Dental Backlog Report DUVALL0317065 | 217 |
| Exhibit No. 14 | Dental Data DUVALL091716 | 234 |
| Exhibit No. 15 | Dental Encounters Report (June 2025) DUVALL0297164 | 238 |
| Exhibit No. 16 | Email Correspondence DUVALL0296445 | 241 |
| Exhibit No. 17 | Charting Guide DUVALL0296451 | 243 |
| Exhibit No. 18 | Charting Guide DUVALL0296450 | 246 |
| Exhibit No. 19 | Email Correspondence Duvall108541 | 249 |
| Exhibit No. 20 | R&O Charting Guide Duvall108562 | 250 |
| Exhibit No. 21 | Email Correspondence Duvall108502 | 255 |
| Exhibit No. 22 | Flowchart | 261 |

CERTIFICATE OF REPORTER 270

(Original exhibits attached to original transcript.)

EXHIBIT
B

A. I heard about it. I don't know the whole extent of it. My general understanding is, one person trying to speak for the others.

**Q. What is your understanding of the type of treatment or policies that Mr. Duvall is seeking to have improved, in his mind, in the Missouri Department of Corrections' system?**

A. That was a little long.
Can you repeat that.

**Q. Yes, I can. It was a little long.**
**So in -- in understanding the case that Mr. Duvall has brought, do you have an understanding of what policies he hopes will change in the treatment of dental care in Missouri facilities?**

A. I do understand what he wants.

**Q. What is your understanding of -- of what he wants?**

A. He wanted to -- things to be implemented -- implemented the way that we are implementing and performing now. All these organizations, policies, guidelines, checks and balances, he was asking for them, and I felt like since I started, I have already addressed all those, and we are in a tremendous different stage at this point, compared to what they were experiencing at



the time when they brought it to your attention.

**Q. And that's -- I -- maybe that's a really -- anticipated, again, kind of what I was curious about.**
**You -- what is your understanding of why you were brought in as an in-house dental director for Centurion, as compared to their previous work with subcontractors or contractors for that role?**

A. I can't speak to that just because I don't know what was going on before me. I was informed it was contracted out, and then Centurion decided to take over and all the dentists become an -- employees of Centurion. So it was a need for a direction to be put in place, and they needed my position to be filled.

**Q. And you have done -- let's maybe make it clear for the record.**
**You started in 2023 at Centurion; is that correct?**

A. Yes.

**Q. What was the date -- the first date of your employment?**

A. 18 -- December 18.

**Q. December 18, 2023?**

A. Correct.



**Q. So you've now been there almost three years?**

A. (Nods.)

**Q. You were -- you're describing that you've done a tremendous amount -- amount of work to try to update the Missouri policies to -- to address -- may- -- would I say, like, the standards that they should be meeting -- is that correct?-- in -- in kind of describing what you've done?**

A. What I have done is basically to make sure all required standards are met not only to NCCHC, but also dental board and dental association.

**Q. And when you say the "dental board," do you mean the Missouri Dental Board; is that correct?**

A. Correct.

**Q. And for the dental association, that's the American Dental Association; correct?**

A. Correct.

**Q. So we have -- and -- and we'll talk about, I think, all of these a little bit more later.**
**We have NCCHC, which I -- let's see if I can remember -- National Commission on Correctional Health Care -- is -- is that correct? -- what that stands for?**

A. I cannot for sure say that.



**Q. You and I will both agree that we're talking about the same NCCHC?**

A. Correct.

**Q. And you also look, though, to the American Dental Association; is that correct?**

A. Yes.

**Q. And the Missouri Dental Board to establish the standard of care for patients in Missouri Department of Correction facilities; correct?**

A. Yes.

**Q. And is it also accurate to say that the standards of care for those in Missouri correctional facilities are the same as the standards of care for those in the general community?**

A. Yes.

**Q. Could you --**

A. I may add --

**Q. Yeah. Okay.**

A. -- obviously, the limitations is being behind the walls, and the limitations that safety and security and movement dictate some of the modifications to what we can offer or we cannot, and, also, we obey by Missouri DOC contract as well.

**Q. That's -- so we'll -- we will definitely add in the contract as well to the -- the kind of,**

**like, parameters that you need to work within, and -- and, also, likely meet certain standards according to contract; is that right?**

A. Yes.

**Q. How do you understand that relationship between the Missouri Department of Corrections and Centurion?**

A. I understand they are the client of ours -- like, client of Centurion. Centurion is contracted to provide services to the residents of Department of Correction [sic].

**Q. And at the end of the day, are you -- you're talking about the -- the policies and making sure that care meets certain guidelines.**

**Is -- are you, as the dental director for Centurion, the ultimate decision-maker on dental care for those in Missouri facilities, or does it also need approval from the Missouri Department of Corrections for policies?**

A. I do need the final sign-off from Missouri Department of Correction as well.

**Q. Do they look to you, though, for expertise on what dental care policies should be?**

A. Yes.

**Q. I am going to start with probably a very**



**basic question, and we're going to -- actually, we're going to try something. We're going to draw together because I sometimes think and -- visually, and I think it will -- will help me break down what can be -- I don't actually think it's a complex process, but just so we understand every piece in the chain, and then we can, hopefully, kind of refer to this chart or drawing throughout if we're -- we're confused about what -- what stage we're at.**

**So I'd like you -- let's kind of go step-by-step in how it's supposed to work when an offender in a Missouri facility has a dental issue, and then let's -- let's go from the very beginning. Someone's sitting in their cell and they're, like: I have some type of problem, how does that -- how do we get from there to treatment of that issue?**

**So what's the first step when someone has an issue? I'm going to draw our little -- our little person who has an issue. Actually, I should make his -- a frowny face. But we're -- he's going to be a happy person today, even though he has a dental issue.**

**But what's that first step when we -- when we start with a person?**

A. I don't know exactly at that moment, but



it could be different ways of approaching it. It could be informing a correctional officer that they have a toothache. They may seek for sick call themselves, declaring themselves that they are sick. And I believe they can seek for that HSR form to fill.

**Q. And, yeah, I -- I guess I should also say, let- -- let's say this is not in an emergency because I realize that there are likely some other things that happen if we go into emergencies.**

**So if they go to and find an officer or sick call or the HSR form; so we have, you know, kind of going to a person, a CO, they could go to sick call -- if they go to a correctional officer or sick call, will they also give them the HSR form to fill out?**

A. I don't know, really, because I feel like sometime for the sick call, they don't have to have an HSR. They would be seen by nurses.

**Q. Okay.**

A. I don't know about the COs, how would they handle it.

**Q. So we have -- and let's talk a little bit more about the HSR form, and then we'll go back, potentially, to these others. But that may be**



**something I need to ask someone at corrections about what happens if a CO gets a complaint.**

A. Uh-huh.

**Q. If they fill out a HSR, which is Health Service Request; is that correct?**

A. Uh-huh. Yes.

**Q. What goes onto that Health Service Request?**

A. They select different needs that they may have, which dental is one of the categories, and in their own type of a wording, write what they wanted.

**Q. And, then, if they turn in -- how do they -- so they -- they might have a form that they fill out.**

**How does that -- what happens to that form, or how does it go to someone?**

A. I don't know. I don't know if nurses go to their housing and collect them. Are they COs collecting and bring them to the nurses? I don't know. Or they drop it off in certain place. I don't know.

**Q. Do they eventually go to the nurses?**

A. Eventually, when that reaches to a -- nurses, that's when they see a nurse.

**Q. And so -- and sick call is also a nurse**

**process; is that correct?**
A. Correct.
**Q. And so a problem could be identified either through an HSR or a sick call, a nurse is being notified of an offender's dental problem through either of those processes?**
A. (Nods.)
**Q. What happens once --**
THE COURT REPORTER: Is that "yes"?
THE WITNESS: Yes.
BY MS. FRENCH:
**Q. What happens once the nurse is notified of a dental problem?**
A. They have 24 hours to see that patient face-to-face. That's my understanding.
**Q. Okay. So we have kind of -- we're -- we're here at nursing and they have 24 hours once -- they get that HSR or they're notified at sick call, they have 24 hours to -- I can't remember the word you used -- I'm going to say to evaluate, but is it also called "to triage"?**
A. Correct.
I think when they are going to sick call, they are already there. There is no waiting for them. But when the paper reaches to them, that's



when the wait possibly happen. So it could be bypassing that 24 hours when they show up to a sick call.
**Q. So if they learn of the need at a sick call and they're able to triage at that moment, it would be an immediate evaluation --**
A. Correct.
**Q. -- of -- but if they go through the HSR, submitting the paper form, once the kind of nursing station receives that, they are required within 24 hours to evaluate the HSR? And, then, after they evaluate it -- well, let's -- let's -- maybe let's stick with the evaluation.**
**What does a -- what is a nursing evaluation? What are they doing at that -- at that stage of evaluation?**
A. I'm not fully clear. I haven't been at that station. I can only say that I expect them to look at in the mouth, hear the patient, identify the issue, and do what it -- needs to be done at that point.
**Q. And they aren't dentists; correct? They're nurses?**
A. They are nurses.
**Q. Do they get training on what to look for**



**in the mouth to identify problems?**
A. I believe so.
**Q. Have you done any of that training?**
A. I haven't done the training, but the categorizations and the problems that fall under each category of the conditions have been shared with nurses.
**Q. Do you know who shares those with nurses?**
A. Apasha Allen.
**Q. Okay.**
A. The -- more officially, had been done very recently.
**Q. Yeah.**
**What -- so when did that training start on showing them the -- how to identify the problems?**
A. I think the training start actually at the onboarding, which I don't know the details of that, but, recently, I did share that table with them, and it got distributed to all of them.
**Q. When you say "recently," would that have been in the last year?**
A. A couple weeks ago.
**Q. Okay.**
A. But when it was established, it was supposed to -- it is a published document. I feel



like many of them might have already had it. This one was, like, a refresher a couple weeks ago to make sure if you are seeking for something, like a cheat sheet, this is it, that --
**Q. Okay.**
A. -- that you could have used.
**Q. And so it would have been similar to the training they receive at onboarding? Do you know if that's true?**
A. I don't know.
**Q. Have you ever looked at the onboarding for dental care that hap- -- that happens for nurses?**
A. No.
**Q. Do you know when they first started doing training on dental issues at onboarding?**
A. I don't know.
**Q. Okay. So we have the nurse looking in -- likely looking in the offender's mouth, if they're following your table to see how it may classify.**
**When they look in, how -- one, they're saying: Yes, this is a dental problem; is that correct?**
A. Yes.
**Q. Do they also prioritize the HSR at that point in time?**

A. I don't know.
**Q. There -- I have seen on HSRs, a categorization of "emergent," "urgent," or "routine."**
**Is that something the nurses do, or is that something dentists do?**
A. I don't know about nurses, but dentist does.
**Q. Okay. So we'll -- we may wait on that.**
**So nursing is identifying that there is a dental problem, and possibly what it is based on the training that they have received?**
A. (Nods.)
**Q. What do they, then, do with that HSR?**
A. They will pass it along to the dental team.
**Q. Okay. And is that physically, they pass it along to the dental team? Like, do they take a -- a paper?**
A. Yes. The paper get transferred. How it get transferred, I don't know. Some of them have a drop box, they put it in there for the dental assistant. If that -- within -- when they are triaging a patient for a dental issue, if the dentist is at the site, many times, they either walk



the patient to the dentist or ask the dentist to take -- take a look; so they don't wait for that transferring to happen. Then they -- dentists get involved with that that much faster. But if dentist is not at the clinic or, for whatever reason, they are busy, they will bring it to the attention of the dental assistant and dental team, and then the paper, obviously, get transferred.
And if they do place the patients on antibiotic, definitely, that is communicated right away. I feel like it on a daily basis.
**Q. So a nurse can place a- -- an offender on antibiotics before they are seen by a dentist; is that correct?**
A. Absolutely.
**Q. Okay. And, then, if they do put them on antibiotics, your expectation is that they would immediately notify the dental team that this is someone who's got an issue that requires antibiotics; is that correct?**
A. That it has been placed on antibiotic, yes.
**Q. So this HSR is going to the dental team, maybe, with the patient themselves --**
A. (Nods.)



**Q. -- immediately, maybe, as a paper copy.**
**When the dental team is aware that there is a problem either by the -- the patient there in -- in clinic or through the -- the paper, HSR, what do they do?**
A. The paper HSR, it's supposed to reach. It doesn't disappear.
**Q. Uh-huh.**
A. It would get transferred one way other as a -- im- -- immediately, or at the end of the shift, supposedly. When the HSR reaches the dental assistant team, that's when they log it into a Smartsheet that they have, and they put the date of when that HSR was submitted and when they have received that HSR.
**Q. So they log into Smartsheet when the offender -- so it'll be at this stage right here, they log in the date that -- that the offender's placed on the HSR; is that correct?**
A. Correct.
**Q. And, then -- so the da- -- that date -- so we'll put that as 1 -- and then they also log in the Smartsheet, the -- the date they received the HSR --**
A. Correct.
**Q. -- is that correct?**



**That brings up a good question, which is: Is there logging in any manner of the dates where nursing receives the HSR?**
A. I believe nurses are the one that log it into MOCIS and get the number -- HSR number for it. Is that happening on every side and every HSR? I don't know.
**Q. So a nurse is supposed to, when they receive an HSR, log that HSR into MOCIS to get an HSR number; is that correct?**
A. Correct.
**Q. And MOCIS, just so the record is clear, that is the electronic health record system for Missouri Department of Corrections?**
A. Correct.
**Q. So they -- they log the HSR in, and that logging is -- do they log both when they receive it and the date the patient places on the HSR? Do you know?**
A. I don't know.
**Q. Do they also log their nursing triage into MOCIS?**
A. I believe so, and they also write it on that HSR paper as well.
**Q. And so when dental receives an HSR from**

**nursing, it should have an HSR number written on it?**
A. (Nods.)
**Q. Is that correct?**
A. Yes, yes.
**Q. If the dental team receives an HSR without a number on it, what happens?**
A. Nothing. It just still log it into the -- a Smartsheet.
**Q. Does anyone, at that point in time, give that HSR a number?**
A. No.
**Q. Is the dental team not capable of generating HSR numbers?**
A. They are, but we have not trained them to that point, and we don't want them -- or at least when the performance measure was identified, we didn't want to kind of catch that number in the middle of the process. We wanted to be very first step when any healthcare provider have interaction with the patient to be generated. So if we generate it halfway through, then it doesn't help with our process.
**Q. So help me understand why it's not helpful to generate an HSR number after nursing has triaged. We're only really missing, here, in this step, the**



**nursing triage as linked to an HSR; is that correct? So why couldn't it be added in at the dental stage?**
A. I understood that if we do -- well, because we wanted the HSR be very first at the medical interaction, and if you put it at the end dental interaction, we not going to have that original date there. I really don't know. I felt like back in the days, we decided and -- to be having a better record of keeping track when patients has requested not to be kind of falling in a crack, just have it identified very beginning. And, then, if we assign a number halfway through, then it will not be as validated to be very first step of the process. I really don't have a good answer for that.
**Q. Yeah.**
**Okay. So we've got -- we got a little sidetracked just out of my own kind of curiosity on some of this.**
**So we've got the dental team, they get the HSR, they're logging into the Smartsheet, the date on the HSR and the date they received the HSR.**
**Once they kind of receive and get this documentation in, what's the next step for that dental assistant team?**



A. That's when they are scheduling that patient for their dental triage with a dentist.
**Q. Okay. So our next step is a dental triage, and that happens with a dentist; is that correct?**
A. Correct.
**Q. And this is the first step where they're seeing someone who is licensed and trained on dental care; is that correct?**
A. If you bypass the nursing.
**Q. Are nurses licensed to be -- to provide dental care?**
A. They are not licensed to provide dental care, but I don't know for the evaluation part, how much they are trained to identify the issue.
**Q. So they maybe have training for identification, but would they, under the Missouri board, be allowed to diagnose a dental problem?**
A. They are not.
**Q. So this is the -- the first time where someone, who could actually diagnose a dental problem, sees an offender; is that correct?**
A. Correct.
**Q. And is that the purpose of this dental triage, a diagnosis?**



A. Correct.
**Q. What else comes out of that dental triage appointment?**
A. And the treatment plan for that specific issue.
**Q. In doing this dental triage -- I -- I am becoming more and more familiar with medical and dental terms -- but I have seen the "SOAP" process.**
**Do they use that process at the dental triage?**
A. Yes.
**Q. And can you explain for -- for people who might not be as familiar, what that S-O-A-P process is?**
A. Subjective is what the patient complaint is -- their kind of chief complaint. Objective of what the dentist, basically, looking at. Then it's a assessment when dentist do further assessment of the issue to determine what is wrong with that specific tooth or oral lesion or health of the mouth. And, then, planning is to treatment plan it for the treatment.
In our system, at -- the assessment treatment plan also happen, and then on the Plan section, we identify the next visit treatment.

**Q. Okay.**
A. So during the assessment plan, it's a subset of the assessment.
**Q. So another part of the dental tri- -- triage, is to schedule that next visit to do the treatment plan; is that correct?**
A. Identify the next visit. Scheduling doesn't happen on that --
**Q. Okay.**
A. -- appointment.
**Q. Okay. So they identify --**
A. Yes.
**Q. -- what is the necessary next visit?**
A. (Nods.)
**Q. In doing the diagnosis and treatment plan, are -- is imaging ever used at the triage stage?**
A. It does. Not always.
**Q. When would it not be used?**
A. If the time doesn't allow, otherwise, yes, it happens at the same time.
**Q. So if time allows, imaging could be used to evaluate, but if time doesn't allow, when would that imaging occur?**
A. Right before the treatment is completed.
**Q. Okay. So we have this dental triage, and**



**it's identifying the next visit, but it doesn't schedule.**
**How did we, then, get this treatment plan scheduled and completed?**
A. All these are locked to Tableau as soon as the dental triage is completed.
**Q. Okay.**
A. The date of the start of identifying those problems and required treatments. And, then, dental assistants running the Tableau reports on regular basis, and then they schedule the patient.
If, for any reason, any of those diagnosis need to -- way more faster than waiting, then they would keep a list on the side for making sure the next time they have a dentist at site, they will schedule that patient. They don't wait for the Tableau report or, like, kind of randomly putting that patient back to the schedule. Those get the higher priority. But if it's something that patient kind of become a -- like, a routine treatment, they go through that process of waiting for the Tableau report and kind of scheduling accordingly based upon availability of the providers.
But if they put -- if the dentist choose to put the patients on antibiotic or if the patient



was already put on antibiotic, they always have their own way of keeping track of those patients, and they making sure they get the highest priority to be seen very next time that they have a dentist. And they just make sure that antibiotic has had enough time to do what it's supposed to do for the time frame when they see the patient back.
**Q. So the -- there is some type of computer system.**
**Is that the correct way of describing Tableau, that they're logging --**
A. It's a reporting system.
**Q. So each of these next visits -- is it the visits that logged into the Tableau or the treatment plan that's --**
A. Treatment plan.
**Q. Okay. So the dentist logs the treatment plan into Tableau, and then Tableau will create reports, and are they chronologically dated as a standard usually for the -- the dental assistants to schedule based on?**
A. We would sort them out when we get the report. They are happening -- like, filling on any database -- as the data is presented, but they are also record on the day of a triage and the treatment



plan. So when we download it, it could be alphabetic, and then we have to look at sorting out, based upon the days, between the triage and how much that, today, is going to be for that particular treatment waiting to have appointment.
**Q. So when a DA is scheduling treatments, they will take a Tableau report and sort by triage date as their initial way to think about scheduling if it's just with a standard?**
A. Not necessarily. It's kind of the same thing, but they look at the days between the triage till today.
**Q. Okay.**
A. That's easier to do it, rather than the date organization. They download it to Excel spreadsheet, and then I have been teaching them to sort it from the oldest, the ones that have been waiting the longest, to the ones that are more recently diagnosed.
**Q. So the standard way for the DA to schedule is days between, but then they also can keep a list on the side where the dentist -- I assume it's the dentist has asked for more quick scheduling; is that correct?**
A. Dentist or it was identified at the

nursing triage.
Q. How -- okay.
A. Because when -- okay -- when the nursing identified, obviously, expedite the triage, but then at the triage, you know that patient was antibiotic; so, then, you would kind of keep it on that list as well.
Q. And this is, like, a -- a -- is there kind of a standard database holding this list of prioritization, or it's just something that a DA keeps either by hand or on their own computer to know who they would want to schedule in faster?
A. Usually, it's manual.
Q. And that prioritization can come from either the dentist in triage or -- so it can come from the dentist in triage; correct?
A. Absolutely.
Q. And it also can come from nursing if they find some way to expedite the -- the treatment; is that correct?
A. Correct.
Q. And -- and one of those is being on antibiotics?
A. Yes.
Q. So this report that the dental assistants



are generating in Tableau, is there a name for it, or is it just Tableau?
A. It's a dental side of the Tableau, which has a different status associated with each tooth, and is usually against the number of days that they are waiting for treatment. They -- as soon as they are diagnosed and they report it in Tableau, they are at the "Pending" status. And, then, as soon as kind of 50 days pass, it fall into "Upcoming Due." And, then, as soon as 180 days passes, it fall to "Overdue-Not Completed." And, then, when the treatment is completed, obviously, the status of the tooth and the treatment change to "Completed."
If the triage had been -- already document for that, it fall into the "Completed," but if there wasn't a triage, let's say, a dentist do -- complete some treatment with not having a triage already started before that, it would still identify in Tableau as "Not Triage-Completed"; so it still captured the completed treatments on those teeth. I believe those are the statuses that it change.
Q. So when a dental assistant, they are logging into Tableau, the database, and they can look up who has been diagnosed, and that tells them they've gone through dental triage --



A. (Nods.)
Q. -- and they can, then -- I assume that for all three of -- well, for three of these categories; "Pending," "Upcoming Due," and "Overdue-Not Completed," those are the ones that they are going to be looking at?
A. Exactly.
Q. And can they, then, select those three categories, and then find the -- the days between for them?
A. Yes.
Q. Okay. And, then, from there, they're able to, then, I think -- come back to your chart -- they're scheduling them for -- for some type of treatment?
A. (Nods.)
Q. Is that the -- kind of our next stage, we have "dental assistant schedules," and then we're going to put in "dental treatment by a dentist"? Is that -- would be correct?
A. Yes.
Q. All right. So we've got "dental treatment by dentist."
And at this stage, there may be a little bit of a pre-stage, or does it happen at the



treatment? Like, when does the imaging occur?
A. If it was taken during the triage, that -- immediately, the information is there. And many times when we have a panoramic X-ray that, originally, when the patient came to the facility was taken, you might not need to take any X-rays, and that would have been used at the dental triage. But if there is no updated X-ray or any X-ray at all that's right before any treatment, an X-ray is taken.
Q. So if there is past imaging that is capable of being used, is there a time limit when you would not -- used previous imaging?
A. It's three to five years. Older images, we don't use. And it's all depends to the clinician. If the structure of the tooth has changed dramatically, even though that could be a year ago, you may still choose to take a new X-ray.
Q. So the clinician could use imaging that's three to five years old, but if they clinically see a need for an additional imaging, that would be within their discretion to order?
A. Correct.
Q. Is that --
So if we need to do updated imaging, if it

scheduling dental care as it currently exists; correct?

A. Yes.

Q. Okay. Thank you. I appreciate that. I realize that, like, I'm on page 1 and it took a while, but I think this is really important and, actually, it's going to cut down on a lot of questions later, and just understanding the basics of how you operate every day. So thank you --

A. Sure.

Q. -- for walking me through.

We talked a little bit about the relationship between the Missouri Department of Corrections and Centurion, and you had mentioned that Missouri Department of Corrections is a client, and there is a contract that governs the relationship between them; is that correct?

A. Yes.

Q. And I am not going to hand you the entire contract, but I do have the most recent amendment that governs the contract period that we're currently in. I'm going to refer to it as Amendment 6 to the contract.

Does that -- is that correct in your understanding of what -- what the current one is



you're under?

A. I don't know.

Q. Okay. I'll -- I'll represent to you that it is Amendment 6, and we're going to label this as Exhibit 2 to Dr. Farahani's deposition.

(Deposition Exhibit No. 2 was marked for identification.)

(Witness is reviewing document.)

MS. FRENCH: Can we -- I'm going to have you look it over, but I may actually -- we've been going a little over an hour. I'm going to -- I'd like a little break.

THE WITNESS: Same here.

MS. FRENCH: And so I'm going to take a little break and we can -- if you want to look at it on a break, that's fine, but we can also do it on -- on record, on recording when we come back as well.

THE WITNESS: Yes, please.

MS. FRENCH: It's a new topic; so thank you.

THE VIDEOGRAPHER: That will put us off the record at 10:24.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record at 10:39.



BY MS. FRENCH:

Q. Welcome back.

A. Thank you.

Q. You have back in front of you something that is now la- -- labeled three times, Exhibit B, Exhibit Foley 21, but, now, for your deposition as well, as Farahani 2. If you haven't already, do you mind just taking a couple moments to flip through this to familiarize with it, given it's a little lengthy.

(Witness is reviewing document.)

A. I think mostly just the dental section applies to me; right?

BY MS. FRENCH:

Q. I believe so.

Does -- you had mentioned, though, at the beginning of the deposition that the contract between Centurion and the Missouri Department of Corrections was one of those other kind of documents that you looked to to make sure that you were developing dental policies to meet the requirements.

Is this Amendment 1 of those documents you would look to in developing policies?

A. Yes.

Q. And it -- it talks about this is a



contract for Comprehensive Health Care Services.

Dental care would fall under that; is that correct?

A. I believe so.

Q. Were you in- -- involved at all in the negotiations between Centurion and the state of Missouri over the 6th Amendment to the contract that- -- that's currently in affect?

A. Yes.

Q. What was your role?

A. I was still, as a dentist, discussing the requirements for the time frame that the patients need to receive their treatments.

Q. And we'll get a little bit more into that when we go to the -- the section where that was established, but you were providing input as a clinician, as to the amount of -- of time or the requirements for timeliness of dental care; is that correct?

A. Correct.

Q. And were you talking directly with anybody at Missouri Department of Corrections or providing input to Centurion?

A. I did once directly -- or twice with them, but most everything else was through the vice

president of operation.
Q. **Who did you speak with at Centurion?**
A. Tanya Wilson.
Q. **And -- and she was the -- she's the VPO; is that correct?**
A. At the time, yes.
Q. **And at the Missouri Department of Corrections, who's --**
A. Jackie Bar- -- Barron.
Q. **Jackie Barron?**
A. Barron, yeah.
Q. **Anyone else?**
A. It was a couple other contract managers. I don't recall their names.
Q. **And would it be accurate to say that part of your job is to monitor whether dental care and staffing complies with the contract requirements?**
A. Yes.
Q. **Is there anyone else who monitors the dental compliance?**
A. Department of Correction.
Q. **Who at the Department of Corrections?**
A. Eric Connelly and, I think, Faria Tasnim. And, obviously, still the vice president of operation or associate vice president of operation



are getting all those reports as well, but I try to make it my own sole responsibility to give them input or requests for resources as when it needed, if there would be any indication of that.
Q. **So you're not waiting for them to say fix a problem?**
A. Huh-uh.
Q. **You're trying to proactively identify problems and ask them for the necessary resources to fix?**
A. Yes.
Q. **Have they been -- have you gotten the resources that you need to --**
A. I have.
Q. **What types of resources have you asked for?**
A. Many times, it would be possibly equipments at the facilities. Obviously, possible bonus programs or compensations for dental staff to be increased or considered to be able to utilize dental staff across the state and pull resources to reallocate when it's needed, to make it a more robust team to be able to count on everyone across the state, not just where they are -- primarily are allocated or housed at.



Q. **And this amendment -- and, I -- you know, I'm not going to put it in front of you, but in the other contract, there are requirements that go to the amount of staff -- dental staff that should have -- be at each facility; is that correct? Does the Missouri Department of Corrections set how many dental FTEs are required at each facility?**
A. That had been placed before even I come on board; so I do have a matrix that I follow and fulfill the requirements as needed.
Q. **And that provides for dentists, obviously; is that correct? Dentist --**
A. Dentists and dental assistants.
Q. **But it does not provide for hygienists; is that correct?**
A. No.
Q. **Do you know why there is no provision for hygienists?**
A. I don't know.
Q. **Have you asked for hygienists to be part of the dental program?**
A. Maybe once.
Q. **What would be the reason for having hygienists also?**
A. The reason would be to take the load off



of dentists, for the dentist to be having more available time to practice on top of their licenses.
Q. **Because hygienists can do some of the things, like, both simple cleaning, deep cleaning, doing the first set of evaluations on certain issues that, then, would be approved by a dentist; is that correct? They could --**
A. It has to be approved by the dentist.
Q. **Yeah.**
A. They can't work individually independent; so all the diagnosis is -- still falls under the dentist. They can just perform the tasks.
Q. **So they can -- they can gather a lot of information and they can clean- -- do the -- the cleanings themselves?**
A. (Nods.)
Q. **Are there any other treatments that they can provide?**
A. I think in state of Missouri, they might be able to place sealants, but that mostly applies to youth and children. For the adults, I think that's a maximum. What they can do is just hygiene.
Q. **Do you know whether they can do any periodontal treatment, like scaling or root cleaning?**

**then it --**

A. Yes.

(Reporter clarification.)

THE COURT REPORTER: "if someone does not show" ...

BY MS. FRENCH:

**Q. Does not show in a day ...**

**All right. That was -- that's helpful.**

A. And if I may add here --

**Q. Yes.**

A. -- not only that 30 days is more tighter for us because it goes back to the patient's request, but also, based upon our guidelines that I had written --

**Q. Uh-huh.**

A. -- I consider that 30 days, and I have reduced the time frame for completion of the treatment to be less than the 180 days. So based upon the different categories, the completion of the treatment for the cases that they are available, nobody wait for that time to kind of continue ticking. And, then, when it's closer to be done, they usually schedule it, based upon availability of the provider and scheduling requirements in their next available appointment. But, also, they are



still keeping in mind that from the day of the triage to this completion of the treatment, it's less than 180 day.

**Q. So I know that there is visibility on this Smartsheet for the date on the HSR, and that goes into how quickly things are being triaged.**

**Once you get past the kind of diagnosis, and we're in the -- the dental assistant scheduling the actual treatment itself, or figuring out completion, does anyone have visibility once the Smartsheet archives to the date on the HSR?**

A. Yes, because, basically, a Smartsheet only archives when the triage has happened; so it would kind of -- not the physically handoff, but, basically, when the patient showed up to their appointment and the dentist complete the dental triage, they complete the charting guide for the dental triage in MOCIS. That's when the MOCIS pick up, and the Tableau start reporting on it. So, basically, until it's in the Smartsheet, as soon as the triage happen, then it goes MOCIS.

**Q. And when they're doing that triage and it's with the dentist, is anyone entering into to MOCIS, the date on the HSR?**

A. There is a section, but is it filled or



not? No.

**Q. So there -- is there any visibility in the MOCIS stage -- so this kind of treatment stage -- at all -- unless someone goes and finds the physical HSR, there's no visibility to when the patient first submitted that HSR?**

A. Correct.

**Q. There is none? Okay. Thank you.**

A. If I may add --

**Q. Yeah.**

A. -- just -- it's just a limitation of the MOCIS.

**Q. And we'll talk about this a little bit later. There's capacity to enter other dates.**

**Could there be a field created that would put in the HSR date, or require it -- require that to be put in?**

A. This might -- might not be directly answering your question, but there is a way to tie every charting guide to the HSR number if it is there, but is it happening or not? No.

**Q. And if there is an HSR number, that HSR number, would that document when -- it -- it definitely documents -- well, actually, maybe I don't know -- but what dates would be documented as**



**linked to an HSR if an HSR number is created?**

A. Every charting guides that is entered can be tied, but, manually, you have to look for it, find it in MOCIS, and then when you entering the charting guide, you have to manually do tie it -- "manually" might not be a right word -- but it is not easily can be tied. It's additional steps you have to take to locate that, and then create the charting guide. That way they would become associated all the way across to the completion of a treatment, but you have to take additional steps of looking it up, tying it to the charting guide, and then putting the charting guide.

So most likely due to the complication of that process, and many of existing dentists were not trained for that, and then I started training some of the newer one. So it's kind of all over the place if it has been practiced or not.

**Q. So it sounds like there might be two complications here. One of them is whether a nurse actually creates an HSR number in the first place. That's -- that's one complication.**

A. (Nods.)

**Q. But the other complication seems to be that even if there is an HSR in there, at each of**

periodontal care; is that correct?
A. Correct.
Q. I think that's my final question on that exhibit, and the only other thing I would like to do is, one, would you look this over and see if there's anything on it that we'd want to -- to change.
(Witness is reviewing document.)
A. That's correct.
(Deposition Exhibit No. 22 was marked for identification.)
BY MS. FRENCH:
Q. Okay. I'd like to mark this one as Exhibit 22 in case -- and that way we've got it referenced as well.
MS. FRENCH: And that's all I have for today. Thank you so much, Dr. Farahani.
THE WITNESS: You're very welcome.
(Sidebar conversation.)
EXAMINATION
BY MR. FELZIEN:
Q. Okay. Dr. Farahani, logging HSR information with Smartsheets is a work-around because of the limitations in MOCIS; is that right?
A. Yes.
Q. Okay. Logging HSR information into MOCIS



is temporary because MDOC is in the process of buying an EMR that will permit electronic submissions of HSRs; is that right?
A. Correct.
Q. Nurses do not diagnose dental problems. They just triage HSRs to identify those that seek dental care; is that right?
A. Yes.
Q. Okay. So, in other words, nurses are not providing dental care and they're not creating any sort of dental treatment plans; is that right?
A. Yes.
Q. If an offender refuses escort to the dental unit, that counts as a refusal; right?
A. Yes.
Q. Okay.
A. Still has to sign the refusal form as well.
Q. Okay. So the provision of dental services is impacted by security environments at the different MDOC facilities; is that right?
A. Correct.
Q. And some facilities have higher security designations than others?
A. Absolutely.



Q. Okay. Within individual facilities, offenders have different security classifications themselves; is that correct?
A. Yes.
Q. And -- and those facility-level security designations and offender-specific security classifications, they can impact a dentist's ability to provide care to those offenders?
A. Absolutely.
Q. Okay. So obstacles to providing timely dental care are different from one facility to another -- excuse me -- because of the differences in security classifications; is that right?
A. Yes.
Q. Okay. Logging HSR information into MOCIS, is that currently temporary because MDOC is in the process of establishing a new EMR system?
A. Yes.
Q. Okay. And do you think that a new EMR system will fundamentally change the way that dental care is documented and aggregated reports are generated?
A. Yes.
Q. Okay.
MR. FELZIEN: I don't have any other



questions.
EXAMINATION
BY MS. FRENCH:
Q. Just a couple follow-up.
You had -- counsel had asked you whether MOCIS was a temporary system for logging HSRs, given that there is a new system coming.
Is that -- do you remember that question?
A. Yes.
Q. How long has Missouri Department of Corrections planned on moving to an electron- -- a new electronic health record system?
A. I don't know.
Q. When they first started using MOCIS and requiring the logging of HSRs, did they view it as temporary?
A. I don't know.
Q. So when you answered, you think that it's temporary now, but it may not have been temporary when they first required it; is that correct?
A. I wasn't here with the system to know when was indicated at the time.
Q. So you don't really know if logging HSRs is a temporary solution in MOCIS?
A. It is what it is at the moment.