IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

JOHN C. DUVALL,

Plaintiff,

vs. Case No. 23-04160-CV-SRB-P

EARL D. SCOTT; KEITH SEGALL; CENTURION OF MISSOURI, LLC; ERNEST JACKSON; JEFFREY PASKAR; MAHDOKHT FARAHANI; KELLY MORRISS; TREVOR FOLEY; KAREN S. BOEGER; and BRYAN POPE,

Defendants.

VIDEO-RECORDED DEPOSITION OF DR. MAHDOKHT A. FARAHANI, DDS, a Corporate Representative, taken on behalf of the Plaintiff, pursuant to Notice, on August 25, 2026, at the Law Offices of Sharp Law, LLP, 4820 West 75th Street, Prairie Village, Kansas 66208, before

CHERIE L. HOUSE

Registered Professional Reporter, Certified Court Reporter of the States of Kansas and Missouri.



APPEARANCES

For the Plaintiff:
Ruth Anne French, Esq.
Nathan A. Kakazu, Esq.
Hans D. Hodes, Esq. (via Zoom)
SHARP LAW, LLP
4820 West 75th Street
Prairie Village, Kansas 66208
(913) 901-0505
rafrench@midwest-law.com
nkakazu@midwest-law.com
hhodes@midwest-law.com

For the Defendants Earl Scott, MD; Keith Segall, MD; Centurion of Missouri, LLC; Dr. Jeffery Paskar; Dr. Bryan Pope; and Dr. Mahdokht Farahani:
Dennis Harms, Esq.
Slater G. Flezien, Esq. (via Zoom)
SANDBERG PHOENIX & von GONTARD PC
701 Market Street, Suite 600
St. Louis, Missouri 63101-1826
(314) 231-3332
dharms@sandbergphoenix.com
sfelzien@sandbergphoenix.com

For the Defendants Trevor Foley, Kelly Morriss, and Karen S. Boeger:

Juliana M. Bartoli, Esq. (via Zoom)
Assistant Attorney General
Office of Attorney General
615 East 13th Street, Suite 401
Kansas City, Missouri 64106
(816) 889-5025
juliana.bartoli@ago.mo.gov

Also present:
Kay Orr
Legal Videographer
Lexitas Legal
Michael Rose, Observer (via Zoom)



TABLE OF CONTENTS


| | Page |
|---|---|
| Stipulation | 6 |
| DR. MAHDOKHT A. FARAHANI, DDS | |
| Examination by Ms. French | 7 |
| Examination by Mr. Harms | 213 |
| Reexamination by Ms. French | 233 |
| Reexamination by Mr. Harms | 249 |
| Further Examination by Ms. French | 251 |
| Certificate of Reporter | 255 |
| Letter | 256 |
| Errata Sheet | 257 |
| Signature of Witness | 258 |


EXHIBITS


| Exhibits | Description | Page |
|---|---|---|
| Exhibit 1 | Amended Notice to Take of 30(b)(6) Videotaped Deposition of Centurion of Missouri, LLC (7 pages) | 7 |
| Exhibit 2 | Email Chain Re: Job Responsibilities and Support Needs Bates Duvall 294981 (3 pages) | 11 |
| Exhibit 3 | Job Responsibilities and Support Needs 2024-2025 - ll.10.24.docx Bates Duvall 294982 (5 pages) | 11 |
| Exhibit 4 | NCCHC Standards for Health Services in Prisons (16 pages) | 17 |
| Exhibit 5 | Guidelines for a Correctional Dental Health Care System (8 pages) | 19 |
| Exhibit 6 | Missouri Department of Corrections Institutional Services Procedure Manual Bates Duvall 22673 (3 pages) | 22 |





| Exhibits | Description | Page |
|---|---|---|
| Exhibit 7 | Dental Care Procedures located in the Missouri Department of Corrections Institutional Services Policy and Procedures Manual Bates Duvall 294538 (13 pages) | 24 |
| Exhibit 8 | Dental Care Procedures located in the Missouri Department of Corrections Institutional Services Policy and Procedures Manual (July 2025 Revisions) Bates Duvall 297068 (13 pages) | 25 |
| Exhibit 9 | Email: 12/31/2024 Subject: FW: Letter of Resignation Bates Duvall 296368 (2 pages) | 42 |
| Exhibit 10 | Letter: 12/31/2024 To: Dr. Mahdokht Farahani From: Ronald E. Price, DDS Bates Duvall 296369 (2 pages) | 42 |
| Exhibit 11 | Email: 05/24/2024 Subject: Annual Comprehensive Dental Examination Guide in EMR/MOCIS Bates Duvall 296441 (4 pages) | 56 |
| Exhibit 12 | Email Chain Re: Intake Pano Exam Bates Duvall 51526-51528 | 83 |
| Exhibit 13 | Email Chain Subject: NCCHC Periodic Dental Exams Bates Duvall 296118 (6 pages) | 102 |
| Exhibit 14 | Email Chain Subject: Outstanding Dental Appeals at MCC - Needing access to Dental Care Bates Duvall 298009 (3 pages) | 119 |






EXHIBIT
C

Page 17

what I wanted. I will hand to you -- these are three separate sections that are put together. The first is mainly just so we can see what the -- the book is, so the table of contents, the -- the title pages and -- and what it's purpose is. There is a section on access to care and one on oral care. Those are the ones that I've copied for you today and am marking as Exhibit 4.

(Farahini Exhibit No. 4 was marked for identification.)

Q. (By Ms. French) And do you recognize these as the current standards for health services that you were referencing from the National Commission on Correctional Health Care?

**A. Yes.**

Q. How are these standards used by Centurion?

**A. At the moment, I am using this to develop my annual dental examination, so very closely.**

Q. So the -- and this is -- you've got two hats on. So the dental director is using these to develop the dental examinations. Do you know if there are other ways that Centurion uses these to ensure timely access to dental care?

**A. One more time, please.**

Q. Do you know of any other ways that

Page 18

Centurion -- beyond the ones you described as for the dental director -- that Centurion uses these standards to guide timely access to dental care?

**A. Yes.**

Q. Can you describe some of those other ways?

**A. Every other department that quality improvements --**

(Reporter clarification.)

**A. -- accreditation, all of those also use this book to set all those check -- checks and balances that need to take place to make sure all the clinical requirements are met.**

Q. (By Ms. French) And did Centurion provide you, as dental director, a copy of these 2026 standards when they came out?

**A. Yes.**

Q. And Centurion also knows that the NCCHC normally uses guidelines from other professional organizations such as the American Dental Association to determine the appropriateness of care required by their standards; is that correct?

MR. HARMS: Object to the form. Go ahead.

**A. Yes.**

Q. (By Ms. French) I -- are you also aware

Page 19

of a document that was put together called "The Guidelines For Correctional Dental Healthcare Systems" by the NCCHC?

**A. No.**

(Farahini Exhibit No. 5 was marked for identification.)

Q. (By Ms. French) I'm handing you what I'm marking as Exhibit 5, which apparently I only have one copy of.

MS. FRENCH: I apologize, Dennis. I'll see if I have another one.

MR. HARMS: You're fine. Could I just look at it real quick?

**A. Looking at it, I -- I think I had referred to this one before.**

Q. (By Ms. French) That's -- that's what I was wondering and was going to ask you first --

**A. Yes.**

Q. -- whether this is something, now having seen it in front of --

**A. Yes.**

Q. -- you, if this refreshes your recollection on these guidelines for a correctional dental care system. So you think you have seen this as well?

Page 20

**A. Yes.**

Q. How did you, as a dental director, use these guidelines?

**A. Mostly because when I was developing the guidelines for Missouri, I was working closely with Dr. Adu-Tutu, so I was relying on him to bringing this portion of the expertise.**

Q. So you didn't necessarily rely on anything specifically within the document? You were relying on Dr. Adu-Tutu?

**A. Correct.**

Q. And we've now referenced him a couple of times. Can you explain who Dr. Michael Adu-Tutu is?

**A. He was a corporate dental director with Centurion.**

Q. And I'm assuming from the way you phrased that, he is no longer with Centurion; is that correct?

**A. Correct.**

Q. Do you know when he left?

**A. Not exact date.**

Q. Do you know why he left?

**A. No.**

Q. And -- and what kind of expertise did he have that you were looking to him for guidance?

the original from 2024.
(Farahini Exhibit No. 7 was marked for identification.)
Q. (By Ms. French) Does that look like an accurate copy of the 2024 guidelines that you put together?
**A. Correct.**
Q. Then I will mark as Exhibit 8 -- these appear to be the July 2025 revisions to those same guidelines?
(Farahini Exhibit No. 8 was marked for identification.)
Q. (By Ms. French) Is that a correct copy as well of -- of them?
**A. Correct.**
Q. And partly why I asked about the Missouri Department of Corrections' procedure manual, is you'll see at the top in italics on both of the documents, it says, "These procedures were originally addressed by IS11-36.1 Dental Care Procedures located in the Missouri Department of Corrections Institutional Services Policies and Procedure Manual." Do you -- do you know what it means that they were originally addressed in that document? I -- partly, I'm just trying to figure



out if -- if the other one is still in operation, if these take precedent.
**A. If I recall, correctly I used one that it was already existed in Centurion system, and then we reviewed it with Dr. Adu-Tutu and enhanced it, so that's when that original one was made of, and then we enhance it and made it whatever applies to Missouri.**
Q. So is it your understanding that the procedures that are in the Missouri Department of Correctional Procedure Manuals are no longer operative given the implementation of the guidelines that you drafted?
**A. No.**
Q. Is there any -- are they -- how do they relate to each other? So if a -- if a clinician is trying to decide what to do, would they look to your guidelines or the procedure manual?
**A. To the guidelines because there's more kind of spelled out. This would be still what they look at, but every one of them has to use their own judgment to go back and verify it against any references.**
Q. Okay. Thank you.
All right. We're going to -- we're going



to keep these close, but put them a little bit to the side and go back to your job responsibilities as dental director.
**A. (Complies.)**
Q. On -- on here, it says that you reviewed and sought -- I -- I will -- putting that -- that you reviewed and -- and sought approval from the corporate dental director. Was that for the guidelines that we're looking at --
**A. Yes.**
Q. -- here?
And is the corporate dental director that you're referencing Dr. Adu-Tutu?
**A. Correct.**
Q. And did -- I believe you also said you sought his input, but it doesn't say so here. Did you also seek input from him on the guidelines?
**A. Yes.**
Q. What input did he provide?
**A. We read through every one lines of this, and he gave me feedback as we were reviewing every line of it.**
Q. What feedback did you end up implementing?
**A. Many of those timelines that we put into the system, he helped me to verify based on his**



**experience.**
Q. And before you could implement it, did you need to get approval from Centurion corporate?
**A. He was a Centurion corporate.**
Q. And did you need to get his approval before you could implement the dental guidelines for Missouri --
**A. Yes.**
Q. It also says, "Reviewed and sought input and approval from the Missouri Department of Corrections." Who did you speak to at the Missouri Department of Corrections?
**A. Jackie Barron.**
Q. And did she also provide input?
**A. Yes.**
Q. Were there areas that the Missouri Department of Corrections were particularly concerned about?
**A. I think very first portion that it was talking about hand-over from nursing to dental.**
(Reporter clarification.)
**A. Very first portion with -- is talking about hand-over between nursing and dental.**
Q. (By Ms. French) And do you remember what changes you made in response to that input?

is not functioning and then -- and then call up Patterson to figure out what the appropriate fix would be, whether repair or replacement; is that correct?

**A. Yes.**

MR. HARMS: Object to the form.

Go ahead.

**A. Yes.**

Q. (By Ms. French) Have you ever had difficulty getting authorization for equipment repair or replacement?

**A. Maybe once.**

Q. Can you describe that situation?

**A. Just one of the vacuums hasn't been stopped working, but --**

(Reporter clarification.)

**A. -- has not stopped working, but it is recommended to be replaced, so we are keeping our eye and getting feedback from the site.**

Q. (By Ms. French) And what site is that at?

**A. Fulton.**

Q. And is that because the directive from Centurion is to wait until the chair is fully not functioning before you do repair or replacement?

**A. No.**



MR. HARMS: Object to the form. Can I jump -- can I say something real quick? With her being the Centurion corporate designee, it's an awkward question to say, "Does Centurion need approval from Centurion?" So that's hence my objection.

MS. FRENCH: Yeah.

MR. HARM: I'm just trying to get it out of the way.

MS. FRENCH: Yeah.

MR. HARMS: Go ahead.

**A. No.**

Q. (By Ms. French) Okay. So what is the difficulty, then, in getting the Fulton chair repaired or replaced?

MR. HARMS: Form.

Go ahead.

**A. I would be speculating, but financial side of it.**

(Reporter clarification.)

Q. (By Ms. French) Is part of managing financial expenditures determining what salaries and benefits can be offered to dentists or dental assistants?

**A. I'm not prepared to answer that.**



Q. Does the dental director have any role in determining what salaries could be offered to dentists?

**A. No.**

Q. Who determines what salaries can be offered to dentists?

**A. I believe it's vice president operation, regional vice president, and all the way up the corporation.**

(Reporter clarification.)

(Comments off the written record.)

Q. (By Ms. French) For dental assistants, is that the same answer for salaries for dental assistants?

**A. Yes.**

Q. For benefits that can be offered to dentists, does the dental director have any role in determining those?

**A. I have been requesting both for salary increases for dental assistants and bonus plans for dentists.**

Q. So the dental director has a role in -- in requesting increased salaries and bonus plans, but those would go to the VPO, regional VP, and all the way up to corporate to approve; is that correct?



**A. Yes.**

Q. And why have you been requesting higher salaries and bonus plans?

**A. At the beginning, I -- it was brought to my attention by dental assistants, when I was meeting them, that they needed higher compensation; and for dentists, it was an incentive to have them to create that cohesive dental team and have them help me across the state for the sites that I didn't have dentists.**

Q. And we'll take them one at a time, but have you had difficulty filling dental assistant roles during your time as dental director?

**A. No, but I wanted to maintain what I had.**

Q. Have you had dental assistants resign because of pay?

**A. Maybe one.**

Q. Same for dentists: Have you had trouble recruiting for any sites based on the current salaries and benefits?

**A. I don't believe so.**

Q. I think that's all we're going to do on your -- your role. We'll talk in detail about some of the things that -- that you mentioned here, but we'll do them with the documents themselves.

**wear a full suit mask when he was sitting chairside, and he had some issues with his family members -- his wife.**

Q. The next sentence there says, "If reducing the backlog for care is truly a care of DOC and Centurion, how about filling the dentist positions that have been open as long as I can recall, offering more competitive salaries and incentives for more remote facilities might go a long way." Do you know what dental positions -- or what dental positions did you understand he was referring to that have been open for as long as he can recall?

**A. I think at the time he might have been referring to a few sites that we had open -- highly likely Southeast Correctional Center -- which at this point, none of those are valid statements because salaries have been raised, bonuses have been placed. We have hired net additional 10 dentists since then. So all of those are not applying anymore.**

Q. Are there any dental positions that are not filled at this time?

**A. Actually, by October, no.**

Q. So there are some now, but they won't be in October; is that correct?



**A. I extended offers last week to three new dentists.**

Q. So is it correct, would it be three FTEs that aren't currently filled, or is that a smaller number of FTEs being filled by three dentists?

**A. It's going to be 2.25 exactly, which is going to be filled with three dentists.**

Q. And then once -- if those dentists start in October, you'll be fully staffed for dentists; is --

**A. Every site --**

Q. -- that correct?

(Reporter clarification.)

THE REPORTER: "You'll be fully staffed"...

Q. (By Ms. French) -- for all sites?

(Comments off the written record.)

Q. (By Ms. French) So you mentioned raising salaries. When did that happen?

**A. I don't know the exact date, but I would say probably in 2025.**

MR. HARMS: Could we take a time-out real quick?

MS. FRENCH: Yeah.

MR. HARM: Did the question before



that, the whole question, and the answer get into the record?

MS. FRENCH: That's a good question.

(The reporter read back the following:)

QUESTION: "And then once -- if those dentists start in October, you'll be fully staffed for all sites" --

ANSWER: "Every site" --

Q. (By Ms. French) Let's repeat that question now and get that answered.

So as of October 2024, if those dentists start at the sites, you will be fully staffed at that point in time; is that correct?

MR. HARM: '26, not '24.

Q. (By Ms. French) I keep messing up this question. So if the -- if the dentists that you have extended offers to start in October of 2026, you will be fully staffed at that point in time; is that correct?

**A. Every single site is going to have dentists at those locations.**

Q. And that's a good point. So we were talking about dentists -- and we'll come back to my other question about some of the other things -- but



are dental assistants currently fully staffed at all sites?

**A. Yes, but if they're all fully hired for those location, no.**

Q. What does that mean?

**A. I have dental assistants working across the state to helping to -- to fill those positions.**

Q. So there may be dental assistants that are moving from site to site to make sure that there's a dental assistant with a dentist, but there might not be someone who's been hired for that particular site; is that correct?

**A. Yes.**

Q. Okay. So let's go back to the salaries. I think you said that it was likely in 2025 that salaries were raised?

**A. I believe so.**

Q. And who -- was that on your recommendation that the salaries increase?

**A. It was a team effort.**

Q. But who else was part of advocating for higher salaries for -- for dentists?

**A. Regional vice president of operation.**

Q. And did that higher salary have to get approved by Centurion corporate?

Q. He also appears to be writing about the new annual comprehensive dental examination charting guide. Is that what you understand this email chain to be about?
**A. Yes.**
Q. And in that first paragraph, he writes -- he agreed that this "is clearly needed and important." And it goes on: "I just noticed, however, that when I print my chart notes to go into the patient folder, it is 13 pages long. I believe there are ways this could be condensed considerably. For instance, the periodontal charting form I showed you earlier could replace entering the teeth individually on the computer. I don't know how helpful the periodontal charting format on the computer is the way it is configured."
Did you consider changing the charting guide based on these comments?
**A. Yes.**
Q. Were any changes made?
**A. Actually, it's going to be by September 1, because not only the whole thing going to be replaced biannual dental examination, but also we are introducing paper chart to specifically chart a schematic of the teeth and periodontal -- periodontal probings.**



Q. And that paper schematic that we'll go in place, did you say on September 1? Is that right?
**A. Yes.**
Q. That will only be in the -- the paper chart, the periodontal probing and the schematic; is that --
**A. Yes.**
Q. -- correct?
And did that come out of these, kind of, same concerns that he has about the effectiveness of the MOCIS system in -- in -- in documenting periodontal care?
**A. I believe so.**
Q. And he was making that complaint in May of 2024, and it is now September of 2026 when the change is being made?
**A. (Nods head.)**
Q. Why do you think it took so long to make that change?
MR. HARMS: Object to the form.
Go ahead.
**A. It -- there has been so many other things that I had to do, and it just took me that long to reach to that part. But at least even placing what I had placed, they didn't even have that to that extent, so it was prompting them to put it somewhere at least. It's cumbersome, yes, but it's not that they couldn't use it.**



Q. And do you understand that to be part of his note, that what was done was clearly needed and important in being able to -- because previously it wasn't being asked to document periodontal screening at all in the system; is that right?
**A. Yes.**
Q. He goes on to say -- let's see, it's in the next -- sort of the next paragraph -- "Our problem also stems from not having a great recall system in place with almost exclusive reliance on HSRs." Do you agree that HSRs are the almost exclusive way for accessing dental care at Missouri Department of Correction facilities?
**A. Up to now, maybe. But again, going forward, we are having more checks and balances to invite the patients back.**
Q. And so up till -- we're being -- we're conducting this deposition right now, but you have plans, I'm understanding, to -- if I remember right -- be able to invite patients back for care? Is that --



**A. Basically, we're going to review if they have received an annual examination. If they haven't, we're going to develop the system to make sure we make them an appointment and basically invite them back to dental clinic for annual examination.**
Q. Do you have that system right now, or the plan is to develop that system?
**A. We are in the process of developing it.**
Q. When do you think it -- you'll have it implemented?
**A. Probably September 1.**
Q. So by next week you'll have it implemented?
**A. Yes.**
Q. Okay. But up until September 1 of this year, HSRs were almost the exclusive way for accessing dental care, correct?
**A. Yes.**
Q. Do you agree that that was a problem?
**A. No.**
Q. Is it correct to say that if a dentist was triaging a problem for a particular tooth -- so someone came in -- and I will mess up my teeth number -- but came in for Tooth No. 4, and the

dentist noticed a problem with another tooth -- so say Tooth No. 13 -- is it Centurion's policy that they -- that they should not develop a treatment plan for the tooth that does not have an HSR and the patient be told to submit a new HSR?
**A. No.**
MR. HARMS: Object to the form.
Go ahead.
**A. No, they are still -- can write what needs to be done, but the patient has to be ready to come to receive that treatment. So they are keeping track of the one immediate one and the one for -- next to it is going to be brought to patient's attention next time when they come, and if patient chooses to be, it would schedule. They don't have to even drop another HSR, but if patient chooses to wait on it, then patient ask for -- for it to be put back on a schedule with a new HSR.**
Q. (By Ms. French) So it's Centurion policy that there should be -- that whenever a patient comes in, a treatment plan should be developed for all dental needs that are identified at an -- at an appointment?
MR. HARMS: Object to --
**A. No.**



MR. HARM: -- the form.
Go ahead.
**A. No.**
Q. (By Ms. French) What is Centurion's policy about unidentified -- dental concerns that were iden- -- not identified on HSRs, how those should be treated by dentists? What's the guidance to dentists?
MR. HARMS: Form.
Go ahead.
**A. Every time is informing patient, "When you have an issue with your teeth, you need to inform us." Patients are in charge of their own dental health to basically inform the dentist when they wanted to be looked at.**
**So we just really don't have nothing at the moment for recalling those patients.**
Q. So you have a way if -- we'll try to break this apart a little bit. So the patient is in charge of informing dental about their needs. Is that -- they inform dental through an HSR; is that correct?
**A. Correct.**
Q. And they may be told at a dental appointment that they have additional issues, and



Centurion leaves it up to the patient to determine whether they want to go forward with care on that -- for those additional problems that --
**A. Yes.**
Q. -- were identified?
(Reporter clarification.)
**A. Yes.**
Q. (By Ms. French) And a patient -- there's no way for the dental department to recall that patient for a treatment plan on that additional tooth that wasn't on an HSR; is that correct?
MR. HARMS: Object to the form.
Go ahead.
**A. That is because of the limitations of MOCIS, no.**
Q. (By Ms. French) So because of the limitations in MOCIS, there is no way to recall if it is not linked with an HSR, correct?
**A. Yes.**
Q. So it would be up to the patient to put in another health service request in order to go through with that -- with any treatment on additional problems?
**A. Not necessarily. Sometimes it's based on the -- the provider's clinical judgment. They would**



**possibly even treatment plan those teeth to be completed if they felt like it has to be done at the time that originally came and looked at the patient. So if the patient says, "It's hurting upper right and lower left," you would ask him, "Which one hurts you the most?" You would put the upper right. When that one is taken care of, you already put in the note lower left. And then when you are in that appointment taking care of the upper lower right, you will put for the lower left, and then it would be tracked for the patient to come back. For those certain instances, patient doesn't have to drop another HSR. So it all goes back to how every dentist use their own clinical judgment to bring the patient back.**
Q. And there's no requirement by Centurion that if a dentist sees additional problems that they develop treatment plans at the time when they see it? It may be within their clinical judgment to do so, but there's no requirement by Centurion as a policy to do so; is that correct?
**A. No, we don't have.**
Q. Okay. Then the next part -- I think I understand the -- the math that Dr. Fairbanks is doing, but the next paragraph talks about some math

Go ahead.
**A. Yes.**
Q. (By Ms. French) Is this the expected course of the disease in the absence of appropriate intervention?
MR. HARMS: Same objection.
**A. Not necessarily, because whenever the dentist does what they do, it is still the home care, and the patients contributing factors are making a different, and whatever they do on regular daily basis could put them back to square one despite of the treatment or possible the risk factors or contributing factors that they have.**
Q. (By Ms. French) Regardless of the other factors, if there isn't appropriate intervention, would that be the course of the disease?
MR. HARMS: Same objection.
**A. Can you repeat the question?**
Q. (By Ms. French) Yeah. So if -- if we kind of -- and maybe we can even do it the opposite way. Let's assume that there aren't other risk factors, that you've got great patient care, but you don't have -- you have an absence of appropriate intervention. Do you agree that, when untreated, that the expected course of the disease is continued



attachment loss, increasing pocket depths, and ultimately, tooth loss?
MR. HARMS: Same objection.
Go ahead.
**A. Yes.**
Q. (By Ms. French) Are you aware that the American Dental Association has endorsed the periodontal screening and recording procedure, a PSR?
**A. I'm not prepared to answer that one.**
Q. Do you agree that evaluation of periodontal status requires conducting a thorough clinical and radiographic examination?
**A. Yes.**
Q. Do you agree that all relevant periodontal findings should be documented?
**A. Yes.**
Q. If periodontal disease is present, what is the treatment?
**A. Cleaning.**
Q. Is cleaning sufficient to prevent continued attachment loss?
**A. No.**
Q. Is cleaning sufficient to prevent increasing pocket depths?



**A. No.**
Q. Is cleaning sufficient to prevent tooth loss?
**A. No.**
Q. What would be the treatments that would be necessary for those?
**A. It could -- might need a medical intervention for the patients with the contributing factors of a medical history is causing those issues, and some people have a genetic of it, so whatever you do may not be -- even prevent the progression of the disease.**
Q. How are -- what are -- are scaling and replaning? Can you describe both of those?
**A. It's basically removing buildups on the teeth.**
Q. And that's different than the cleaning that would be done either by a hygienist or a dentist at an annual examination; is that correct?
**A. It's still called "cleaning," but that would be considered deep cleaning.**
Q. And it's not what would be done, though -- so someone came in for their periodic examination. You -- a dentist would not do that as a matter of course unless they decided to treat dental -- or



periodontal disease; is that correct?
**A. It would be each dentist's clinical judgment on how to proceed.**
Q. Do you recommend that scaling and root planing happen at periodic examinations -- and "you" being Centurion? Or does Centurion recommend scaling and root planing happen at periodic examinations?
**A. No. Probably it has to be done in a separate appointment.**
Q. So at the periodic examination, you may screen for the periodontal disease, but then you would make a plan to do treatment, like scaling and replaning; is that correct?
**A. Yes.**
Q. Okay. Which dental professionals at MDOC facilities are trained to do scaling?
**A. Every dentist, general dentists.**
Q. What about root planing?
**A. Same thing.**
Q. Have you confirmed with every dentist that they feel comfortable doing those procedures?
**A. It's part of their licensing and credentials. It's, like, if I verify every one of them if they know how to do a filling.**

Q. Can -- are dental hygienists are -- also trained to do scaling?

**A. Yes.**

Q. What about root planing?

**A. Yes.**

Q. I'd like to move on to intake examinations. Can you explain what an intake examination is?

**A. It's like an oral dental examination, basically.**

Q. I'll -- I'll ask a little further on that, but let's -- I'm -- I think, likely, we'll be looking a little bit at your Exhibit 8, if you have it in front of you. This is your -- or the Centurion Missouri dental treatment guidelines and the revision that occurred in July of 2025. So we see on the first page the "Dental Intake Examinations", and are these -- they're examinations, but they -- the kind of distinction is that they happen at risk -- at R&O facilities; is that correct?

**A. Yes.**

Q. So the -- is the content similar to what occurs at any other dental examination? That's just a difference at what facility, or is there



substantive differences as well?

**A. It's like annual dental examination.**

Q. Do you consider periodontal screening essential for an intake examination?

MR. HARMS: Object to the form.

Go ahead.

**A. Yes.**

Q. (By Ms. French) And I'd like you to look at what we have listed as Exhibit 4. It's the NCCHC standards for healthcare. And I believe we're going to look at -- it's the third stapled portion of it: P-E-06: Oral Care. And down there they have definitions of different oral -- oral care. Have you found that?

**A. I have to start from the beginning.**

Q. It will be probably at the very end. It's page 135, if you look at the page numbers at the bottom.

**A. Okay, yeah.**

Q. And so they've -- there's definitions there.

**A. Yes.**

Q. And one of them is for oral examination?

**A. Correct.**

Q. And the oral examination, there are



multiple things: taking/reviewing oral history and extraoral head and neck exam, charting of teeth, periodontal assessment, and examination of the hard and soft tissues of the oral cavity with a mouth mirror, explorer, and adequate illumination.

And do you understand this to be the NCCHC standards, including periodontal assessment as one of the required components --

**A. Yes.**

Q. -- is that correct?

And then the NCCHC guidelines that we -- the ones authored by Dr. Adu-Tutu, they also require periodontal screening; is that correct?

**A. Yes.**

Q. How are you ensuring that periodontal screening is occurring at intake examinations?

**A. Right now we do have those PSR evaluation, but I am in process of refreshing annual examination for district requirement that came out this year, as well as I'm going to make it exactly like the reception and orientation examination, so it would be those additional paper charting that is going to be added to electronic records to put all those perio probings and a screening of those completed at both reception and on annual basis.**



Q. So it sounds like there is a plan for both intake examinations at R&O sites as well as periodic examinations at other sites to include this PSR evaluation as you have it in charting guides in both the annual exam and the R&O ones; is that correct?

**A. More than just the PSR. PSR is, like, more of a screening tool, but this one going to be a perio charting. You're going to record six different numbers out of each single tooth, basically, for knowing the health of the bone and the tissue around every single tooth, so this is going to be a full blown-out perio charting.**

Q. And that's the one that you're going to establish with paper charting; is that correct?

**A. Correct.**

Q. When that -- that is likely to start on September 1; is that correct?

**A. Yes.**

Q. At this particular moment before that starts, is the periodontal screening that happens just at the R&O intake examinations, is the main way you track that through the MOCIS charting guide for intake R&O exams?

**A. That's due to the limitation of MOCIS, yes, but -- yes.**

judgment?
MR. HARMS: Object to the form.
A. **It was their approach wrong.**
Q. (By Ms. French) This wasn't a problem with not having a dentist at Moberly?
A. **Well, that was the problem, but they -- when -- even they -- they are treatment planning the way that they are, it's going to make the problem even that much more worse then.**
**But that all being said, that December -- second quarter of 2025, we had over 40 percent backlog for all the treatments that they were across the state, and we were around 1,400 people in -- basically having a dental care, which add -- like, the last quarter of 2026, we had only close to 4 -- 4 percent backlog, which even not only we treated that many more patients, but also reduced the backlog.**
**So these problems, whatever they are or they were, it was then. It's not now.**
**So we have improved 40 percent backlog from second quarter of 2025 to second quarter of 2026 to 4 percent. And the population that we were treating, it has increased almost twice as much. It was around 1,100 then, and it's around 2,200 now.**



**So whatever it was, it was a problem, but is not a problem now. Since Dr. Scheperle has been on board, we have been addressing all these issues.**
Q. You say you've been addressing these issues. I hear you saying that you have reduced backlogs -- is that correct -- that -- that people are not waiting as long for care?
A. **Correct.**
Q. Is that correct?
A. **Yes.**
Q. Are you tracking how many extractions happen in a year?
A. **Yes.**
Q. How has that changed over time?
A. **It has improved compar- -- we have numbers. We know exactly how many happening on the cycle that peoples are incarceration within the time frame that they have been from the diagnosis to receiving a treatment.**
Q. What I'm curious about is the number of extractions in a year per inmate population. Do you track that?
A. **Yes.**
Q. What were the numbers last year for the number of extractions?



A. **We have to look at the completed treatments. There are ways around it. It's not very completely -- we have to dig into the data, very manual, we have to compile it, but we do have a data to compile.**
Q. Have you compared the number of extractions completed in 2023 or 2024 with this last year?
A. **That's what I was saying, you know, when -- at the time, we had that many patient waiting to receive their treatment versus for the amounts that has been diagnosed yesterday, it was only 3 percent that were waiting more than six months.**
Q. I'm not asking about waiting. I'm asking about the number of people who lost a tooth in 2024 who had to have teeth extracted. Have you tracked outcomes, so not backlogs but outcomes to the patient? Like, how many patients -- how many teeth were lost, had to be extracted in 2023 or 2024 compared to currently?
A. **I think we still can dig it out of the data that we have. It's not very easily accessible because, again, it's not keeping track of historic data, and looking on this cycle of the patients**



**incarceration and today's population of the patients, that they are in the system, but there are ways to compile those data.**
Q. But that's not something you regularly monitor, is kind of patient outcomes, like the number of extractions?
A. **No. Why do I need to do that?**
Q. Would it be useful in knowing how good your dental care is to know how many people are experiencing tooth loss?
A. **You have to consider this population comes with a whole lot of negligent to their dental -- dental and oral health when they are coming to the facilities. So it's not the fault of the dentist that they are pulling the bad teeth. It's the fault of a patient that came with those bad teeth.**
Q. Isn't -- I think we looked at the beginning of the NCCHC standards, and they acknowledge that this is a very vulnerable population. That's why the oral care treatment, like periodic examinations and periodontal care are so important given those problems that you discussed. Is that correct?
A. **It is, but if they have an urgent and emergent need, why do we have to ignore all those**

**problems that they are getting more infection in their mouth and all those creating sleepless night and do the comprehensive exam to just delay even receiving treatments for those other urgent cares?**

Q. So right now is there not staffing available to both do -- treat emergent and urgent care needs as well as do periodic examinations as required by the NCCHC?

MR. HARMS: Object to the form.

Go ahead.

**A. No.**

Q. (By Ms. French) On -- for these ones that you were concerned about, did you ever go back and pull their dental records to see if this was a problem of prior -- if they had periodic exams and it was just a problem of prioritizing?

**A. No.**

Q. Did anyone ever assess whether these teeth were lost that could have been restored if they had timely care?

**A. No.**

MS. FRENCH: I'm about to start another topic. Do we want to take a break now, or --

**THE WITNESS: Yes.**



MR. HARMS: I'd love to take a break.

THE VIDEOGRAPHER: Okay. We are going off the record. The time is approximately 12:17 p.m.

(Reporter clarification.)

THE VIDEOGRAPHER: And we are back on the record. The time is approximately 1:11 p.m. Please proceed.

Q. (By Ms. French) Welcome back.

**A. Thank you.**

Q. I -- let me look. I think I had a couple quick -- well, let's see if they're quick -- but a couple follow-ups on the periodic examinations before we move on to my next topic. We talked about in the R&O context how the panographic -- panoramic -- I apologize -- panoramic radiographs were required for the R&O examinations. Are there any radiographs that are required for the periodic examinations?

**A. That would be the -- whatever the clinician determined.**

Q. So there's -- there's none required to do, but a clinician could decide to do some?

**A. Yes.**

Q. Would the reason why they would do some



would be because of a dental condition that they see?

**A. Yes.**

Q. So they wouldn't do them as a matter of course, only if they identified a potential problem?

**A. Yes, in the community is diagnosed by --**

(Reporter clarification.)

**A. -- a dental provider.**

Q. (By Ms. French) So in the community, there's no requirement to do radiographs -- to keep radiographs current?

**A. There is a guideline for it, but it's all left to the providers'/clinician's clinical judgment.**

Q. What are the recommendations on how often radiographs should be kept current?

MR. HARMS: In the community --

**A. In the community?**

MR. HARM: Is that what you're asking?

(Reporter clarification.)

Q. (By Ms. French) Let's start within the community?

**A. Well, community is a lot dictated with the insurance companies. The reality of the fact, every**



**five years a full-mouth X-rays would be -- and still, again, it's my clinical judgment, and every provider could have their different clinical judgment -- and then updated it all play factor based upon patient's risk. It carries risks and many other consideration. Then you'll determine how frequently you will update those.**

Q. So is the full mouth -- is that a panoramic or could that be multiple radiographs?

**A. It -- it is is kind of defined. It could be panoramic plus few bitewings or 18 bitewings and PA combinations.**

Q. And if there are additional risk factors, what are the recommendations?

**A. Those are basically if it's a highest risk patient, then you will take the 18 pictures.**

Q. And that would be every five years or more?

**A. It is between three to five years.**

Q. And you said this is guided somewhat by insurance. So insurance will only reimburse radiographs done at examinations every three to five years?

**A. For the full mouth X-rays, yes.**

Q. Are there things beyond full-mouth X-rays


Lexitas operates in all 50 states and is licensed where required
Nevada Registration #116F - California Firm Registration #179
LEXITAS

that insurance will reimburse that are not for diagnosing a problem but for just visibility during a treatment plan?

A. **No. Examination is when the treatment plan will develop, and that's when the X-ray is basically needed for seeing the hard tissue.**

(Videographer comment.)

THE VIDEOGRAPHER: Off the record at 1:15 p.m.

(Off the record.)

THE VIDEOGRAPHER: And we are back on the record. The time is approximately 1:17 p.m. Please proceed.

Q. (By Ms. French) We were just talking about radiographs, and I had asked for the community standard of care, and I believe your testimony -- and you can confirm with me -- is that for the full-mouth pan- -- full-mouth imaging, whether it's panoramic or done through a series, that the recommendation is every five years, but if there are certain risk factors, it could be every three to five years; is that correct?

A. **Yes.**

MR. HARMS: Object to the form.

Q. (By Ms. French) But no requirement at



annual exams unless there is a treatment plan that needs to be developed; is that correct?

A. **Per what I have learned, any oral examination has to have X-ray because you have to examine the hard tissue, and you can only examine the hard tissue with X-ray.**

Q. So consistent with what we look at in the NCCHC standards, which set out their definition of oral examination and included in there the use of radiographs, it would be important to have those radiographs to be able to -- to see the -- the hard tissue; is that correct?

A. **Yes.**

MR. HARMS: Objection to the form.

Q. (By Ms. French) And in the stan- -- Centurion guidelines to dentists at Missouri correctional facilities, are there any radiographs required to occur at the periodic examinations?

A. **It's not something that I can really dictate because it goes back to the clinical judgment, and it's all based on individuals when they receive examinations.**

Q. Do you provide them any guidance on using radiographs at the periodic examinations?

A. **Yes.**



Q. What -- what is that done through?

A. **When I'm developing this annual charting guide, annual dental oral examination charting guide, there is a space that prompt them what kind of X-ray was recommended. Was it the X-ray needed to be taken? And they can document whatever they have taken. And even the existing charting guide has that place as well.**

Q. So both in the existing guide and the one you're developing right now, there is a place to indicate whether radiographs were taken and the reason for them; is that correct?

A. **Not the reason for it, just if they were -- needed to be taken and what it -- had been taken.**

Q. Okay. So it's possible that they could -- need to be taken, but they weren't taken at that particular point in time just due to time constraints or something else. Is that -- and that's why you would put in that they need -- it's important to have in the record that they need to be taken at some point; is that right?

A. **Yes.**

Q. So I understand that MOCIS has no way of making -- making it a required field the dentists



have to answer whether radiographs were taken. Are there other ways that Centurion could ensure that radiographs are part of all oral examinations?

MR. HARMS: Object to the form.

A. **For reception sites, we have that Tableau portal that we look and basically prevent the patients from moving to make sure a panoramic is taken, but for annual examination, there's not going to be a way to do that.**

Q. (By Ms. French) Would you be able to set up a similar Tableau style of reporting to find out whether radiographs were taken at periodic examinations?

A. **Yes.**

Q. But currently, one does not exist for periodic examinations that don't happen at R&O; is that correct?

A. **Yes. Except the one that it happened in R&O. For the one that are happening in R&O, we do have.**

Q. But for the ones that don't happen in R&O, there is -- there is not?

A. **Correct.**

Q. So there was a little bit of discussion earlier, and I just want to make sure it's -- it's

**A. No.**
Q. -- of this?
Is Centurion aware that at JCCC there was a period where sick call didn't happen for at least six weeks?
MR. HARMS: Object to the form.
**A. I was not informed of that.**
Q. (By Ms. French) And sick call is when either a incarcerated individual can submit an HSR or self-declare; is that correct?
**A. Yes.**
Q. And there have been issues with nursing backlogs of HSRs since at least 2024; is that correct?
MR. HARMS: Object to the form.
**A. Yes.**
Q. (By Ms. French) Is it accurate to say that Centurion has no way of measuring how long an inmate waits for care -- waits for the completion of care after submitting a dental HSR?
**A. No. We do have different ways that we are working around the limitation of the MOCIS.**
Q. How would you go about doing that for a --
**A. The --**
**A. -- HSR.**



**A. The process that you have there through the Smartsheet and Tableau.**
Q. And I believe you had told us earlier that there was no way to match up the Smartsheet and the Tableau to see if any -- any particular HSR had been completed; is that correct?
**A. It's manual.**
Q. And how would you --
**A. Not with the HSR number.**
**(Reporter clarification.).**
Q. (By Ms. French) And if you pulled any particular HSR, would you be able to tell in MOCIS whether it had been completed?
**A. You have to basically dig through the charting guides and patients' charts.**
Q. And that would -- those all have -- are done by the teeth number, and I believe you had said that the HSRs that are submitted may not have that information; is that correct?
**A. Correct.**
Q. So it may be very difficult to measure?
**A. Very difficult.**
Q. All right. Final -- I hope they are easy questions. Now I have to find where I put them. I am at 15 exhibits, and look at this.



(Farahini Exhibit No. 15 was marked for identification.)
Q. (By Ms. French) And I believe this is going to be my last one.
MR. HARMS: Sorry. Thank you.
MS. FRENCH: No, you're good.
Q. (By Ms. French) These are Centurion's answers and objections to plaintiff's first set of interrogatories. Have you seen these before?
**A. No.**
Q. Well, let's take a look. The -- the first interrogatory -- I guess it's Interrogatory No. 19 -- asked to identify how the dental charting guides (R&O), assessment, and documentation is the same or different than the ADA Clinical Oral Evaluation Code D0150. And I'll let you look through the answer. My kind of general understanding is the answer kind of points out that D0150 is a billing code, I assume, for mostly for insurance purposes, but a billing code, whereas a charting guide is -- is not a billing code; it's a -- it's a charting guide, but then they -- the notes that there are similar in that they indicate certain aspects of dental examinations to be performed and the charting guide suggests that



overlapping aspects. Can you identify for me what the overlapping aspects are between the D0150 code and the dental charting guide?
MR. HARMS: Just to show my objection to the question, it's outside the -- the scope of the topics disclosed in the notice. These were just served yesterday. It wasn't in sufficient time to prepare the witness to testify on behalf of the corporation. So my statement for the record would be whatever her testimony is her testimony as an individual and not as Centurion.
MS. FRENCH: That is just fine, and we may end up doing a meet-and-confer on this. I thought we may be able to get some information here --
(Reporter clarification.)
MS. FRENCH: -- and avoid a meet-and-confer if I could understand what -- what these overlapping aspects are.
**A. I'm not prepared to answer that.**
Q. (By Ms. French) Okay. And the same -- would that same be true for the understanding of the

but Todd didn't want to contribute to the 'stacks and stacks and stacks' of HSRs." In preparing for today, have you heard of stacks and stacks and stacks of HSRs being waited to triage?
MR. HARMS: Form.
**A. No.**
MS. FRENCH: No further questions.
MR. HARMS: Juliana, I have some clean-up questions. Do you have any?
MS. BARTOLI: No. No questions for me.
MR. HARM: Okay.
EXAMINATION
BY MR. HARMS:
Q. Dr. Farahani, I'm going to kind of bounce around quite a bit, so hang with me, okay? I'm going to try to kind of go in the same order we went in today.
And first I want to talk to you about the efforts that you've made to increase the number of dentists and dental assistants working at Missouri Department of Corrections' facilities, okay?
**A. Okay.**
Q. You talked earlier about how in October of 2026, when these new folks start, that Centurion



will be fully staffed, right?
**A. Yes.**
MS. FRENCH: Object, form.
Q. (By Mr. Harms) What do you mean by "fully staffed"?
**A. Basically, every facility going to have a dentist at -- at their locations.**
Q. And even with a dentist at each location in terms of the FTE hours, you'll still be, I think you said, 1-point-something FTE hours short of what's required by the staffing matrix?
**A. A little more than that, but yes.**
Q. Okay. 2-point-something --
**A. Yes.**
Q. -- hours?
Does that mean that those 2-point, whatever it is, hours of FTE time are going to go unfilled?
**A. No.**
Q. How will Centurion close that 2-point whatever FTE-hour gap?
**A. We're still going to continue doing our outreach to recruit dentists. I personally in the past have been attending different conferences or seminars. I personally joined Missouri Coalition of**



**Oral Health and.**
(Reporter clarification.)
**A. -- making basically -- bringing correctional dentistry to the up front of all the other dentists that they are in a community to introduce the opportunities for working in prisons. And we have teamed up with the recruiting team that she is sending constantly communications to the dentists in the area. They do use geofencing and all the other stuff, specially for an outreach areas, and we have been seeing the results that is paying off. That's why we have had so many just last week -- or this week. We extended an offer to three separate dentists. So no, we're going to constantly filling those positions.**
Q. (By Mr. Harms) And so that's recruiting. Will you continue -- will Centurion continue to use it's current dentists at various facilities, moving around to make sure that that 2-point whatever-hour FTE gap is filled?
**A. Yes. And I myself do still travel to fill any needed positions that they need to be present and filled.**
Q. Okay. You were asked a series of questions at various parts of today about



periodontal disease or periodontal care, right?
**A. Yes.**
Q. We can agree that the efficacy of whatever type of periodontal care is provided is patient to patient different?
**A. Yes.**
MS. FRENCH: Object to form.
Q. (By Mr. Harms) What factors come into play to determine the efficacy of any different type of periodontal care?
**A. Multiple risk factors: It could be patient medical history. It could be the genetics. It could be the patient's oral hygiene and home care. So there are multiple factors beyond just what a dentist can do as a provider for that patient that can result in a different outcome of the treatment.**
Q. And by "patient-to-patient dependent," what I mean is what works well for one patient might be completely ineffective for a different patient. Is that --
**A. Correct.**
Q. -- a fair characterization?
**A. Yes.**
Q. Okay. You were asked some questions

a little over 50, those are -- that's the number of people total that need the dental intake examination, right?
A. **Correct.**
Q. How many people are there at those sites that are -- have waited longer than 30 days?
A. **Zero.**
Q. Thank you.
If an inmate submits an HSR that indicates an emergent condition, for example, an inability to breathe, and it's a weekend or it's a state holiday, are the nurses empowered to seek emergency care for that emergent condition?
A. **Yes.**
Q. They don't need to wait three to five days for a dental triage?
A. **No.**
Q. What -- what does the word "triage" mean?
A. **It's a limited examination to address the patient's chief complaint.**
Q. And so one -- when someone gets triaged, whether it's by a nurse or by a dentist, the person performing that triage -- a member of Centurion staff -- has the ability to expedite or escalate care as needed, right?



MS. FRENCH: Object --
A. **Yes.**
MS. FRENCH: -- to form.
Q. (By Mr. Harms) They're not required to wait a certain time that may be spelled out by a policy. Would you agree with that?
A. **Absolutely.**
MS. FRENCH: Object --
(Reporter comment.)
MS. FRENCH: Object to form.
THE REPORTER: And your answer?
A. **Absolutely.**
THE REPORTER: Thank you.
Q. (By Mr. Harms) And -- and I think you got into this earlier, but I -- I just want to make sure the record is clear. If somebody has a life-threatening emergency, was it your testimony earlier that that life-threatening emergency is dealt with and then, per the guidelines, they should be assessed by a dentist within three to five business days?
A. **Yes.**
Q. It is certainly Centurion's -- oh, strike that.
Centurion's expectation is that emergency



care is going to be provided emergently, right?
MS. FRENCH: Object --
A. **Yes.**
MS. FRENCH: -- to form.
Q. (By Mr. Harms) Centurion's expectation is that urgent care is going to be provided urgently, correct?
A. **Yes.**
Q. You've used the phrase "clinical judgment" a number of times during your deposition today. What do you mean when you use the phrase "clinical judgment"?
A. **Every provider entitled to judge the situation and provide care the way that they have been trained as a dental provider.**
Q. And they have -- that would include the use of clinical judgment to expedite or escalate care as they see needed, right?
A. **Yes.**
Q. When you drafted the guidelines in this case and then have revised them since you initially drafted them, is your goal in those guidelines to address every possible eventuality?
A. **It was a starting point, a foundation, a skeleton work; and we -- and that's why we are**



**constantly updating. It's a living document that gets improved as any improvement come to my attention.**
Q. So you set forth these guidelines but still expect the dentists working as part of Centurion staff to use their clinical judgment?
A. **Yes.**
MS. FRENCH: Object to form.
Q. (By Mr. Harms) Your expectation is not that the dentists working for Centurion are going to disregard their clinical judgment in favor of the policy --
MS. FRENCH: Object to --
Q. -- true?
(Reporter comment.)
A. **True.**
MS. FRENCH: Object to form.
A. **Dentists are first dentists, and they have to protect their licenses and whatever they've been trained to practice dentistry before wherever they are employed.**
Q. (By Mr. Harms) I want to touch on the discussion here somewhat recently about -- about HSRs. Was your testimony that -- that you have knowledge of some issues at some sites related to

Q. (By Mr. Harms) Oh, the -- the NCCHC guidelines and standards changed this year, right?
**A. Yes.**
Q. And in terms of NCCHC surveys, the surveyors give companies like Centurion and other correctional medicine companies time to update their guidelines to comply with the new standards; is that your understanding?
**A. Yes.**
Q. And that's something that you're working on doing?
**A. Yes.**
Q. All of the Missouri Department of Corrections' facilities where dental care is being provided are currently accredited by the National Commission on Correctional Health Care, true?
**A. Yes.**
Q. Okay. For now, at least, that's all the questions I have. Thank you.
**A. Sure.**

**REEXAMINATION**

BY MS. FRENCH:
Q. I just have a couple following up on Mr. Harms' questioning.
We were talking about the -- the staffing



that's going to occur in October of 2026 and that you would not have full FTEs but would have dentists at each location; is that correct?
**A. Correct.**
Q. And I believe Mr. Harmes referenced several times two hours unfulfilled. Is that the correct form? Or is it 2.25 FTEs?
**A. FTEs.**
Q. And full-time equivalent -- two full-time equivalents is not two hours. It would be -- was a full-time equivalent the number of hours someone would work full-time in a day or in a week?
**A. 1.0 FTEs equal to 40 hours per week.**
Q. So what you're missing is around 40, 80, a hun- -- 90 hours; is that correct?
**A. However that adds up.**
Q. Not -- not two hours; is that correct?
**A. Yes. But --**
Q. And --
**A. -- if I can add, but we are constantly evaluating any additions that even beyond the matrix may require to be added to, because especially introducing annual examination is going to have impact to dental -- dentists that are available to complete those.**



Q. And that may require additional FTEs?
**A. Yes.**
Q. And there was some discussion about simply doing more treatment over time, and you've been able to do more treatments since hiring on more dentists. Is that correct?
**A. Yes.**
Q. And I understand some of that as well, but if early intervention works -- so if you're able to do some restorations or periodic cleaning -- if that happens more quickly, are more teeth able to be restored and not need extractions?
MR. HARMS: Object to the form.
Go ahead.
**A. Not necessarily because many of these teeth that are nonrestorable. They kind of patients came to the facilities with -- with those nonrestorable teeth, that there is nothing to do for those teeth. Sooner we get them out of their mouth, healthier the patient become, and ultimately, they can get the replacement for those missing teeth.**
**The patient populations and their history of whatever they have done is worse than the community just because they had so much negligence before they even get to the facilities.**



**So it doesn't mean if we don't do preventive. Really, some of them, preventive doesn't even apply to them.**
Q. So is it Centurion's position that there couldn't be any extractions prevented if they put in place annual examinations?
MR. HARMS: Object to the form.
**A. It's hard to answer. It hasn't been evaluated, but the reality of fact is when the patient complain about pain, that tooth is already nonrestorable.**
Q. (By Ms. French) And is that the reason why you would want to do preventative dentistry to avoid getting to the point of pain?
**A. Yes.**
Q. And does pain sometimes occur when restoration could occur to solve the problem?
**A. No. Most of the time when restoration needs to happen, it's before the tooth becomes symptomatic. When the tooth becomes symptomatic, the nerve of a tooth is already compromised, and there is not the easy way just with the filling to do it, and even placing a filling make that situation worse then.**
Q. That's a really good point. So if you're

trying to decide what "urgently" means, the only thing that they would have to look at, as far as time frames that Centurion accepts, are those ones within the guidelines; is that correct?

MR. HARMS: Object to the form.

**A. That would be whatever is published, but when a patient comes with a specific issue, the dentist is not going to go open this and say, "Oh, this is not emergent, and I'm going to wait three days to see you just because I still have the time." They're going to see the patient, determine the treatment, and they're going to implement the treatment based upon their clinical judgment. So those are just there as kind of a framework, but every dentist is entitled to see those patient sooner, as soon as the next day or even they receive treatment same day. Many of these dental triages, when they happen for the camps, that they do have those kind of capabilities and resources. They may even receive the treatment right there and then, and that could be even just a simple routine treatment and they receive it if that would -- however the time and resources allow.**

**So it -- I cannot just say that they're going to open the book and say, "Oh, this is now I'm**



**going to categorize it as urgent, and let's wait for seven days to triage them and then come back and then do the treatment in five months."**

Q. But we did go over, like, what the guidelines do allow, correct?

**A. The guideline would not want to go beyond it.**

Q. Yeah. And there is no definition of what "urgently" means if a dentist is trying to decide what Centurion's expectation of dealing with something "urgently" means?

**A. They are first dentists and dental provider, and they have obtained their licenses, so they're going to practice dentistry up to their credentials before being employed by Centurion.**

Q. And if they think that something needs to be dealt with in a week but there are no available openings, they're also still con- -- constrained by resources and time; is that correct?

**A. Usually, we do kind of look into the whatever is urgently needs to be happen, and sometimes modification of the schedule may take place that we may delay one patient to get the other patient just because -- or they overbook themselves and take care of it because we still have no-shows**



**in the clinic. Patients wants to be, but when their appointment comes, they don't show up, so they do overbook it and then take advantage of that kind of a situation.**

Q. But resources and time will constrain how quickly any clinician can get to someone? That's true even in a community, correct?

**A. Exactly.**

Q. We talked about your -- your preparation and how you had some personal knowledge of issues at Moberly. If an HSR issue was not brought to your atten- -- attention, you would not be aware of it, correct?

**A. Oh, well, this Smartsheet that we have in place, even if they don't tell me, when I'm logging into the system, I'll look at it and I see. And usually, I look at the other end of it when I see we have that many patients waiting more than 30 days to be triaged, that's when I go back and look at it and troubleshoot as where they were coming from. Was it the dental --**

(Reporter clarification.)

**A. -- was it like a dental team that they were slacking and not seeing the patient, or was it because the -- the paperwork didn't reach to them on**



**time? So I would not necessarily always wait for that, just at least give me some sort of visibility with a Smartsheet and the data that they are entering to it.**

Q. (By Ms. French) And so your visibility really is from that Smartsheet side, or if you're getting some report -- specific reports to you from particular facilities; is that correct?

**A. Actually, that report that we reviewed last time, that was part of it, was that the patients that waiting for more than 30 days triage, that's a weekly report that every facility is required to provide that to their director of operations, and then it is distributed to all of us in the regional, and I'm one of the one that is receiving it. So it's not just me. It's basically both me, department of correction, and everyone else in the chain.**

Q. Okay. Really briefly, we discussed the Missouri department's correction -- the Missouri Department of Corrections' efforts to replace MOCIS with a different EMR system. I believe you'd mentioned that they put out an RFP and identified what requirements would be required. Is that the current status of the replacement efforts?