IN THE UNITED STATES DISTRICT COURT
OF THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| JOHN C. DUVALL, | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. 2:23-04160-CV-SRB-P |
| EARL D. SCOTT, ET AL., | ) | |
| Defendants. | ) | |

THE DEPOSITION OF JOHN C. DUVALL

Taken on behalf of Defendants

October 21, 2026

9:00 A.M.

CERTIFIED TRANSCRIPT

EXHIBIT

G



Case 2:23-cv-04160-SRB Document 295-8 Filed 11/18/26 Page 1 of 10

teeth. And he paused. And then he said, if we -- if we were outside at private practice, I would fix it.
**Q. And when Dr. Paskar mentioned that all he does is pull teeth, did he say anything else about he feels like that's all he does is pull teeth or his only job is to put pull teeth? Did he say --**
A. No, he didn't say anything about feelings or anything. He says, all I do is pull teeth. And so we had a pretty good -- we had a conversation about pulling the teeth. And I said -- I said, why do you just pull teeth? He says, I'm very good at it. Because I'm very good at it. Oh, no, I -- I described where my wisdom teeth were a four-hour battle for one tooth. And he says, I'm very good at pulling teeth and that's all I do.
**Q. So from your perspective, did you take that to mean his only job there was to pull teeth or that he just only pulled teeth because that was --**
A. No, from my perspective, it was his only job because he wasn't allowed to fix teeth.
**Q. I think for now that takes care of my questions related to your personal dental issues.**
**So when was the first time that you became aware that other incarcerated individuals, other offenders might be experiencing some similar dental**



**issues to yourself?**
A. I'm sorry. In the waiting room, in the wings, we would have people with -- with -- they were pulling their own teeth because dental wasn't taking care of them, literally. I'll give you an example of currently, if I may?
My cellie, Donald Davis, he just came from Bonne Terre, he went into the dentist office, he says, oh, you have broken teeth. And that was eight months ago. He's transferred here, nothing happens. His mouth is a complete, absolute mess. And they -- so I finally convinced him three weeks ago to put an HSR in to see the dentist. And he was promptly seen, I think within four days, four or five days. And the dentist looked at him and said, I'll get back with you.
It's so ingrained in here. I took three inmates in my wing on unit 1, C wing, and I said, now's the time. We're working on a class action to get your teeth fixed. Oh, hell no, we're not going to dental because all they do is pull your teeth. They don't do anything. They wait until they're rotted out; so what difference does it make whether you go?
**Q. That's what the other offenders were saying?**
A. That's what other offenders -- this is -- this is currently now. It was much worse back in



2022.
**Q. So you would say conditions have improved related to dental since 2022?**
A. Some. Some. But they're not doing follow-up and they're not doing cleanings. I have -- I had another fellow, Robert Buck, who's been down six or eight years and has never been -- up until last month had never been called to dental for cleaning, examination, nothing. In other words, unless you're complaining about pain, it's sorry.
**Q. And you previously referenced some things had improved. What are the things that have improved?**
A. Well, improved for me as far as getting in and seeing them and getting my dentures. Oh, well, on the three guys -- the -- well, I'll say two, I can -- I know who they are. I can't tell you their names, but they're on my wing. They came back last week, I -- I talked them into going to the dentist and they did extract enough teeth, but they both came back with sutures and they did oral surgeries that day; so -- which before, you couldn't get them -- you know, the mindset is, we're not going to the dentist because that's all they do is pull teeth and give you a box of Ibuprofen and say, there you go.
**Q. So to kind of recap what you said, in your**



**experience, since 2022 until now, they are faster to see you and then faster to repair?**
A. At this facility.
**Q. So just at MECC?**
A. And I've only been here since June 2nd. At Jefferson City, they are still not. The -- the -- you go to -- go to sick call. And I've been in the -- they call it the sick call tank, where there's 30 to 40 inmates with HSRs. And the nurse comes out and says, we're not -- I'm not taking sick calls today, HSRs today, come back tomorrow, try it tomorrow.
Then the other issue over at Jefferson City is, when they do take the HSR, the last time I was in the dentist office over there, which was -- let's say it was less than a year ago, and both dental technicians came over to the chair and said, they're -- they're aware of the litigation and they wanted to know if there was anything that -- that our lawyers could do to make sure that they get the dental HSRs because when they've been collecting them, they've been disappearing. Now, they're scanned into a system, supposed to be. But then when they were putting the HSRs -- when you put the HSRs in the box, the box -- a huge mailbox would be completely full of HSRs and never emptied. And that took three weeks.

**communicate by mail?**
A. Not very often. Just -- let's see. It was more often when I was over at Jefferson City. So I really -- there's -- there's a mail log at Jefferson City for legal mail.
**Q. That's fine. I just wanted to see if you had a general idea of how often you --**
A. Well, the problem is, is last October, I had a mild stroke. And that's why I'm going to say I'm not exact on dates and on -- on the tooth. And it took me several months to feel like I'm almost back to normal, other than going partially blind in my right eye.
**Q. Okay. So let's talk about the stroke then for just a minute. So you said getting back to normal. What was it like when you were not close to getting back to normal.**
A. Psychologically, I was angry. Really, the slightest thing. I -- I would wake up mad, wake up almost in a rage. And then I would -- and my cellie would say, John, John. And I would realize, I'd have to say to myself, that's not me, that's not me. That's the stroke. That's not me. And I worked as a physical therapy assistant for -- for a while and was trained and I worked nursing and hospice, which helped



me recognize. But, like I said, other than the blindness -- now, last Saturday, I was slurring my speech pretty hard, but it's -- it's infrequent. And as long as I'm on my blood pressure meds, I'm -- I'm good.
**Q. So the blood pressure medication is what helps you kind of manage those -- those symptoms of the stroke?**
A. Well, the blood pressure meds is what was keeping me from having the stroke, and then I didn't get them for two months.
**Q. And when you say you didn't get them, you had a prescription in --**
A. I had a prescription, and they just simply don't refill them. Like right now, I don't have my -- I don't have my Prilosec. My cellie doesn't have his Prilosec. Jason Crawford doesn't have his Prilosec. And then when we put in HSRs and they go, okay, you're good, we're going to renew them, we don't see them. And then we turn around and we -- and I have the documents from other -- from the other inmate, from Jason Crawford, where we put the sticker on the refill because they said it was -- you know, and they pulled the sticker off and wrote, this is not how you renew prescriptions. Don't -- I've got that, I'll give you



a copy, I just got it yesterday. We're back to running out of meds for a month or two at a time for who knows how many inmates.
**Q. And so they were saying you were filling out the HSRs incorrectly?**
A. No, no. You have a ren- -- you have a medication renewal for existing prescriptions, then you have an HSR to renew the prescription. We -- we do the HSR to renew. Never hear back from them. And then we go ahead and put the sticker on and put it in the refill box and -- they sent Jason's back. I haven't heard a thing. I mean, the doctor during telemed says, okay, I'm renewing -- renewing your Prilosec and the enteric aspirin and one other thing, but -- and that's been four or five weeks ago now.
**Q. And so you previously mentioned on -- on one of them, I don't know which one it was, that you said that the staff told you, no, that's the wrong way to do it?**
A. No, no, no. They wrote it on the refill slip -- the refill slip. And I have that and I'll -- I'll get it to the office.
**Q. And so when you say they wrote it on the refill slip, were they rejecting a refill? Were they -- I don't understand what you mean.**



A. Yeah, they actually peel -- peeled the -- the medication sticker off, which has the -- the digital code on it. They peeled it off and then they wrote on there, this is not how you renew medications.
**Q. So physically, like, on your pill bottle?**
A. No. It's -- it's -- it's a flat card with blister pack. It's a flat blister pack.
**Q. Okay.**
A. And it's got an adhesive sticker on the top. You peel off part of it and put it on a half sheet of paper that's for -- for refills.
**Q. I think I understand.**
A. And then you put it in the box and you go, you put your hands together and pray.
**Q. Okay. And why do you do that?**
A. Hope you get them.
**Q. Because sometimes you don't?**
A. Because a lot of times you don't.
**Q. Okay. And, again, I don't want to discuss anything that you've personally discussed with your attorneys, but are you generally aware of your duties as a class representative if this would be -- if this were to be certified as a class?**
A. Actually, I was sent a description of it, and to be honest, I didn't read it.

**Q. Okay.**
A. Or if I did, I don't remember.
**Q. Okay. And then regarding you as a representative of a prospective class, do you believe that you can represent all the interests of that prospective class?**
A. Yes, I think so.
**Q. Okay. And do you have an understanding of what that class would be?**
A. This is on dental care, on follow-up, and mostly on -- on follow-up on getting the dental care that needs to be done, done.
**Q. Okay. And are you aware of anybody in that prospective class regarding inmates who might need dental care that would be a conflict regarding your representation of the class?**
A. No.
**Q. No enemies or anybody that you have issues with in the Department of Corrections?**
**MS. FRENCH:** Objection.
A. No.
**THE WITNESS:** Oh, I'm sorry.
**Q. (By Mr. Rose) You can answer.**
A. Yeah, no, the only enemy I have is -- is, I believe, out on the street; so . . .



**Q. And so I know we talked about -- a little bit about offenders coming from different institutions and you mentioned knowledge of Bonne Terre, JCCC, and then here, MECC. What led you to the belief that dental care issues are happening DOC-wide or statewide?**
A. Mostly from the -- the transfers, other people coming in from -- from Southeast Correctional Center. I think that's Licking. And the fact that the dentists at -- the dentists at Jeff City were traveling to the different facilities -- same dentists were going to the same facility -- different facilities. So it's kind of hard not to believe -- you know, it'd be hard to believe that they're giving these people really good dental care and the hell with us.
**Q. Okay. So you mentioned SECC. So do you have knowledge of other facilities besides Bonne Terre, JCCC, and MECC?**
A. Just what inmates have told me.
**Q. Okay. So do you know what other facilities you have knowledge of based on inmates from those facilities besides the ones we've already discussed?**
A. Yeah, I guess Southeast Correctional Center.
**Q. Any others you can think of?**



A. Not off -- no, not off the top of my head.
**Q. And you may have answered this already, but you haven't had any written correspondence or telephone calls or anything with inmates in other facilities to talk about dental issues?**
A. No.
**Q. Just through transfers that come in and you talk to them?**
A. Yes.
**Q. Do people approach you unsolicited?**
A. When I was the law clerk at Jefferson City, yes.
**Q. Is that because you had a position to where people kind of looked toward you for advice?**
A. Because I was a law clerk, that's where people were instructed to go to, to -- to get information on legal matters.
**Q. Okay. Have you looked over any medical or dental records of other incarcerated individuals, specifically ones that have dental issues?**
A. I haven't looked at their medical records per se, but I have looked at their HSRs. I've helped them fill out HSRs at Jefferson City, and then I did the one for here for Donald Davis. But as far as medical records, most the inmates complained that they



couldn't get their dental records. So I've never seen anybody else's -- anybody else's dental or medical records.
**Q. Okay. And I know you mentioned previously that you kind of, at times, would take a group of individuals to fill out HSRs; is that correct?**
A. No.
**Q. And that's fine if it's not correct. I'm just trying to clarify some information because earlier you mentioned that you either took a group of individuals or you assisted a group of individuals in filling out HSRs?**
A. No.
**Q. So you don't help people fill out HSRs?**
A. No. I -- I -- like my cellie and people that come to -- come to my cell and ask me for help or came to the library, I did.
**Q. That -- that's what I'm asking.**
A. Yeah.
**Q. Yeah. So how many people would you say you've helped fill out HSRs and get referrals?**
A. Over the last five --
**Q. Let's just say in the last two years.**
A. Two years? And that would be after I was a law clerk, but I was still going to the law library

regularly at Jefferson City. Thirty, possibly 40 people, but that included medical and dental.
**Q. How many would you say were dental?**
A. Probably eight.
**Q. In the past two years?**
A. In the -- in the last two years, yes. And then here, one dental HSR. And it's not -- that's not counting the men that I insist -- insisted that they should go and go to dental and -- and get something done.
**Q. And you mentioned another individual. I can't remember his name right now. But you said he was seen fairly quickly, got sutures fairly quickly. Do you -- is that accurate? I can't remember his name.**
A. I didn't give his name. I don't know his name. I called him Snaggletooth. No insult or anything to him or -- but everyone goes by nicknames and -- but I can get those names.
**Q. That's okay. I just wanted to make sure that was accurate, that that's what you said earlier.**
A. Yes. Yes. I had two inmates from my wing that came in, I think the second one was from my wing, but they were -- had sutures in their mouth --
**Q. Okay. And --**



A. -- from dental.
**Q. -- and have you talked to any other offenders related to them getting care faster than you've received care for your issues?**
A. I've asked around, quite a few inmates, and -- and so many of them just don't even want to talk about it because of the bad reputation. But I haven't met -- I probably talked to 15, maybe 16 people -- oh, I'm not even counting my -- my church group. Sorry, I forgot about -- because I actually talk about it in -- in church. I have -- nobody that I've talked to has been called in for routine dental care, and we're talking people that have been here for years.
**Q. Okay. And I'm just asking right now related to, if they have issues and they needed treatment, such as the sutures you mentioned, do you know of anybody receiving care faster than you have received care in the past?**
A. Just the two that I've mentioned.
**Q. Just the two you mentioned.**
A. Yes. This dentist here has a really good reputation.
**Q. Okay. And do you know of any inmates who have been waiting -- specific inmates who have been**



**waiting a significant amount of time specifically for periodontal care?**
A. Well, I would say my current cellie, Donald Davis, that's -- he hasn't received anything other than an initial evaluation from -- from Bonne Terre.
**Q. And do you know what treatment he needs or what symptoms he's having?**
A. Well, he definitely needs some -- some stumps pulled out for two broken teeth. And I really -- I haven't actually examined him. You know, I haven't said, open up. But he's pulled down his lip and showed me the two -- two broken teeth, one on the bottom. And I'm wanting to say the other one's on top, but . . .
**Q. And so besides your cellmate, you don't know of any other offenders specifically?**
A. Not ones that have asked and -- asked for medical care or that med- -- that dental was aware of their problems.
**Q. So you're saying there's some that have not tried to submit a referral because of the reputation you mentioned?**
A. Because of the reputation.
**Q. Okay. So some offenders have issues that need treatment, but they don't want to go to dental?**



A. Right. And it's not -- it's not the standard, you know, being afraid of a dentist thing out in the street. It's -- it's what good does it do?
**Q. Okay. And do you know what kind of treatment they are providing for themselves, if any?**
A. Just -- just forbearing the pain and some at Jefferson City pulled their own teeth, just worked at it a little bit at a time, a little bit at a time, and they felt that was better than going to the dentist.
**Q. And I wanted to ask you about that as well because I remember you mentioned that before. So when you say "pulled their own teeth," how -- what does that process look like? You said --**
A. Oh.
**Q. Go ahead.**
A. I've -- I've never watched somebody else pull their own teeth.
**Q. Okay. So you just know of that happening generally?**
A. Yes.
**Q. Okay. Do you know of any specific inmates who have pulled their own teeth?**
A. Gary Jolley.
**Q. Anybody else?**
A. I had a newspaper article that listed --

listed a fellow, but that was taken, along with most of my paperwork.
**Q. Okay. And I know you mentioned that you haven't actually seen somebody pull their own teeth, but you kind of illustrated how people go a little bit at a time, a little --**
A. That's what they said. Well, I've -- I've watched them work their teeth. I haven't actually seen them pull it out, but I've watched them work their teeth and asked them what they're doing. And that's -- they're -- they're pulling their -- they're getting it loose so they can pull it themselves.
**Q. So you would say they just wiggle their own teeth with their fingers until it comes out?**
A. Yes.
**Q. Okay.**
A. And on Gary Jolley, I think he's been having problems getting dental care over at Jefferson City. I had -- I had notes on him. But, like I said, most of that was taken when I was transferred here.
**Q. And --**
A. I don't suppose you can get -- get my legal files back?
**Q. I actually don't know what you're talking about right now, but we're going to just focus on the**



**dental claims for right now.**
**Did you -- with the exception of extractions, have you received any preventative or restorative dental care during your time at MDOC? And so I'm referring specifically to the time since you've been back in, I believe, 2019, you said?**
A. Yes. No, just extractions.
**Q. So just extractions. And then have you ever been seen, even if it's just for intake appointments or just taking down your name style appointment that -- like you mentioned you had for that intake appointment?**
A. Well, the last time I was over at dental, I went in because I actually had a good mirror, and I could see what I thought was a cavity starting on the eyetooth where the -- well, where the clasp goes on for my dentures. It looked like -- it looked like a cavity.
And so I went over to dental. Kimberly saw me in the waiting room. I went over with an HSR and she says, well, just come on back. And so he put me in the chair and looked and -- and said -- he -- he kind of laughed. He says, that's not a cavity. That's -- and I can't remember what he called it. I recognized the name when he called it. It's like a



calcification, it's -- it's a little -- little bit of a hole, but it's -- it's -- I can't remember the name of it.
But he says, it's not a cavity and it's -- it's firm and it's not going to go anywhere. And that's when the two nurses asked me about the HSRs, told me they were having a problem getting the HSRs for dental care.
**Q. Okay. And in that particular instance, had you put in an HSR or you just --**
A. No, I had it and I went to dental. I mean, went into the tank waiting for -- for sick call.
**Q. So you were getting ready to put in an HSR?**
A. Right.
**Q. But they just said, come on back, we don't need that today?**
A. I think she did, yeah. When she -- she was coming through and she looked -- looked at me and said, Mr. Duvall, what are you doing? And I went, waved -- waved the HSR, and she took me on back.
**Q. Sure. So how often would you say that that -- something like that happens, where you come ready to put in an HSR and they say, just come back here?**
A. I've been in the tank, the waiting room,



probably 20 to 40 times since -- since 2019, when people have been there with dental HSRs and when -- when they would come through for other people -- the -- what I'm trying to say is, because I was in active litigation, it kind of -- it -- they took care of me and -- but it didn't mean that other people got special care. It didn't -- didn't mean that it sped it up for other people.
Typically, when I was in there for other issues and people would say, I've got a dental HSR, and she'd say -- she would say, you have to wait on the nurse, or we've got a waiting list, or -- but I didn't -- I've never seen anybody else taken straight back.
**Q. Okay. So I want to talk about that process a little bit. So you mentioned 20 to 40 times probably since 2019, you have gone to what you described as the tank or the waiting room?**
A. Mm-hmm. Yes.
**Q. With an HSR to put in an HSR to be seen?**
A. Yes. That's for medical also.
**Q. Okay. And how many of those would be dental, do you think?**
A. Well, I don't know. It should be in -- in my medical record -- in the dental records.

A. That -- well, the female technicians there, it was the hygienist. I'm not -- I've -- I've heard different people say they've never had any training, but I think 20 years of being next to a dentist is training, you know. But, yeah, they -- they said that's why teeth weren't being fixed.

**Q. And do you know why they brought this tray to you and started naming the prices of the things on the tray?**

A. Oh, because I had found litigation against one of the dental suppliers -- three of the dental suppliers -- manufacturers in the United States had been hit with a price fixing criminal and civil litigation, Anti-Sherman Act or whatever. And I had found that and I said -- I said -- and I was upset about my then cellie when I was in 3 house, B wing, had went and had a wisdom tooth pulled and they put one suture in his mouth.

And when he came back to the unit and got in the cell, he grabbed my plastic cup and went, bleh, and coughed up a whole mouthful of blood. And I said, are you still bleeding? And he nodded. I said, take this, show it to him at the window and get your butt back up to dental. And I -- he says -- so he did.

And then when he went out the door, he -- I



saw him out the window, fill the cup, dump it. And then when he got almost to medical, it was almost full again that I could see. Two cups of blood. And when he got back, they said that Dr. Jackson -- this is Dr. Jackson that had pulled the tooth, Dr. -- they took eight shots, they did eight injections to get the bleeding to stop. And when he went to put sutures in, that one of the ladies says, you do know you're almost out of sutures; so -- out of suture material; so be conservative. And he said, that's what got us into this. That's -- that was relayed to me by my -- by my cellie. And if he hadn't been a big guy -- he was big. If he hadn't been big, he'd have passed out from blood loss.

**Q. Okay. And is that related to --**

A. Oh, oh, I -- I was -- well, I was -- I was upset when I went to dental and -- and said, hey, I said, you know, I couldn't believe one suture, you -- I said, Dr. Jackson put one suture in my cellie's mouth and he almost bled out. And that's -- and that's when they pulled out the tray and said this is how much this cost and all. So they were basically letting me know that they needed supplies.

And then I heard one -- on one visit get on the phone and call up the hill, the prison just -- you



can see it above Jefferson City Correctional Center. Algoa. Got on the phone and went to the dentist she was helping and said, they said, hell no, they're not lending us any. And I think it was for some kind of pad packs.

**Q. Okay. So your -- just to recap. Your understanding of why they showed you the tray and started talking about the cost of the items is because they needed other equipment, but the prison that is up the street did not want to lend them equipment that they had?**

A. No, no. I'm saying that them and Algoa had so little dental supplies to even do procedures that needed to be done that they wouldn't even -- that Algoa wouldn't even loan them anything. Wouldn't --

**Q. And -- and that's why they were showing you how much everything costs --**

A. On --

**Q. -- because it's easier to extract teeth?**

A. It's cheaper and uses less supplies.

**Q. Okay. And are you familiar with any of the contracts between MDOC and Centurion related to dental care? Other than -- go ahead.**

A. Other than the direct contract with -- with Dr. Jackson's business, no. I had the -- I've -- I've



seen the contracts -- up until June 2nd, I had -- had a lot of the contracts, but I haven't had the contract with Centurion and DOC for dental care. I haven't seen that.

**Q. Okay. So which contracts have you reviewed that you just referenced?**

A. I've reviewed the contracts between -- now, they're old now. This is what, three -- three years ago. The contracts with Dr. Jackson's company, I can't remember what he called it, Correctional Dental Services of whatever. I've -- I've had those and the contracts with two or three of the dentists, but I can't tell you which ones now. I wasn't able to review anything before I came over.

**Q. So in relation to the entire prospective class, in relation to their dental care, what differences would you say you have in what you need as far as dental care goes and what they need as far as dental care goes, if any?**

A. Well, so far my dental cares have been caught up and taken care of, other than the fact that I lost my teeth that shouldn't have been lost.

**Q. And so let me follow up on that. So just -- so at present right now, your dental issues have been taken care -- I understand that you're not satisfied**

**that your teeth were extracted. But at present, you have no dental issues?**
A. At -- at this point, other than having never been cleaned, no, not really.
**Q. So you'd say your only complaint right now is that you haven't had a -- you're not up to date on your cleanings?**
A. Periodontal care, yes.
**Q. That's fair to say?**
A. Yes.
**Q. Okay. Now, throughout the class and since -- since we've just talked about the offenders you know from Bonne Terre, JCCC, and MECC, and then I think one maybe you mentioned from SECC; is that correct?**
A. Yes.
**Q. Okay.**
A. Actually, I talked to several from there, but -- and, like I said, that was at least two years ago.
**Q. Okay. And of that group of individuals from those institutions, what is your understanding of the treatment they need?**
A. They need follow-up, they need evaluation. And so at Bonne Terre, they gave evaluation, but no



follow-up. They're simply not connecting -- they're made aware, they're put in the computer. I'm assuming that the dental records are saying, okay, he's got this cavity and he needs this and -- but they're not doing any follow-up. There's no connection. And they're not doing -- policy requires, I believe it's yearly dental exams.
**Q. And is that DOC policy that you were --**
A. That's DOC policy requires yearly dental exams. And so far here, I haven't met a single person that's had a yearly dental exam, much less a dental exam, unless they put in an HSR and say, I've got this problem. And then what -- what really, really -- I hate to use the word, but what really pissed me off is you go to the dentist, you got a horrible toothache, you can look in a mirror and see the -- see the cavity, and they put their gloves on. The dentist puts his gloves on and he say -- you open your mouth and he says, okay, where's the problem? Point to it. He wants you to tell him where the cavity that you can see is. And God help you if you don't see the other one because they're not going to chart it. Medical and dental here do not document anything.
**Q. And so you're referring to an experience you had before your --**



A. I'm -- yes.
**Q. Okay. Do you know of experiences similar to that with other offenders you've talked to, JCCC, MECC, and Bonne Terre?**
A. Yes.
**Q. Okay. How many would you say?**
A. I didn't count. I can give an example -- I can give an example of Gary Jolley going to dental and then them saying, point to the specific problem area, when, in fact, he needed a lot of work done.
**Q. And when you say "a lot of work done," what --**
A. You could -- you could see the decay in his mouth on different teeth. I actually looked in his mouth because he was a friend of mine. And, you know, it's -- once the dentist looks in your mouth and sees you need three different things done and they never do it.
**Q. Well, and let's talk about Mr. Jolley for a moment. So all the work that he needed, was that -- did that decay over time when he was in MDOC or did he have a lot of issues when he was first incarcerated?**
A. He had issues when he first came in.
**Q. Would you say, like, similar to his -- the messed up mouth that you mentioned?**



A. No, not nearly as bad.
**Q. So what got worse from his time of first being incarcerated and then --**
A. Periodontal disease started developing.
**Q. Can you be more specific on that?**
A. Yeah, where the teeth actually blacken around the base of them and the gums start receding, the tooth starts getting loose.
**Q. Okay. And that's the decay you referred to related to --**
A. There was a couple actual cavities that I could see.
**Q. So you -- in Mr. Jolley's mouth -- you would have him open his mouth for you?**
A. I actually had him open his mouth because I was helping him with -- with litigation.
**Q. Okay. Got it.**
**So if you had the resolution that you wanted -- I understand your problems have been resolved, although not to your liking related to the extractions right now. But if you had the resolution you wanted related to the prospective class, what would that look like for you or what would that look like for the class?**
A. Comprehensive evaluation at intake and then

yearly comprehensive evaluations pursuant to policy. And then follow up on those -- on the evaluations of actually getting the repairs done that need to be done, whether -- whether it's -- it's dentures, fillings. Now, I know there's different rules on root canals and all. And personally, I don't know the rules on root canals, but I think -- I think the teeth need to -- it is -- what do they call that? It is the community practice on the street that if a -- if a natural tooth can be saved, to be saved, and that they need to -- they need to repair teeth that can be repaired.

**Q. So to recap that, if a tooth can be repaired rather than extracted, you would want that?**

A. Of course.

**Q. And then you've talked a lot about the intake examinations. Not really just the intake examinations, but the routine examinations that you believe should occur once a year. Would you say that's probably your number one goal is to get regular routine examinations and preventative care?**

A. I think it's got to be two part. You say number one goal. Yeah, that would be the start. But you'd have to have the follow-up after you have the routine examination and evaluation. And it's the



follow-ups that's -- that's the problem. They're not getting it.

**Q. And when you say "follow-up," you mean if they identify an issue in the routine exam, that you follow up and you correct the issue --**

A. Right. You log it and you say, okay, we're going to get you in, in X amount of days or -- not -- not we're going to wait until -- I think on one tooth they had me come in three different times to say, yep, still got a cavity. Well, you're still on the waiting list. We'll get to you. When they -- when they could have fixed it right then and there instead of -- I called it the look-see dental care. Yep, you still got a cavity.

**Q. So is it fair to say that your goal is treatment that prevents extraction?**

A. Yes, absolutely.

Can I add one thing, when they were showing me the dental supplies?

**Q. Please, go ahead.**

A. I think it was three bits in one pack. And they said that if -- when we open this and all we use is -- is the first drill, it's -- we can't use the other two. Once -- once the package is open, they're done. And so -- because I think I -- I said something



about wouldn't it be easier to fix a small cavity rather than wait until it gets real big? And they were saying it doesn't make any difference on cost because it's all the same tray of material.

**Q. Is that all you wanted to add to that?**

A. Yes, I wanted to add that.

**Q. Now, not just for you, but for the class as well, have you experienced any dental delays related to behavioral issues, security classifications, for example, somebody's in ad seg or something like that?**

A. Not that I know of because I haven't been in ad seg and none of the people that I've talked -- in medical, they pretty much shut it down when they bring somebody from ad seg, whether they're going to medical or dental. So they -- they close the door and they put a drape over the -- they put a magnetic block over the window. So I wouldn't be privy to any of that. And as far as people coming out of the hole, I really don't -- I don't have any information on that.

**Q. So essentially what you're saying, if -- if somebody from ad seg is getting treatment, really no one from ad seg or general population would know because it is --**

A. Well, the other guys in ad seg would know because they -- they holler and tell each other



everything. And plus they know when -- when someone comes to the door, the officer says, all right, your dental appointment. And so they can hear that for several doors.

**Q. And so I guess a better question is, if you're not in ad seg, you would not know that an ad seg --**

A. You wouldn't be privy to it.

**Q. You would just know that they're shutting it down to bring somebody in from ad seg?**

A. Right. That, and protective custody.

**Q. Okay. And so in your experience, behavioral history, disciplinary issues, things like that do not prevent people from getting medical or dental care?**

A. No, not that I know of.

**Q. Any -- any different or any other wait time than any normal, non-disciplinary person would receive it?**

A. I wouldn't know. I really wouldn't. I don't plan on going to the hole to find out.

**Q. And based on the facilities that we've talked about -- so, again, like Bonne Terre, JCCC, MECC -- do you believe that those individual facilities have different, whether formal or informal, policies on how they handle dental treatment?**

was in October. The day after Christmas, Dr. Lane, the optometrist, comes in. They send me a pass, which I -- I didn't believe was a real one for the 26th, to be honest. But I go up there, he says, have a seat. And he pulls the file and he says, boy, it has been a long time since you got glasses. It is time for you to have new glasses.

And I said, Doctor, do you know why I'm here? He says, well, to get new glasses. And I said, I went partially blind in my right eye. And his jaw opened. And when did this happen? I says -- and I knew the date then. I've got it written down on the HSR. Oh, he was pissed. He was pissed. But, you know, I've never seen medical on it, just optometrist. And then they sent me to an ophthalmologist at the university.

And we can't see why, we can't see anything like that. But, you know, we don't -- we don't disbelieve you that you've gone partially blind. But I haven't had an x-ray or -- or nothing. I haven't been seen by medical over it. And both the optometrist and the doctor said that I needed to have my blood sugar -- sugar monitored for a while and my blood pressure monitored for a while. And I -- I told the optometrist -- I told the doctor, the optometrist,



I said, I hadn't had my blood meds for -- blood pressure meds for two months. And then when they sent me to the ophthalmologist at the university at the end of May, I'm wanting to say May 20th something, he said, be sure to get your -- I want your blood sugar checked and your blood pressure checked. And I said, well, I've gone another two months without my blood pressure meds.

So I've gotten here and it's been since the day after Christmas, and I still haven't had a finger stick.

**Q. We'll move on to different topic --**

A. Sorry.

**Q. -- even though I -- I know, definitely fresh on your mind about problems with HSRs.**

**In this case, we have talked about -- I think you called them annual exams. I may call them comprehensive examinations. If I use that term, do you understand what I'm talking about?**

A. Yes.

**Q. Okay.**

A. Absolutely, yeah.

**Q. Have you ever had any comprehensive examination of your teeth while you're in Missouri DOC facilities?**



A. Just -- just from Dr. Teubner -- Teubner.

**Q. And that's when you were coming in with a specific problem. Have you ever had -- been brought in just to have a cleaning and x-rays and periodontal probing?**

A. No. No.

**Q. So you've never had any periodontal screening done?**

A. No.

**Q. Have you ever heard of anyone having any periodontal screening done?**

A. No. And I've asked a lot of people.

**Q. You -- I believe you testified earlier that you don't have any current issues. Would be the -- the correct way to talk about that to say that you have no pain at this moment from any -- in any dental areas?**

A. Not from the dental areas. From the jaw pain.

**Q. So there could be issues with your teeth that are not resulting in pain, you just wouldn't know because you haven't been examined; is that correct?**

A. Could be, yes.

**Q. I think Mr. Rose already covered this, but when you were talking about the problems with**



**follow-up, I just want to confirm that what you meant is that once patients are triaged and diagnosed with a problem, you think that there is a problem that they are then not scheduled and treated for those issues; is that correct?**

A. Yes.

**Q. Would it be accurate to say that part of your complaint is about timely access to treatment?**

A. Absolutely.

**Q. You also had mentioned one of your complaints being that you would go into the dentist and they would have you point to teeth. Would it be accurate to say that part of the problem is dentists relying on self-diagnosis of pain, but not doing examinations to use their clinical judgment to diagnose?**

A. Yes.

**Q. There were discussions about notifying dental and Dr. Jackson about your dental issues. Does the Missouri Department of Correction have ultimate responsibility for the custody of those housed in their facilities?**

A. Yes.

**MS. FRENCH:** I think that's all my -- oh, yeah, that's all my questions.