DEFENDANT'S EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
OF THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| JOHN C. DUVALL, Plaintiff, vs. EARL D. SCOTT, ET AL., Defendants. | Case No. 2:23-04160-CV-SRB-P |

THE DEPOSITION OF JOHN C. DUVALL

Taken on behalf of Defendants

October 21, 2026

9:00 A.M.

CERTIFIED TRANSCRIPT

I N D E X

WITNESS: JOHN C. DUVALL

Examination By Mr. Rose ........................5
Examination By Ms. French .....................76
Examination By Mr. Rose .......................90
Examination By Ms. French .....................94

* * * * *

E X H I B I T S

There were no exhibits marked in this deposition.



IN THE UNITED STATES DISTRICT COURT
OF THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

JOHN C. DUVALL, )
Plaintiff, )
vs. ) Case No. 2:23-04160-CV-SRB-P
EARL D. SCOTT, ET AL., )
Defendants. )

THE DEPOSITION OF JOHN C. DUVALL, on the 21st day of October, 2026, between 8:00 a.m. and 5:00 p.m. of that day, at Missouri Eastern Correctional Center, 18701 Old Highway 66, Pacific, Missouri 63069, before Rebecca L. Tuggle, a Certified Court Reporter within and for the State of Missouri, in the above-styled certain cause now pending In The United States District Court of the Western District of Missouri, Central Division; on behalf of the Defendants.



APPEARANCES OF COUNSEL:

The Plaintiff was represented by:

Ms. Ruth Anne French, Esq.
Sharp Law
4820 West 75th Street
Prairie Village, KS 66208
(913) 901-0505
rafrench@midwest-law.com

The Defendants Boeger and Foley were represented by:

Mr. Michael Rose, Esq.
Mr. Adam J. Merello, Esq.
Assistant Attorney Generals
615 E. 13th Street, Suite 401
Kansas City, MO 64106
(816) 889-5008
michael.rose@ago.mo.gov

The Defendant Centurion of Missouri was represented by:

Mr. Slater G. Felzien, Esq.
Sandberg Phoenix
701 Market Street, Suite 600
St. Louis, MO 63101
(314) 577-4876
sfelzien@sandbergphoenix.com



JOHN C. DUVALL,
of lawful age, being first duly sworn to tell the truth, the whole truth and nothing but the truth, deposes and says on behalf of the Defendants, as follows:

**EXAMINATION**
**QUESTIONS BY MR. ROSE:**

**Q. Good morning, Mr. Duvall. So I'm Mike Rose. I'm with the Attorney General's Office. I know that we met previously off the record, but I just wanted to go over a few things before we get started here today.**
**So have you ever been deposed before?**
A. Oh, yes.
**Q. Okay. So this isn't your first deposition. Are you familiar with kind of the rules that govern depositions?**
A. Yes.
**Q. Okay. So just to go through those real quickly, you understand that for the court reporter, it's better to talk a little slower. It's better to use full answers, complete answers, "yes" or "no."**
**You understand that?**
A. Yes.
**Q. No "mm-hmm, hmm-hmm," things like that.**
A. Yes.

Page 26

teeth. And he paused. And then he said, if we -- if we were outside at private practice, I would fix it.
**Q. And when Dr. Paskar mentioned that all he does is pull teeth, did he say anything else about he feels like that's all he does is pull teeth or his only job is to put pull teeth? Did he say --**
A. No, he didn't say anything about feelings or anything. He says, all I do is pull teeth. And so we had a pretty good -- we had a conversation about pulling the teeth. And I said -- I said, why do you just pull teeth? He says, I'm very good at it. Because I'm very good at it. Oh, no, I -- I described where my wisdom teeth were a four-hour battle for one tooth. And he says, I'm very good at pulling teeth and that's all I do.
**Q. So from your perspective, did you take that to mean his only job there was to pull teeth or that he just only pulled teeth because that was --**
A. No, from my perspective, it was his only job because he wasn't allowed to fix teeth.
**Q. I think for now that takes care of my questions related to your personal dental issues.**
**So when was the first time that you became aware that other incarcerated individuals, other offenders might be experiencing some similar dental**

Page 27

**issues to yourself?**
A. I'm sorry. In the waiting room, in the wings, we would have people with -- with -- they were pulling their own teeth because dental wasn't taking care of them, literally. I'll give you an example of currently, if I may?
My cellie, Donald Davis, he just came from Bonne Terre, he went into the dentist office, he says, oh, you have broken teeth. And that was eight months ago. He's transferred here, nothing happens. His mouth is a complete, absolute mess. And they -- so I finally convinced him three weeks ago to put an HSR in to see the dentist. And he was promptly seen, I think within four days, four or five days. And the dentist looked at him and said, I'll get back with you.
It's so ingrained in here. I took three inmates in my wing on unit 1, C wing, and I said, now's the time. We're working on a class action to get your teeth fixed. Oh, hell no, we're not going to dental because all they do is pull your teeth. They don't do anything. They wait until they're rotted out; so what difference does it make whether you go?
**Q. That's what the other offenders were saying?**
A. That's what other offenders -- this is -- this is currently now. It was much worse back in

Page 28

2022.
**Q. So you would say conditions have improved related to dental since 2022?**
A. Some. Some. But they're not doing follow-up and they're not doing cleanings. I have -- I had another fellow, Robert Buck, who's been down six or eight years and has never been -- up until last month had never been called to dental for cleaning, examination, nothing. In other words, unless you're complaining about pain, it's sorry.
**Q. And you previously referenced some things had improved. What are the things that have improved?**
A. Well, improved for me as far as getting in and seeing them and getting my dentures. Oh, well, on the three guys -- the -- well, I'll say two, I can -- I know who they are. I can't tell you their names, but they're on my wing. They came back last week, I -- I talked them into going to the dentist and they did extract enough teeth, but they both came back with sutures and they did oral surgeries that day; so -- which before, you couldn't get them -- you know, the mindset is, we're not going to the dentist because that's all they do is pull teeth and give you a box of Ibuprofen and say, there you go.
**Q. So to kind of recap what you said, in your**

Page 29

**experience, since 2022 until now, they are faster to see you and then faster to repair?**
A. At this facility.
**Q. So just at MECC?**
A. And I've only been here since June 2nd. At Jefferson City, they are still not. The -- the -- you go to -- go to sick call. And I've been in the -- they call it the sick call tank, where there's 30 to 40 inmates with HSRs. And the nurse comes out and says, we're not -- I'm not taking sick calls today, HSRs today, come back tomorrow, try it tomorrow.
Then the other issue over at Jefferson City is, when they do take the HSR, the last time I was in the dentist office over there, which was -- let's say it was less than a year ago, and both dental technicians came over to the chair and said, they're -- they're aware of the litigation and they wanted to know if there was anything that -- that our lawyers could do to make sure that they get the dental HSRs because when they've been collecting them, they've been disappearing. Now, they're scanned into a system, supposed to be. But then when they were putting the HSRs -- when you put the HSRs in the box, the box -- a huge mailbox would be completely full of HSRs and never emptied. And that took three weeks.

**communicate by mail?**
A. Not very often. Just -- let's see. It was more often when I was over at Jefferson City. So I really -- there's -- there's a mail log at Jefferson City for legal mail.
**Q. That's fine. I just wanted to see if you had a general idea of how often you --**
A. Well, the problem is, is last October, I had a mild stroke. And that's why I'm going to say I'm not exact on dates and on -- on the tooth. And it took me several months to feel like I'm almost back to normal, other than going partially blind in my right eye.
**Q. Okay. So let's talk about the stroke then for just a minute. So you said getting back to normal. What was it like when you were not close to getting back to normal.**
A. Psychologically, I was angry. Really, the slightest thing. I -- I would wake up mad, wake up almost in a rage. And then I would -- and my cellie would say, John, John. And I would realize, I'd have to say to myself, that's not me, that's not me. That's the stroke. That's not me. And I worked as a physical therapy assistant for -- for a while and was trained and I worked nursing and hospice, which helped



me recognize. But, like I said, other than the blindness -- now, last Saturday, I was slurring my speech pretty hard, but it's -- it's infrequent. And as long as I'm on my blood pressure meds, I'm -- I'm good.
**Q. So the blood pressure medication is what helps you kind of manage those -- those symptoms of the stroke?**
A. Well, the blood pressure meds is what was keeping me from having the stroke, and then I didn't get them for two months.
**Q. And when you say you didn't get them, you had a prescription in --**
A. I had a prescription, and they just simply don't refill them. Like right now, I don't have my -- I don't have my Prilosec. My cellie doesn't have his Prilosec. Jason Crawford doesn't have his Prilosec. And then when we put in HSRs and they go, okay, you're good, we're going to renew them, we don't see them. And then we turn around and we -- and I have the documents from other -- from the other inmate, from Jason Crawford, where we put the sticker on the refill because they said it was -- you know, and they pulled the sticker off and wrote, this is not how you renew prescriptions. Don't -- I've got that, I'll give you



a copy, I just got it yesterday. We're back to running out of meds for a month or two at a time for who knows how many inmates.
**Q. And so they were saying you were filling out the HSRs incorrectly?**
A. No, no. You have a ren- -- you have a medication renewal for existing prescriptions, then you have an HSR to renew the prescription. We -- we do the HSR to renew. Never hear back from them. And then we go ahead and put the sticker on and put it in the refill box and -- they sent Jason's back. I haven't heard a thing. I mean, the doctor during telemed says, okay, I'm renewing -- renewing your Prilosec and the enteric aspirin and one other thing, but -- and that's been four or five weeks ago now.
**Q. And so you previously mentioned on -- on one of them, I don't know which one it was, that you said that the staff told you, no, that's the wrong way to do it?**
A. No, no, no. They wrote it on the refill slip -- the refill slip. And I have that and I'll -- I'll get it to the office.
**Q. And so when you say they wrote it on the refill slip, were they rejecting a refill? Were they -- I don't understand what you mean.**



A. Yeah, they actually peel -- peeled the -- the medication sticker off, which has the -- the digital code on it. They peeled it off and then they wrote on there, this is not how you renew medications.
**Q. So physically, like, on your pill bottle?**
A. No. It's -- it's -- it's a flat card with blister pack. It's a flat blister pack.
**Q. Okay.**
A. And it's got an adhesive sticker on the top. You peel off part of it and put it on a half sheet of paper that's for -- for refills.
**Q. I think I understand.**
A. And then you put it in the box and you go, you put your hands together and pray.
**Q. Okay. And why do you do that?**
A. Hope you get them.
**Q. Because sometimes you don't?**
A. Because a lot of times you don't.
**Q. Okay. And, again, I don't want to discuss anything that you've personally discussed with your attorneys, but are you generally aware of your duties as a class representative if this would be -- if this were to be certified as a class?**
A. Actually, I was sent a description of it, and to be honest, I didn't read it.

regularly at Jefferson City. Thirty, possibly 40 people, but that included medical and dental.
**Q. How many would you say were dental?**
A. Probably eight.
**Q. In the past two years?**
A. In the -- in the last two years, yes. And then here, one dental HSR. And it's not -- that's not counting the men that I insist -- insisted that they should go and go to dental and -- and get something done.
**Q. And you mentioned another individual. I can't remember his name right now. But you said he was seen fairly quickly, got sutures fairly quickly. Do you -- is that accurate? I can't remember his name.**
A. I didn't give his name. I don't know his name. I called him Snaggletooth. No insult or anything to him or -- but everyone goes by nicknames and -- but I can get those names.
**Q. That's okay. I just wanted to make sure that was accurate, that that's what you said earlier.**
A. Yes. Yes. I had two inmates from my wing that came in, I think the second one was from my wing, but they were -- had sutures in their mouth --
**Q. Okay. And --**



A. -- from dental.
**Q. -- and have you talked to any other offenders related to them getting care faster than you've received care for your issues?**
A. I've asked around, quite a few inmates, and -- and so many of them just don't even want to talk about it because of the bad reputation. But I haven't met -- I probably talked to 15, maybe 16 people -- oh, I'm not even counting my -- my church group. Sorry, I forgot about -- because I actually talk about it in -- in church. I have -- nobody that I've talked to has been called in for routine dental care, and we're talking people that have been here for years.
**Q. Okay. And I'm just asking right now related to, if they have issues and they needed treatment, such as the sutures you mentioned, do you know of anybody receiving care faster than you have received care in the past?**
A. Just the two that I've mentioned.
**Q. Just the two you mentioned.**
A. Yes. This dentist here has a really good reputation.
**Q. Okay. And do you know of any inmates who have been waiting -- specific inmates who have been**



**waiting a significant amount of time specifically for periodontal care?**
A. Well, I would say my current cellie, Donald Davis, that's -- he hasn't received anything other than an initial evaluation from -- from Bonne Terre.
**Q. And do you know what treatment he needs or what symptoms he's having?**
A. Well, he definitely needs some -- some stumps pulled out for two broken teeth. And I really -- I haven't actually examined him. You know, I haven't said, open up. But he's pulled down his lip and showed me the two -- two broken teeth, one on the bottom. And I'm wanting to say the other one's on top, but . . .
**Q. And so besides your cellmate, you don't know of any other offenders specifically?**
A. Not ones that have asked and -- asked for medical care or that med- -- that dental was aware of their problems.
**Q. So you're saying there's some that have not tried to submit a referral because of the reputation you mentioned?**
A. Because of the reputation.
**Q. Okay. So some offenders have issues that need treatment, but they don't want to go to dental?**



A. Right. And it's not -- it's not the standard, you know, being afraid of a dentist thing out in the street. It's -- it's what good does it do?
**Q. Okay. And do you know what kind of treatment they are providing for themselves, if any?**
A. Just -- just forbearing the pain and some at Jefferson City pulled their own teeth, just worked at it a little bit at a time, a little bit at a time, and they felt that was better than going to the dentist.
**Q. And I wanted to ask you about that as well because I remember you mentioned that before. So when you say "pulled their own teeth," how -- what does that process look like? You said --**
A. Oh.
**Q. Go ahead.**
A. I've -- I've never watched somebody else pull their own teeth.
**Q. Okay. So you just know of that happening generally?**
A. Yes.
**Q. Okay. Do you know of any specific inmates who have pulled their own teeth?**
A. Gary Jolley.
**Q. Anybody else?**
A. I had a newspaper article that listed --

A. That -- well, the female technicians there, it was the hygienist. I'm not -- I've -- I've heard different people say they've never had any training, but I think 20 years of being next to a dentist is training, you know. But, yeah, they -- they said that's why teeth weren't being fixed.

**Q. And do you know why they brought this tray to you and started naming the prices of the things on the tray?**

A. Oh, because I had found litigation against one of the dental suppliers -- three of the dental suppliers -- manufacturers in the United States had been hit with a price fixing criminal and civil litigation, Anti-Sherman Act or whatever. And I had found that and I said -- I said -- and I was upset about my then cellie when I was in 3 house, B wing, had went and had a wisdom tooth pulled and they put one suture in his mouth.

And when he came back to the unit and got in the cell, he grabbed my plastic cup and went, bleh, and coughed up a whole mouthful of blood. And I said, are you still bleeding? And he nodded. I said, take this, show it to him at the window and get your butt back up to dental. And I -- he says -- so he did.

And then when he went out the door, he -- I



saw him out the window, fill the cup, dump it. And then when he got almost to medical, it was almost full again that I could see. Two cups of blood. And when he got back, they said that Dr. Jackson -- this is Dr. Jackson that had pulled the tooth, Dr. -- they took eight shots, they did eight injections to get the bleeding to stop. And when he went to put sutures in, that one of the ladies says, you do know you're almost out of sutures; so -- out of suture material; so be conservative. And he said, that's what got us into this. That's -- that was relayed to me by my -- by my cellie. And if he hadn't been a big guy -- he was big. If he hadn't been big, he'd have passed out from blood loss.

**Q. Okay. And is that related to --**

A. Oh, oh, I -- I was -- well, I was -- I was upset when I went to dental and -- and said, hey, I said, you know, I couldn't believe one suture, you -- I said, Dr. Jackson put one suture in my cellie's mouth and he almost bled out. And that's -- and that's when they pulled out the tray and said this is how much this cost and all. So they were basically letting me know that they needed supplies.

And then I heard one -- on one visit get on the phone and call up the hill, the prison just -- you



can see it above Jefferson City Correctional Center. Algoa. Got on the phone and went to the dentist she was helping and said, they said, hell no, they're not lending us any. And I think it was for some kind of pad packs.

**Q. Okay. So your -- just to recap. Your understanding of why they showed you the tray and started talking about the cost of the items is because they needed other equipment, but the prison that is up the street did not want to lend them equipment that they had?**

A. No, no. I'm saying that them and Algoa had so little dental supplies to even do procedures that needed to be done that they wouldn't even -- that Algoa wouldn't even loan them anything. Wouldn't --

**Q. And -- and that's why they were showing you how much everything costs --**

A. On --

**Q. -- because it's easier to extract teeth?**

A. It's cheaper and uses less supplies.

**Q. Okay. And are you familiar with any of the contracts between MDOC and Centurion related to dental care? Other than -- go ahead.**

A. Other than the direct contract with -- with Dr. Jackson's business, no. I had the -- I've -- I've



seen the contracts -- up until June 2nd, I had -- had a lot of the contracts, but I haven't had the contract with Centurion and DOC for dental care. I haven't seen that.

**Q. Okay. So which contracts have you reviewed that you just referenced?**

A. I've reviewed the contracts between -- now, they're old now. This is what, three -- three years ago. The contracts with Dr. Jackson's company, I can't remember what he called it, Correctional Dental Services of whatever. I've -- I've had those and the contracts with two or three of the dentists, but I can't tell you which ones now. I wasn't able to review anything before I came over.

**Q. So in relation to the entire prospective class, in relation to their dental care, what differences would you say you have in what you need as far as dental care goes and what they need as far as dental care goes, if any?**

A. Well, so far my dental cares have been caught up and taken care of, other than the fact that I lost my teeth that shouldn't have been lost.

**Q. And so let me follow up on that. So just -- so at present right now, your dental issues have been taken care -- I understand that you're not satisfied**

**that your teeth were extracted. But at present, you have no dental issues?**
A. At -- at this point, other than having never been cleaned, no, not really.
**Q. So you'd say your only complaint right now is that you haven't had a -- you're not up to date on your cleanings?**
A. Periodontal care, yes.
**Q. That's fair to say?**
A. Yes.
**Q. Okay. Now, throughout the class and since -- since we've just talked about the offenders you know from Bonne Terre, JCCC, and MECC, and then I think one maybe you mentioned from SECC; is that correct?**
A. Yes.
**Q. Okay.**
A. Actually, I talked to several from there, but -- and, like I said, that was at least two years ago.
**Q. Okay. And of that group of individuals from those institutions, what is your understanding of the treatment they need?**
A. They need follow-up, they need evaluation. And so at Bonne Terre, they gave evaluation, but no



follow-up. They're simply not connecting -- they're made aware, they're put in the computer. I'm assuming that the dental records are saying, okay, he's got this cavity and he needs this and -- but they're not doing any follow-up. There's no connection. And they're not doing -- policy requires, I believe it's yearly dental exams.
**Q. And is that DOC policy that you were --**
A. That's DOC policy requires yearly dental exams. And so far here, I haven't met a single person that's had a yearly dental exam, much less a dental exam, unless they put in an HSR and say, I've got this problem. And then what -- what really, really -- I hate to use the word, but what really pissed me off is you go to the dentist, you got a horrible toothache, you can look in a mirror and see the -- see the cavity, and they put their gloves on. The dentist puts his gloves on and he say -- you open your mouth and he says, okay, where's the problem? Point to it. He wants you to tell him where the cavity that you can see is. And God help you if you don't see the other one because they're not going to chart it. Medical and dental here do not document anything.
**Q. And so you're referring to an experience you had before your --**



A. I'm -- yes.
**Q. Okay. Do you know of experiences similar to that with other offenders you've talked to, JCCC, MECC, and Bonne Terre?**
A. Yes.
**Q. Okay. How many would you say?**
A. I didn't count. I can give an example -- I can give an example of Gary Jolley going to dental and then them saying, point to the specific problem area, when, in fact, he needed a lot of work done.
**Q. And when you say "a lot of work done," what --**
A. You could -- you could see the decay in his mouth on different teeth. I actually looked in his mouth because he was a friend of mine. And, you know, it's -- once the dentist looks in your mouth and sees you need three different things done and they never do it.
**Q. Well, and let's talk about Mr. Jolley for a moment. So all the work that he needed, was that -- did that decay over time when he was in MDOC or did he have a lot of issues when he was first incarcerated?**
A. He had issues when he first came in.
**Q. Would you say, like, similar to his -- the messed up mouth that you mentioned?**



A. No, not nearly as bad.
**Q. So what got worse from his time of first being incarcerated and then --**
A. Periodontal disease started developing.
**Q. Can you be more specific on that?**
A. Yeah, where the teeth actually blacken around the base of them and the gums start receding, the tooth starts getting loose.
**Q. Okay. And that's the decay you referred to related to --**
A. There was a couple actual cavities that I could see.
**Q. So you -- in Mr. Jolley's mouth -- you would have him open his mouth for you?**
A. I actually had him open his mouth because I was helping him with -- with litigation.
**Q. Okay. Got it.**
**So if you had the resolution that you wanted -- I understand your problems have been resolved, although not to your liking related to the extractions right now. But if you had the resolution you wanted related to the prospective class, what would that look like for you or what would that look like for the class?**
A. Comprehensive evaluation at intake and then

yearly comprehensive evaluations pursuant to policy. And then follow up on those -- on the evaluations of actually getting the repairs done that need to be done, whether -- whether it's -- it's dentures, fillings. Now, I know there's different rules on root canals and all. And personally, I don't know the rules on root canals, but I think -- I think the teeth need to -- it is -- what do they call that? It is the community practice on the street that if a -- if a natural tooth can be saved, to be saved, and that they need to -- they need to repair teeth that can be repaired.

**Q. So to recap that, if a tooth can be repaired rather than extracted, you would want that?**

A. Of course.

**Q. And then you've talked a lot about the intake examinations. Not really just the intake examinations, but the routine examinations that you believe should occur once a year. Would you say that's probably your number one goal is to get regular routine examinations and preventative care?**

A. I think it's got to be two part. You say number one goal. Yeah, that would be the start. But you'd have to have the follow-up after you have the routine examination and evaluation. And it's the



follow-ups that's -- that's the problem. They're not getting it.

**Q. And when you say "follow-up," you mean if they identify an issue in the routine exam, that you follow up and you correct the issue --**

A. Right. You log it and you say, okay, we're going to get you in, in X amount of days or -- not -- not we're going to wait until -- I think on one tooth they had me come in three different times to say, yep, still got a cavity. Well, you're still on the waiting list. We'll get to you. When they -- when they could have fixed it right then and there instead of -- I called it the look-see dental care. Yep, you still got a cavity.

**Q. So is it fair to say that your goal is treatment that prevents extraction?**

A. Yes, absolutely.

Can I add one thing, when they were showing me the dental supplies?

**Q. Please, go ahead.**

A. I think it was three bits in one pack. And they said that if -- when we open this and all we use is -- is the first drill, it's -- we can't use the other two. Once -- once the package is open, they're done. And so -- because I think I -- I said something



about wouldn't it be easier to fix a small cavity rather than wait until it gets real big? And they were saying it doesn't make any difference on cost because it's all the same tray of material.

**Q. Is that all you wanted to add to that?**

A. Yes, I wanted to add that.

**Q. Now, not just for you, but for the class as well, have you experienced any dental delays related to behavioral issues, security classifications, for example, somebody's in ad seg or something like that?**

A. Not that I know of because I haven't been in ad seg and none of the people that I've talked -- in medical, they pretty much shut it down when they bring somebody from ad seg, whether they're going to medical or dental. So they -- they close the door and they put a drape over the -- they put a magnetic block over the window. So I wouldn't be privy to any of that. And as far as people coming out of the hole, I really don't -- I don't have any information on that.

**Q. So essentially what you're saying, if -- if somebody from ad seg is getting treatment, really no one from ad seg or general population would know because it is --**

A. Well, the other guys in ad seg would know because they -- they holler and tell each other



everything. And plus they know when -- when someone comes to the door, the officer says, all right, your dental appointment. And so they can hear that for several doors.

**Q. And so I guess a better question is, if you're not in ad seg, you would not know that an ad seg --**

A. You wouldn't be privy to it.

**Q. You would just know that they're shutting it down to bring somebody in from ad seg?**

A. Right. That, and protective custody.

**Q. Okay. And so in your experience, behavioral history, disciplinary issues, things like that do not prevent people from getting medical or dental care?**

A. No, not that I know of.

**Q. Any -- any different or any other wait time than any normal, non-disciplinary person would receive it?**

A. I wouldn't know. I really wouldn't. I don't plan on going to the hole to find out.

**Q. And based on the facilities that we've talked about -- so, again, like Bonne Terre, JCCC, MECC -- do you believe that those individual facilities have different, whether formal or informal, policies on how they handle dental treatment?**

A. I haven't looked at the SOPs here, but I can't imagine why they would have different policies or practices because the national standards cover -- cover the -- what needs to be done, what should be done.
**Q. And that's fine. And I was just kind of curious, as you mentioned, with that HSR thing where they kind of took you back immediately, I was wondering if, for example, this is a hypothetical, maybe at JCCC, they would say, oh, Mr. Duvall, we know you, come on back. But here at MECC, they might say, well, we don't know you well enough; so you're going to have to wait. Something like that.**
A. I don't know.
**Q. That's fine.**
A. I don't think anybody in medical is -- is aware of the litigation here because if they were, I think I would have gotten my Prilosec. Well, although it didn't help me get my blood pressure medicine last fall.
**Q. Okay. And so now I want to talk about damages a little bit. So you're seeking both individual damages and then class-wide injunctive relief. So how do you see your personal damage claims relating to the interests of the class as a whole --**



**of the prospective class as a whole?**
A. I'm sorry --
**MR. MERELLO:** Mike, can we go off the record for a minute?
**MR. ROSE:** Can we go off the record for a moment?
(Whereupon, a short break was taken.)
**Q. (By Mr. Rose) Okay. We're back on the record, Mr. Duvall. And before we went off the record for a break, I asked you a question regarding individual damages and then class-wide injunctive relief. Just disregard that question. That's something that we've covered a lot about today and we don't need to go over that.**
**So, again, related to the class, are you aware of any risks related to you personally that would affect the class as a whole?**
A. No.
**Q. And how would you plan to communicate or consult with class members if a class is certified and some kind of settlement is reached?**
A. That would be through -- through the attorney's office.
**Q. So you'll go through your attorneys for that? Is that a "yes"?**



A. Yes. I'm sorry.
**Q. So related to grievances, IRRs, what ultimately led you to file this lawsuit as opposed to continue seeking relief through grievances or IRRs or the grievance process, in general?**
A. Well, now, I had exhausted the grievance initially where Dr. Jackson said he was going -- going to see me and -- and then never got it. And I'm not sure on the timing of filing the lawsuit itself. I think I pretty much had to file a lawsuit to get anything done, didn't I? Well, I'm sorry. I didn't mean to phrase that in the form of a question. The fact -- the fact of the matter was, is I wasn't getting the -- the dental care.
**Q. And that final -- I don't have the exact grievance or the grievance number in front of me, but it was that final grievance that you filed before filing the lawsuit, which I believe would have been in 2023; correct?**
A. I -- I couldn't tell you because those were attached to my files.
**Q. But it was the one related to, you said, Dr. Jackson, not --**
A. Dr. Jackson where he specifically said that -- he answered it and said that I'll take care of



this, or something like that.
**Q. And -- you can go ahead if you have more to say.**
A. No, he said he -- he was going to see me and -- and never did.
**Q. Okay. And Dr. Jackson is a Centurion dentist?**
A. He's contracted to Centurion, or was. I -- that relationship may be different now. I don't know since the last couple years.
**Q. So when you say contracted through Centurion, I mean, your understanding is he works for Centurion and Centurion pays him?**
A. Yes, that's my understanding.
**Q. Okay. And then so related to that final grievance, you wanted treatment from Dr. Jackson?**
A. I wanted treatment, period.
**Q. Fair.**
**And related -- related to that grievance, did you ask MDOC personnel to do anything specifically or was it just related to Dr. Jackson?**
A. I wouldn't ask DOC anything for dental issues, just strictly through the HSR's, grievances, and -- and to them personally.
**Q. And that's -- and that's why you named Dr.**

**Jackson and the Centurion personnel in that particular --**
A. Right. Right.
**Q. Okay.**
A. Because -- because it was so consistent, it had to have been policy and practice.
**Q. And related to this lawsuit, I know you mentioned you've talked to a few other inmates just about it in general, have you received any feedback from them on -- or encouragement from them related to this?**
A. No, no, not that I'm aware of.
**Q. Do you understand what it means to act in the best interests of the class?**
A. Yeah. Yeah, it's -- it's to -- for their benefit.
**Q. Okay. If you felt your interests conflicted with the class, would you be willing to step aside as a class representative if it came down to that?**
A. Absolutely.
**Q. Are you currently in the midst of any disciplinary issues or restrictions here at MECC that would hinder your performance as a class representative?**
A. No.



**Q. So I know you mentioned earlier something about your legal files were seized?**
A. Yes.
**Q. Can you describe that just briefly?**
A. Originally -- I'm sorry. Let's see, I believe I got here June 2nd -- June 2nd. Prior to that, they had packed me up -- told me to pack my stuff. And I had two large boxes and three medium-sized postal flat rate boxes with legal documents in it. And when I took my property up there, I told the property officer, I don't know her name, she's a young, thin, black girl, I said, now -- I said, you do know it's unlawful -- a violation of state law to ship me while I have a habeas corpus pending in -- in Cole County.
I hate -- I hate repeating stuff verbatim. But she says, well, in that case, I'll just call you and you can come get your fucking stuff in a couple hours. Then she was laughing. She was actually joking. Well, two hours later, she called me to come and get my stuff. And my two big boxes had shipping labels on them to here, to MECC, box 1 of -- 1 and 1 of 2, but my small boxes were missing.
Well, when I raised a stink, they had them and I got them. And she says -- she says, I'll be



damned, I got on the computer and found out you weren't lying about your habeas. And I called CTA and they said, cancel the -- the move. So I went back, I wrote the Attorney General's Office, the female on one of the lawsuits, on one of the habeas. And I said, they just tried to transfer me and keep my files and this crap better not happen again.
So then when they had me pack up again, when I got here, they didn't let us have our property for the first two days. And when I went to go get my property, they said, well, you're limited to two containers. You can't have your third one unless you trade stuff out, which was not true.
Bottom line is, is when I got my property, all my current litigat- -- federal litigation, everything that has to do with federal litigation, except for with Centurion, the -- and what -- my actual federal files, my Centurion lawsuit from state court was still -- everything from state court was still in my files. But it was pretty obvious that an attorney had went through all of my files and pulled everything that could be used against DOC out of it. My affidavits, my summaries. My -- I had three lawsuits that was already drafted, ready for filing with exhibits and the grievances attached to them.



All I needed to do was photocopy them and -- and wait until I could get to filing them.
But they took all my litigation files, like I said, except for my two state habeas and an old Callaway County lawsuit file, which I think if they'd have recognized it was actually against a DOC employee, that might have took it. But -- but they -- somebody went through my file folders because I had everything labeled with my name on it, nicely done. And -- and took all of -- went through them and took everything specific to federal litigation against DOC.
**Q. Okay. And kind of a long road to get here, but the reason I'm asking is because I wanted to ask if you have access to documents for this case? Do you have access to the documents that you need for this case?**
A. I -- I have the -- I have the complaint, the current complaint right now. But as far as the other documents, just about everything was taken. Everything that's been filed in court was taken.
**Q. Okay. Are you confident that working through your attorneys or through MDOC, that you can have the documents needed for this case at your disposal?**
A. Yeah, except for the -- the medical records